1                UNITED STATES DISTRICT COURT
                  DISTRICT OF MINNESOTA
2

3   -------------------------------------------------------------
                          )
   United States of America,    )  File No. 15-284
4                        )      (DWF/SER)
        Plaintiff,        )
5                        )
   vs.                    )  St. Paul, Minnesota
6                        )  January 20, 2016
                        )  9:27 a.m.
7   Thomas Robert Page,       )
                        )
8        Defendant.       )
   -------------------------------------------------------------
9

                BEFORE THE HONORABLE
10                STEVEN E. RAU
     UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
11              **(MOTION HEARING)**

12   <u>APPEARANCES</u>
    For the Plaintiff:        UNITED STATES ATTORNEY'S OFFICE
13                        Manda M. Sertich, AUSA
                        600 U.S. Courthouse
14                        300 South Fourth Street
                        Minneapolis, MN 55415
15

    For the Defendant:        FEDERAL DEFENDER'S OFFICE
16                        Andrew H. Mohring, ESQ.
                        Manvir Atwal, ESQ.
17                        U.S. Courthouse, Room 107
                        300 South Fourth Street
18                        Minneapolis, MN 55415

19   Court Reporter:           STACI A. HEICHERT,
                        RDR, CRR, CBC, CCP
20                        1005 U.S. Courthouse
                        300 South Fourth Street
21                        Minneapolis, Minnesota 55415

22

23

24     Proceedings recorded by mechanical stenography;
   transcript produced by computer.
25

1        **P R O C E E D I N G S**

2                        **IN OPEN COURT**

3              THE COURT:  We're here in the matter entitled

4     United States of America versus Thomas Robert Page, a

5     motions hearing.

6              Counsel, note their appearances for the record,

7     starting with the government.

8              MS. SERTICH:  Good morning, Your Honor.  Assistant

9     U.S. Attorney Manda Sertich on behalf of the government.

10    I'm joined at counsel table by Yordene who is a law clerk in

11    our office.

12             THE COURT:  Good morning.

13             MR. MORHING:  Good morning, Judge.  Andrew

14    Mohring, here with Manny Atwal, with Mr. Page who is here

15    with us as well.

16             THE COURT:  Good morning.

17             So I've received all the motion papers, reviewed

18    them.  It's the Court's understanding that there is

19    significant testimony this morning, and there are some other

20    issues that have been raised that may truncate today's

21    hearing a little bit.  We're going to wait and see on that.

22    But for now, the Court's suggestion, I'm willing to listen

23    to whatever the parties would suggest, is that we just plow

24    through the testimony and see if we can get through all of

25    that today.  We can reserve arguments to both briefing

1    and/or at the end of the testimony.  Is that acceptable to

2    the defense?

3              MR. MOHRING:  That would be fine, Your Honor.

4    There will come a point that we will want to make a very

5    brief record about some of the discovery motions, but that

6    can happen at any time.

7              THE COURT:  Yeah.

8              MS. SERTICH:  No objection from the government.

9              THE COURT:  Very good.  Why don't we proceed.

10             And just for the record, we'll take a short break

11   this morning.  I think I'll try to go until at least noon,

12   take an hour lunch break, and then come back and keep going,

13   okay?

14             MR. MOHRING:  Great.

15             THE COURT:  All right.

16             MS. SERTICH:  Are you ready for the government?

17             THE COURT:  I am.

18             MS. SERTICH:  Thank you, Your Honor.

19             MR. MOHRING:  Your Honor, I apologize for

20   interrupting.  I don't know if there are witnesses, other

21   witnesses than the one who will be testifying, but if there

22   are, we would ask that they be sequestered.

23             MS. SERTICH:  The witnesses have been sequestered,

24   Your Honor.

25             THE COURT:  Very good.  And both sides of the V

1    also know that the Court sometimes forgets that there's a

2    witness on the witness stand and we may be engaging in

3    argument, and if the Court does and the witness's testimony

4    is over, don't be shy, remind me.  Thank you.

5            You may proceed, Ms. Sertich.

6            MS. SERTICH:  Actually, before calling my first

7    witness, Your Honor, the government would like to admit

8    Government's Exhibit 1 which is the Facebook search warrant

9    that has been moved to be suppressed by defense counsel.

10           THE COURT:  Okay.

11           MR. MOHRING:  No objection, Your Honor.

12           THE COURT:  It will be received.

13       (Government Exhibit No. 1 is received.)

14           THE COURT:  Okay.  And the record should also

15   reflect that Government's Exhibit 1 is a Facebook search

16   warrant that has been executed and signed by me, and so I

17   will have to impose upon one of my colleagues to do their

18   own four corners analysis of this particular search warrant,

19   not me.  And I think everyone understands that's how we do

20   that so.

21           MR. MOHRING:  Thank you.

22           THE COURT:  Thank you.

23           MS. SERTICH:  Thank you.  The government calls

24   Special Agent Summer Jones.

25       (The witness is sworn.)

1          THE COURT:  Thank you.  Please be seated.  State

2     your name and spell your last name for the record.

3          THE WITNESS:  Summer Jones.  J-O-N-E-S.

4                    **DIRECT EXAMINATION**

5     BY MS. SERTICH:

6     Q.  Good morning, Special Agent Jones.

7     A.  Good morning.

8     Q.  Where are you employed?

9     A.  With the Department of Homeland Security, Homeland

10    Security Investigations.

11    Q.  What's your position with HSI?

12    A.  I'm a special agent.

13    Q.  How long have you been with HSI?

14    A.  Approximately almost eight years.

15    Q.  What are your primary duties in that role?

16    A.  I investigate various crimes, to include child

17    exploitation cases, student terrorism cases and drugs,

18    various other cases as well.

19    Q.  Are you familiar with the investigation of defendant,

20    Thomas Robert Page, for engaging in elicit sexual conduct in

21    foreign places?

22    A.  Yes, I am.

23    Q.  Could you please provide the Court with a brief

24    explanation of who Mr. Page is and the allegations against

25    him?

1    A.  Mr. Page is a United States citizen.  He's a resident of

2    Minnesota.  He has been a teacher overseas, mainly in

3    Africa, for approximately 25 years.

4    Q.  And can you briefly explain the facts alleged underlying

5    the facts set forth in the Indictment?

6    A.  Mr. Page is being charged against for having sexual

7    conduct with minor men boys in African countries that he has

8    taught in.

9    Q.  With respect to the indictment in particular, did that

10   relate to sexual abuse of minors in Cameroon?

11   A.  Yes, it does.

12   Q.  How long have you been involved in the investigation of

13   this case?

14   A.  Over three and a half years.

15   Q.  Have you also had discussions with and reviewed the

16   official reports of other law enforcement officers relating

17   to this case?

18   A.  Yes, I have.

19   Q.  Did you travel to Togo to investigate Mr. Page in June

20   of 2012?

21   A.  Yes, I did.

22   Q.  Can you explain for the Court what prompted that travel?

23   A.  We received notification from the attaché, the HSI

24   attaché office in Paris, France, who at that time covered

25   the country of Togo in western Africa.  They had been

1    notified by the State Department of the U.S. Embassy in

2    Lomé, Togo, about allegations against Mr. Page.

3    Q.  And who were those allegations initially made to?

4    A.  They were made to the British school of BSO where

5    Mr. Page was teaching at.  The headmistress there then

6    reported that to the ARSO for the State Department at the

7    U.S. Embassy in Lomé, Togo, who then contacted HSI in Paris,

8    France.

9    Q.  What subject does Mr. Page teach or what did he teach at

10   the British school in Lomé?

11   A.  I believe he taught science.  He is a science and math

12   teacher though.

13   Q.  When you arrived in Togo in June of 2012, was Mr. Page

14   being investigated by Togolese law enforcement authorities

15   who are called the gens d'armes?

16   A.  Yes, he was.

17   Q.  And what happened with respect to that investigation by

18   the gens d'armes after you arrived?

19   A.  The gens d'armes, per their investigation, had moved to

20   arrest Mr. Page for the allegation against him.

21   Q.  And about how long did that happen after you arrived in

22   the country?

23   A.  I believe a day or two.

24   Q.  Did you or other U.S. law enforcement officers play a

25   role in determining whether Mr. Page should be arrested by

1    the gens d'armes?

2    A.  No, we did not.

3    Q.  Do you know what the charges against Mr. Page were that

4    the arrest was based on?

5    A.  Yes.  He was being charged with two counts of pederasty.

6    Q.  Can you explain what pederasty is?

7    A.  Pederasty is engaging in sexual conduct with minor male

8    boys.

9    Q.  And what was the date of that arrest?

10   A.  He was arrested on July 24th, 2012.

11   Q.  How was the arrest effected?

12   A.  The Togolese police arrested him I believe at a bar that

13   he was at not far from his residence.

14   Q.  Were you present for the arrest?

15   A.  I was not.

16   Q.  Where were you?

17   A.  I was in a vehicle down the street.

18   Q.  Could you see what was happening throughout different

19   points in the arrest?

20   A.  I could.  Not at first, though.  I then saw the gens

21   d'armes, the Togolese police, walking with Mr. Page.  I

22   believe he had his bicycle.  They were walking towards his

23   residence.

24   Q.  Okay.  What happened after that?

25   A.  They then went to his residence, and I believe that they

```
1   went into his house and executed a search warrant.

2   Q.  And that was a Togolese search warrant?

3   A.  Yes.

4   Q.  Did any U.S. law enforcement officers play a role in

5   executing that search warrant?

6   A.  No.  But there were two law enforcement that were in the

7   house, but they were not -- they did not participate in the

8   search, but they were in his house while the Togolese police

9   were searching his house.

10  Q.  Are who were those officials?

11  A.  It was HSI Special Agent Keith McKinney who was at the

12  time the deputy attaché of the Paris office.  And it was

13  ARSO Dave McClintock of the State Department.

14  Q.  Can you explain what a ARSO is?

15  A.  ARSO is assisted regional security officer, also can be

16  the acting regional security officer, and David McClintock

17  at that time was the acting regional security officer.

18  Q.  Would it be accurate to say that that role is a U.S. law

19  enforcement officer who is assigned to be positioned at the

20  embassy in a country like Togo?

21  A.  Yes, that's correct .

22  Q.  Were you able to observe what happened after there was

23  apparently a search at Mr. Page's home in Togo?

24  A.  The only thing I recall was seeing Mr. Page get into a

25  van that belonged to the Togolese police.  And the Togolese
```

1    police got into the van as well.

2    Q.  Was he handcuffed or anything like that?

3    A.  No.

4    Q.  And, again, where were you when you were viewing this?

5    A.  I was in a vehicle down the street.

6    Q.  Did you interview Mr. Page the following day on

7    July 25th, 2012?

8    A.  Yes, I did.

9    Q.  Was that interview recorded?

10   A.  No, it was not.

11   Q.  Why not?

12   A.  Per the policy of our agency, we do not record

13   interviews.

14   Q.  Where was Mr. Page when you interviewed him?

15   A.  He was at the Togolese Police Department.

16   Q.  Can you describe for the Court the setting of the

17   Togolese Police Department?

18   A.  When we walked in there, he -- Mr. Page was in a room

19   that had, like, four desks and four chairs.  I think it was

20   where the investigators sit and they talk to people.  It's

21   just wood desks and wood chairs.  There was nobody else in

22   the room besides Mr. Page.

23   Q.  Was there anyone else at the police department when you

24   first arrived?

25   A.  Yes.  There are.  And there's lots of people around.

1    But they don't allow you to see any other portions of the

2    police department, so we just walked into a room, and then

3    they took us to the room where Mr. Page was at.

4    Q.  So were there any Togolese officials in the room with

5    you while you were interviewing Mr. Page?

6    A.  No.

7    Q.  Who else was in the room with you?

8    A.  Special Agent Keith McKinney.

9    Q.  And, again, he's a special agent with HSI?

10   A.  Yes, he is.

11   Q.  Approximately what time of day was it?

12   A.  It was late morning.  I'm -- I want to say somewhere

13   around ten or so.

14   Q.  When you first encountered Mr. Page that day, did it

15   appear that he had been physically harmed or under duress in

16   any way?

17   A.  No.

18   Q.  Did you or SA McKinney have a weapon with you during the

19   interview?

20   A.  No.

21   Q.  When you first encountered Mr. Page, did you identify

22   yourself?

23   A.  Yes.

24   Q.  How did you do that?

25   A.  Both SA McKinney and myself identified ourselves as with

1    our names, showed him our credentials, and stated who we

2    work for.

3    Q.  Did you ask Mr. Page if he knew why he was in custody?

4    A.  Yes, I did.

5    Q.  How did he respond?

6    A.  He said he was unaware of why he was in custody.

7    Q.  Did you explain to Mr. Page why he was in custody?

8    A.  Yes.

9    Q.  What did you say?

10   A.  I told him that he was being charged with two counts of

11   pederasty.

12   Q.  And did you explain to him more generally speaking what

13   that meant?

14   A.  I don't believe so.  I -- but I did tell him that these

15   charges were brought by the Togolese Police Department and

16   that I -- myself nor Keith McKinney had anything to do with

17   the charges against him.

18   Q.  Did you indicate to him whether the charges were based

19   on sexual conduct with minor boys in Lomé?

20   A.  I don't recall if I specifically said that to him or

21   not.  I might have later on during the conversation.

22   Q.  Did you have knowledge at that point that Mr. Page would

23   be transferred to another location later that day?

24   A.  Yes.

25   Q.  And can you explain what that information was?

1    A.  They had told us that Mr. Page was going to be

2    transferred to the prison later on that day.

3    Q.  Where is the prison?

4    A.  The prison is in Lomé, Togo.

5    Q.  Did you inform Mr. Page that that was what you had been

6    informed of?

7    A.  Yes.

8    Q.  Did you tell Mr. Page anything about your ability to

9    have an impact on his situation with the Togolese

10   authorities?

11   A.  No.  I mean, I told him that we were -- that we had

12   no -- we didn't have anything to do with it and there wasn't

13   anything that we can do as far as the Togolese investigation

14   was concerned.

15   Q.  Did Mr. Page mention whether someone from U.S. Consular

16   Affairs had visited him?

17   A.  Yes, he did.

18   Q.  What'd he say?

19   A.  He stated that a guy named Phil had come to visit him

20   from Consular Affairs and had provided him with a list of

21   attorneys.

22   Q.  Did you explain to Mr. Page why you and Special Agent

23   McKinney were in Lomé?

24   A.  Yes.

25   Q.  What did you say?

1    A.  I -- we told Mr. Page that we were there to investigate

2    further the allegations against him as we were notified from

3    the State Department.

4    Q.  Did you ask Mr. Page if he was willing to speak with you

5    and Special Agent McKinney?

6    A.  Yes, I did.

7    Q.  How did he respond?

8    A.  He said that he was willing to answer questions.

9    Q.  Did you provide Mr. Page with a Miranda warning?

10   A.  Yes, we did.

11            MS. SERTICH:  Your Honor, may I approach?

12            THE COURT:  You may.

13   BY MS. SERTICH:

14   Q.  I've handed Special Agent Jones a document marked

15   Government Exhibit 2 which has been disclosed to defense

16   counsel at Bates number 12.  Special Agent Jones, do you

17   recognize that document?

18   A.  Yes, I do.

19   Q.  What is it?

20   A.  It's the statement of rights.

21   Q.  And does your signature appear on the page?

22   A.  Yes, it does.

23   Q.  Is that in the first witness line?

24   A.  Yes, it is.

25   Q.  There's a signature in the second witness line.  Whose

1    signature is that?

2    A.  That's SA Keith McKinney.

3            MS. SERTICH:  Government offers Exhibit 2.

4            MS. ATWAL:  No objection, Your Honor.

5            THE COURT:  It will be received.

6        (Government Exhibit No. 2 is received.)

7    BY MS. SERTICH:

8    Q.  Special Agent Jones, did you read the entirety of this

9    document to Mr. Page on July 25th, 2012?

10   A.  Yes, I did.

11   Q.  Did he initial each line and sign the bottom when you

12   were finished reading it?

13   A.  Yes, he did.

14   Q.  I notice that there are dashes in the space on the

15   documents where you would usually fill in the time and date

16   that the individual was taken into custody.  Why is that?

17   A.  SA McKinney had put those lines through there because we

18   did not take Mr. Page into custody, so he did not feel that

19   that was relevant, so that's the reason why he put the lines

20   through it.

21   Q.  Okay.  But it's accurate that Mr. Page placed his

22   signature on this document on July 25th, 2012.  Is that

23   correct?

24   A.  That's correct.

25   Q.  And was this form signed by Mr. Page towards the

1   beginning of the interview before he was asked any questions

2   about the allegations that form the basis of the indictment

3   in this case?

4   A.  Yes, he did.

5   Q.  Accurate to say that the only things you've discussed

6   before signing this form are the issues you've testified

7   about so far this morning?

8   A.  Yes.

9   Q.  Did you begin the interview by asking Mr. Page general

10  background information?

11  A.  Yes.

12  Q.  What did he say?

13  A.  He stated that he has been a math and science teacher

14  for approximately 20 years and had taught in various African

15  countries, to include Cameroon, Burkina Faso, Sudan, various

16  others.

17  Q.  Did he say that at the time he was a science teacher at

18  the British Lomé school?

19  A.  Yes, he did.

20  Q.  Did he mention any houseworkers that he had working in

21  his home at the time?

22  A.  Yes.  He had two of them, Elvis and Surge.

23  Q.  Did he say where those individuals were from?

24  A.  They were from Cameroon.

25  Q.  At that point did Mr. Page talk to you at all about

1    travels back to the U.S. while he was teaching in Africa?

2    A.  Yes.  Mr. Page stated that typically the school would

3    give him a plane ticket to be able to go home back to

4    Minnesota for summer vacation and occasionally on during the

5    holidays.

6    Q.  Did you ask Mr. Page if he ever went to the beach in

7    Togo?

8    A.  Yes.

9    Q.  How did he respond?

10   A.  He stated that he had gone to the beach.

11   Q.  Did he talk about whether he spent any time with kids at

12   the beach?

13   A.  Yes.

14   Q.  What'd he say?

15   A.  At first he stated that he didn't spend time with kids

16   on the beach, and then he later said that he did spend time

17   with kids on the beach.

18   Q.  Did you ask Mr. Page if he knew a local boy with the

19   name Noel?

20   A.  Yes.

21   Q.  How did he respond?

22   A.  He stated that he had met Noel I believe on the beach

23   and that Noel had been to his house.

24   Q.  Did he make any indication about whether he knew Noel's

25   mom?

1    A.  Yes, he did.

2    Q.  What did he say?

3    A.  He stated that he knew Noel's mom and that Noel's mom

4    had been to his house with Noel and that he did speak to

5    Noel's mom via the phone.

6    Q.  Did he say anything about giving money to Noel or Noel's

7    mom?

8    A.  Yes.

9              MS. ATWAL:  Objection.  Relevance.

10             MS. SERTICH:  Your Honor, I'm just establishing

11   the course of admissions throughout this interview.

12             THE COURT:  It will be overruled.

13   BY MS. SERTICH:

14   Q.  You can answer the question.

15   A.  Yeah.  He had stated that he had given Noel's mom money

16   for Noel's schools, school fees.

17   Q.  Did Mr. Page then make additional statements about his

18   relationship to the boys that he knew from the beach?

19   A.  Yes, he did.

20   Q.  What did he say?

21   A.  He stated that he does have the boys over from the

22   beach --

23   Q.  When you say "he has them over," what do you mean?

24   A.  Over to his house.

25   Q.  Did he indicate what they did at his house?

1    A.   Yes.  He stated that they watch TV and then they would

2    take pictures with his camera.

3    Q.   Did he talk about whether the boys would stay overnight

4    at his house?

5    A.   Yes.

6    Q.   What did he say?

7    A.   He said that they would stay overnight at his house but

8    they would not stay in his bedroom.

9    Q.   Did he say anything more about his activities with the

10   boys at the beach?

11   A.   He said he -- he did tell us about playing a cat game, a

12   game with bobcats.

13   Q.   Did he say anything about swimming with the boys?

14   A.   Yes, he did.

15   Q.   What --

16   A.   He said he would swim with the boys but they had their

17   boxers on and so did he.  And he also stated that he would

18   have the boys sit on his lap.

19   Q.   Did Mr. Page deny sexual conduct with Noel or any of the

20   other boys from the beach?

21   A.   Yes, he did.

22   Q.   Did you then begin to ask Mr. Page about his activities

23   in Yaoundé, Cameroon?

24   A.   Yes, I did.

25   Q.   And how did you -- what did he say initially about his

1   time in Cameroon?

2   A.  He stated that it was -- when I asked him why he had

3   left Cameroon, he had stated that it was time to go.  He

4   stated that he had problems with the director at that time

5   and that the problems were relating to I believe somebody

6   breaking into his house and stealing his laptop or something

7   like that.

8   Q.  And when you say "problems with the director," who do

9   you mean by the director?

10  A.  The director at the time was Paul Shepard.

11  Q.  And what was he the director of?

12  A.  He was the director of ASOY, the American School of

13  Yaoundé, which Mr. Page taught at.

14  Q.  Did you confront Mr. Page with allegations of the sexual

15  abuse of minors in Cameroon?

16  A.  Yes, I did.

17  Q.  What was his response?

18  A.  I actually asked him about the allegations in Cameroon.

19  I had a report from the gens d'armes about the allegations

20  against Mr. Page in Cameroon.

21  Q.  And when you say "the gens d'armes," do you mean the

22  gens d'armes in Cameroon?

23  A.  Yes.

24  Q.  Okay.  So what happened after you brought up that

25  report?

1    A.  I asked him if he wanted me to read the report from the

2    gens d'armes from Yaoundé, Cameroon.  He stated no.  I asked

3    him why he didn't want me to read what was in the report.

4    He stated that he already knew what was in the report

5    because he had seen it.

6    Q.  And briefly speaking, what were the allegations in those

7    police reports?

8    A.  They were allegations of sexual abuse, oral, oral sex

9    and anal sex.

10   Q.  Okay.  And did it mention any victims in that report?

11   A.  Yes, it did.

12   Q.  Who were they?

13   A.  Two of them with the initials A.E. and J.C.M.

14   Q.  Did Mr. Page initially deny any activities involving

15   sexual abuse of minors in Cameroon?

16   A.  Yes, he did.

17   Q.  So what happened after he said that he knew what was in

18   those reports?

19   A.  I asked him that the -- if what was in those reports was

20   true.  He said yes.  But then he went on to say but only

21   oral sex.

22   Q.  So when you say "oral sex," do you mean that he admitted

23   to engaging in oral sex with the two minor boys?

24   A.  Yes.

25   Q.  But that he denied any anal sex with them?

1   A.   Correct.

2   Q.   Did Mr. Page make any statements about who these two

3   minor boys were?

4   A.   He had stated that they were street kids that he had met

5   and that they had been to his house on several occasions.

6   Q.   Did Mr. Page make any statements about giving either of

7   those two individuals money?

8   A.   Yes, he had stated he gave money to one of the boys and

9   gave money to one of the -- the other boy's mom.

10  Q.   Did you ask Mr. Page whether he had engaged in sexual

11  conduct with another boy in Cameroon with the initials S.A.?

12  A.   Yes.

13  Q.   How did he respond?

14  A.   He stated that he had not had any sexual conduct with

15  S.A. and stated that he believed he was in his 20s, I

16  believe.

17  Q.   Did you ask Mr. Page about any current relationships

18  with males that he was engaging in?

19  A.   Yes, I did.

20  Q.   How did he respond?

21  A.   He stated that he did not want to talk about that at

22  this time and did not want to get anybody in trouble.

23  Q.   At that point in the interview did you take a break?

24  A.   Yes.

25  Q.   And what was the reason for the break?

1    A.   SA McKinney stated that we should take a break.

2    Q.   Up to that point in the interview, how would you

3    describe your tone of the interview?

4    A.   It was very calm, relaxed.

5    Q.   Did you or SA McKinney ever raise your voices at

6    Mr. Page?

7    A.   No.

8    Q.   Did you or SA McKinney use profanity with Mr. Page?

9    A.   No.

10   Q.   Did you or SA McKinney make any promises to him?

11   A.   No.

12   Q.   Did you or SA McKinney threaten him at all?

13   A.   No.

14   Q.   About how long do you think you were interviewing

15   Mr. Page up to that point?

16   A.   I would say approximately 45 minutes or so.

17   Q.   So where did you and SA McKinney go for the break?

18   A.   We just stepped outside of the door.

19   Q.   Did SA -- did Mr. Page stay in the room?

20   A.   Yes.

21   Q.   About how long was the break?

22   A.   Probably maybe 15, 20 minutes.

23   Q.   When you returned to the room, were there any other law

24   enforcement officers there?

25   A.   Yes.  There was HSI Special Agent Nanette Shorten.

1   Q.  And what was her role in the investigation of this case?

2   A.  She had traveled to Lomé, Togo mas well.  She was acting

3   as the what we call a forensic interview specialist, even

4   though that's not her title.

5   Q.  Okay.  And where is she normally stationed?

6   A.  At that time she was on a temporary duty assignment I

7   want to say in, I don't know, Saudi Arabia or something.

8   But she's normally I believe out of Washington, D.C., the

9   D.C. area.

10  Q.  And so initially was it just you and SA Shorten who

11  entered the room?

12  A.  Yes.

13  Q.  And at that point did you engage in casual conversation

14  with Mr. Page while waiting for SA McKinney to come back

15  into the room?

16  A.  Yes, I did.

17  Q.  What happened when SA McKinney came back into the room?

18  A.  He did not ask SA Shorten to leave.

19  Q.  Okay.  What happened after that?

20  A.  I believe he then sat elsewhere, and --

21          THE COURT:  Who do you mean by "he"?

22          THE WITNESS:  SA McKinney.

23          THE COURT:  Okay.

24          THE WITNESS:  So then SA Shorten started asking

25  Mr. Page questions.

1   BY MS. SERTICH:

2   Q.  Okay.  And before the break, can you describe where the

3   three of you were sitting in the room?

4   A.  We were sitting, the door is back here, and we were

5   sitting up towards the front of the room.  There was a desk

6   in front of us, and we were sitting in wood chairs.

7   Mr. Page was sitting in a chair closest to the wall.  Then I

8   was sitting right beside him, and then Nanette Shorten was

9   sitting --

10  Q.  Sorry, can you go back to before the break and where you

11  were sitting with Mr. Page, you and Mr. McKinney?

12  A.  The same -- the same way.  We didn't change chairs at

13  all.  It's just SA McKinney sat where now SA Shorten was

14  sitting.

15  Q.  And then where did SA McKinney sit when --

16  A.  I believe he -- I couldn't tell you exactly.  I think he

17  sat back in one of the chairs in a different, behind us.

18  Q.  Okay.  So can you describe for the Court what happened

19  after SA McKinney came back into the room and took a seat?

20  A.  SA Shorten started asking Mr. Page questions, basically,

21  and this isn't verbatim, she stated to Mr. Page, "If you

22  just tell us what we -- what we want, we will try to get you

23  back to the U.S.," something to that effect.

24  Q.  How did you respond to that statement by SA Shorten?

25  A.  I told Mr. Page that that is not true and that she

1    shouldn't be making those type of statements and that we've

2    already -- I've already gone through with Mr. Page that

3    there were no promises made and that there weren't going to

4    be any promises made so what SA Shorten was saying was not

5    true.  Mr. Page stated that he understood that, and we went

6    back through again about what was stated at the beginning of

7    the interview; that there were no promises being made.

8    Mr. Page stated that he understood that.

9    Q.  Okay.  Did you -- did law enforcement continue to

10   question Mr. Page about his activities in Lomé, Togo?

11   A.  Yes.

12   Q.  What did he say?

13   A.  I believe SA Shorten asked him about engaging in sexual

14   conduct with Noel.

15   Q.  And how did he respond?

16   A.  I believe he admitted to having oral sex with Noel.

17   Q.  Did he admit to sexual conduct with any of the other

18   kids?

19   A.  I don't recall.  I don't remember if it was --

20   Q.  Would it be helpful for you to review your report?

21   A.  Yes, please.

22       MS. SERTICH:  I've handed Special Agent Jones a

23   copy of the report of her interview on July 25th, 2012,

24   which has been disclosed to defense counsel.

25   BY MS. SERTICH:

1    Q.  Have you had a chance to review the report?

2    A.  Yes.

3    Q.  Does it refresh your recollection?

4    A.  Yes.

5    Q.  So do you recall whether Mr. Page admitted to sexual

6    activity with any of the other kids in Lomé, Togo?

7    A.  He did not.  He did -- he -- he would not admit to any

8    other activities with any other boys in Lomé, Togo.

9    Q.  Did he make any statements about sexual conduct with the

10   boy from Cameroon that we previously mentioned with the

11   initials S.A.?

12   A.  He stated that he -- that he -- he denied any

13   other -- he denied -- still denied any sexual contact with

14   S.A.

15   Q.  At that point did law enforcement ask Mr. Page whether

16   he had engaged in sexual conduct with any of the kids in

17   Cameroon?

18   A.  Yes.

19   Q.  How did he respond?  Would you like to refresh your

20   recollection?

21   A.  Yeah.  Yeah.  He did.

22   Q.  How did he respond?

23   A.  He stated he no longer wanted to talk about Cameroon.

24   Q.  Did you ask Mr. Page whether he had engaged in sexual

25   conduct with boys in any of the other countries he worked

1   in?

2   A.  Yes.  And he stated he had not.

3   Q.  He had not?

4   A.  He had not.

5   Q.  Okay.  Did the interview end after that?

6   A.  Yes, it did.

7   Q.  Approximately what time of day was it at that point?

8   A.  I believe it was around noon or so.

9   Q.  So how long was that second part of the interview after

10  the break?

11  A.  Probably I want to say 30 minutes, maybe a little

12  longer, 30 to -- maybe it was 45 even.

13  Q.  Did the tone of the interview change after the break?

14  A.  Yes, it did.

15  Q.  In what way?

16  A.  Nanette Shorten, the way her tone had changed -- well,

17  she hadn't been in there, but the way that she was speaking

18  to Mr. Page.

19  Q.  Can you describe that?

20  A.  She was just -- she seemed just very aggressive with

21  Mr. Page in the questioning.

22          THE COURT:  I'm sorry, you said very?

23          THE WITNESS:  Aggressive.

24  BY MS. SERTICH:

25  Q.  Did she raise her voice with Mr. Page?

1    A.  She did slightly, yes.

2    Q.  Did she use any profanity with him?

3    A.  No, she didn't.

4    Q.  Other than the statement that we previously -- you

5    previously testified about regarding her saying she would

6    see what she could do about getting Mr. Page back to the

7    United States, did she make any promises to Mr. Page?

8    A.  Other than what she had already stated?  No, not -- no.

9    Q.  Did she or anyone else in the room make any threats to

10   Mr. Page after the break?

11   A.  No.

12   Q.  Did you or Special Agent McKinney raise your voice or

13   change your demeanor with him after the break?

14   A.  No.

15   Q.  During the entire interview, did you or any other law

16   enforcement officers place hands on Mr. Page?

17   A.  No.

18   Q.  At any time during the interview did Mr. Page ask to

19   speak to an attorney?

20   A.  No, he did not.

21   Q.  Did you also interview Mr. Page two days later on

22   July 27th, 2012?

23   A.  Yes, I did.

24   Q.  Where was he at that time?

25   A.  He was located in the prison at the time.

1    Q.  And is the prison in Lomé, Togo?

2    A.  Yes, it is.

3    Q.  Can you describe that setting for the Court?

4    A.  Well, when we got there, we're not allowed in the prison

5    or anything else like that.  We had gotten to I guess what's

6    called the -- the administrative portion of the prison where

7    the judge is located and the courtrooms are located.  And so

8    it was a building where it had like open airways that you

9    would, I mean, walkways that you could come through, and

10   then there was doors, and those were the offices, judge's

11   quarters and things like that.  We went to the judge's

12   quarters first.

13   Q.  Okay.  So accurate to say that you were never in the

14   part of the prison where Mr. Page was being held?

15   A.  No.

16   Q.  Can you describe what the room looked like that you were

17   in?

18   A.  Well, after we were -- we were brought to a room that

19   was next to the courtroom, I guess, and it looked like -- it

20   looked like a schoolroom as well.  It had some desks and

21   some chairs in it.

22   Q.  Was Mr. Page already there when you arrived?

23   A.  No.  They brought him out to us there.

24   Q.  So he was brought into this classroom type setting?

25   A.  Yes.

1    Q.  Approximately what time of day was it?

2    A.  I don't really recall.  I believe it was later on in the

3    afternoon.

4    Q.  And in terms of U.S. law enforcement, who else was

5    there?

6    A.  SA Keith McKinney was there, Dave McClintock was there,

7    and FSNI Steven I can never remember his last name.  I don't

8    know his last name.  Steven.

9    Q.  And what's Steven's role?

10   A.  Steven is a foreign service national investigator at the

11   U.S. Embassy in Lomé, Togo.

12   Q.  What does that mean to be a FSNI?

13   A.  Typically that position is given to the local natives,

14   and they work for the U.S. Embassy doing investigations for

15   the State Department.

16   Q.  And can you remind the Court of what David McClintock's

17   role was?

18   A.  David McClintock was the acting regional security

19   officer at that time.

20   Q.  When Mr. Page was brought in, did any of the Togolese

21   law enforcement officials stay in the room during the

22   interview?

23   A.  No.  There was an armed guard, though, outside the door

24   there.

25   Q.  When you first encountered Mr. Page that day, did it

1   appear that he had been physically harmed in any way?

2   A.  No.

3   Q.  Did you remind Mr. Page of the Miranda warnings that you

4   gave him during the previous interview?

5   A.  Yes, I did.

6   Q.  Did you ask him if he was willing to be interviewed

7   again?

8   A.  Yes, I did.

9   Q.  How did he respond?

10  A.  He stated that he was willing to answer questions.

11  Q.  Did Mr. Page talk about his interactions with kids in

12  Togo?

13  A.  Yes.

14  Q.  What did he say?

15  A.  He stated that he would have I believe groups of two to

16  three kids that he would have come to his house.

17  Q.  Did he talk about whether he invited anyone other than

18  kids to his house as well?

19  A.  He did state that he invited others to his house as

20  well.

21  Q.  Did you ask Mr. Page about another minor individual that

22  he met while he was working in Burkina Faso?

23  A.  Yes.

24  Q.  How did he respond?

25  A.  He stated that he knew that individual when he was a

1   teacher in Burkina Faso and that he believed he was of high

2   school age.

3   Q.  Did he deny any sexual contact with that person?

4   A.  Yes, he did.

5   Q.  Did Mr. Page make any statements with respect to the

6   statements he had made two days prior about sexual conduct

7   with Noel?

8   A.  Yes.

9   Q.  What did he say?

10  A.  He had stated that the only reason why he said that he

11  had engaged in sexual conduct with Noel was because of the

12  promises that SA Nanette Shorten had made.

13  Q.  Did he make any similar remarks with respect to the

14  statements he made on July 25th regarding the Cameroonian

15  kids?

16  A.  Can I --

17  Q.  Would it help you to --

18  A.  Yes.

19  Q.  -- review your report?

20          MS. SERTICH:  I've handed Special Agent Jones a

21  copy of the report of her interview with Mr. Page on

22  July 27th, 2012, which has been disclosed to defense

23  counsel.

24  BY MS. SERTICH:

25  Q.  Have you had a chance to review the report?

```
 1    A.  Yes.

 2    Q.  Has it refreshed your recollection?

 3    A.  Yes.

 4    Q.  So I'll just ask the question again.  You previously

 5    testified that Mr. Page told you the only reason he had made

 6    any admissions about sexual conduct with Noel in Togo was

 7    because of what he perceived to be promises made by Special

 8    Agent Shorten.  Did he make any similar statements with

 9    respect to the admissions he made on July 25th with respect

10    to the Cameroonian children?

11    A.  No.

12    Q.  Did Mr. Page then end the interview?

13    A.  Yes.

14    Q.  Were any of the law enforcement officers at that

15    interview carrying a weapon at the time?

16    A.  No.

17    Q.  How would you describe the tone of this second

18    interview?

19    A.  It was much the same.  It was relaxed.  But, however,

20    towards the end, Mr. Page was upset.

21    Q.  And when did he become upset?

22    A.  At the very end of the interview.

23    Q.  What was being discussed at that time?

24    A.  He had just -- he started crying.  I asked Mr. Page why

25    he was crying.  And he stated that because he was in the
```

 1    prison.  I then gave Mr. Page a Kleenex.

 2    Q.  Did you or anyone else during that interview raise your

 3    voice at Mr. Page?

 4    A.  No.

 5    Q.  Did you or anyone else use profanity with Mr. Page

 6    during that interview?

 7    A.  No.

 8    Q.  Did you or anyone else make any promises to Mr. Page

 9    during that interview?

10    A.  No.

11    Q.  Did you or anyone else threaten Mr. Page during that

12    interview?

13    A.  No.

14    Q.  During the second interview, did you or anyone else

15    place your hands on Mr. Page at any time?

16    A.  No.

17    Q.  How long was this second interview?

18    A.  It was probably only about 20 minutes, 25 minutes or so.

19    Q.  And at any time during this second interview did

20    Mr. Page ask to speak to an attorney?

21    A.  No.

22    Q.  At any time during the first or second interview did

23    Mr. Page ask questions about the statement of rights form

24    that he signed that is Government's Exhibit 2?

25    A.  No.

1    Q.  I'm going to change gears a little bit here.  Special

2    Agent Jones, as an agent with HSI, do you have the ability

3    to track particular individual's comings and goings from the

4    U.S.?

5    A.  Yes.

6    Q.  Can you explain how that works?

7    A.  We use a system called TECS, T-E-C-S.  That's also the

8    system where we put in our reports of investigation, and

9    it's typical for us to put in the individuals that we're

10   investigating, we put them into the system as well, their

11   biographical information.

12   Q.  Okay.  And what's the purpose of putting the information

13   into that system?

14   A.  It creates -- it creates a lookout for the individual so

15   that we are notified if that individual comes back into the

16   country or departs the country.

17   Q.  And so was there a TECS lookout for Mr. Page after you

18   started this investigation?

19   A.  Yes, there was.

20   Q.  Other than biographical information, is there any other

21   data that you put into that TECS lookout?

22   A.  The case, the case number, and then also you can put in

23   the area of remarks.

24   Q.  Did you put any remarks in there?

25   A.  Yes.

1    Q.  What did you put?

2    A.  I believe it's -- it was something to the effect of

3    subject is under investigation under the Protect Act; if

4    encountered, contact me.

5    Q.  So did you receive alerts when Mr. Page was either

6    coming into the United States or leaving the United States

7    after that?

8    A.  Yes, I did.  I received e-mails.

9    Q.  And what was the type of information that you hoped to

10   gain by having that TECS lookout in place?

11   A.  Like I said, just to know when he was leaving the

12   country or coming back into the country.

13   Q.  Did you provide any instructions about what you wanted

14   any border agents to ask him about when he was crossing the

15   border?

16   A.  No.  Typically what happens is that they get those TECS

17   hits and then they'll review them and they'll either call me

18   or I'll call them.

19   Q.  Do you understand the indictment states that Mr. Page's

20   last known place of residence in the U.S. is in Minnesota?

21   A.  Yes.

22   Q.  In the course of your investigation, have you gathered

23   evidence to support that allegation?

24   A.  Yes.

25   Q.  Can you explain that for the Court?

1    A.  I do have his driver's license record that shows that he

2    has maintained a Minnesota driver's license.  He has a

3    current Minnesota driver's license as well.  I believe it

4    expires in 2017.  And he has maintained the same address on

5    that driver's license.

6    Q.  When he fills out passport paperwork, does he have to

7    provide an address?

8    A.  Yes, he does.

9    Q.  And what address does he provide?

10   A.  He provides that same address in Winona, Minnesota.  His

11   last passport application, he obtained a new passport while

12   he was in Burkina Faso.

13   Q.  And about when was that?

14   A.  That was I believe 2013.

15   Q.  Do you also have evidence that Mr. Page did regularly

16   travel back to Minnesota?

17   A.  Yes, I do.

18   Q.  Can you explain that for the Court?

19   A.  The same thing, every time that he would depart the

20   country, I would receive a TECS notification that he was

21   departing the U.S.

22   Q.  Do you have any airline records -- well, let me ask this

23   a different way.  You previously testified that he told you

24   that he would travel home --

25   A.  Yes.

1   Q.  -- to Minnesota with tickets provided by the schools

2   when school was not in session.  Do the travel records that

3   you have support that statement?

4   A.  Yes.

5   Q.  In the course of your investigation, have you learned

6   whether Mr. Page has a teaching license?

7   A.  Yes.

8   Q.  And where did he obtain his teaching license?

9   A.  The state of Minnesota.

10  Q.  And is that a current teaching license?

11  A.  I believe it is.

12          MS. SERTICH:  No further questions at this time,

13  Your Honor.

14          MS. ATWAL:  Your Honor, may I just have a moment

15  to set up, please?

16          THE COURT:  You may.

17          MS. ATWAL:  I'm going to apologize right away.  I

18  do have a little bit of a cold, so I apologize if I

19  sound --

20          THE COURT:  You're in the same club I'm in so.

21          Ms. Sertich, do you want to tender Exhibit 2 to

22  the Court.

23          MS. SERTICH:  Yes.

24          THE COURT:  Or do you have another copy that you

25  want to give me?

1          MS. SERTICH:  I have another copy at my desk,

2     thank you.

3          MS. ATWAL:  Thank you, Your Honor.

4          THE COURT:  You may proceed.

5                    **CROSS-EXAMINATION**

6     BY MS. ATWAL:

7     Q.  Good morning, Agent Jones.

8     A.  Good morning.

9     Q.  Agent Jones, you said you've been with the Department of

10    Homeland Security for the past eight years.  Is that

11    correct?

12    A.  Correct.

13    Q.  And how many times have you traveled overseas to

14    investigate cases?

15    A.  Let me see.  Three times for this case and twice for two

16    other cases.

17    Q.  And those two other cases, what countries or continents

18    were those?

19    A.  Belize and Jamaica.

20    Q.  Now, when you did travel to Togo, you did notice that

21    the country is very poor, correct?

22    A.  Correct.

23    Q.  In fact, when you want to drink water, you have to have

24    bottled water?

25    A.  Correct.

1    Q.  You know at the jails that people don't have proper

2    settings and their needs aren't met, correct?

3    A.  That's my understanding.

4    Q.  And in fact, you know that people are housed usually in

5    a big room without beds, correct?

6    A.  I -- I have not seen that personally, but that is my

7    understanding.

8    Q.  You've learned that through investigating this case and

9    talking to other agents, correct?

10   A.  Correct.

11   Q.  Now, the child exploitation cases that you have worked,

12   has that been the entire eight years or more recently?

13   A.  No.  It has been the majority of the almost eight years.

14   Q.  Now, when you first investigated this case, you were

15   first contacted by whom?

16   A.  The deputy attaché, Special Agent Keith McKinney from

17   Paris, HSI Paris, France.

18   Q.  Fair to say this investigation began on July 4th, 2012?

19   A.  Sure.  Yes.

20   Q.  That is when the headmistress contacted the U.S.

21   Embassy, correct?

22   A.  Yes.

23   Q.  Right.  And then that U.S. Embassy contacted the office

24   at Paris, France, correct?

25   A.  Correct.

1    Q.  They did not contact agents in the U.S., correct?

2    A.  Correct.

3    Q.  Now, Togo police were called to investigate the case

4    around July 6th, 2012, correct?

5    A.  Correct.

6    Q.  And at that time Special Agent Dave McClintock also was

7    investigating the case along with the local police, correct?

8    A.  That I do not know.

9    Q.  Do you recall, as a case agent in this case, do you

10   recall reviewing other reports?

11   A.  Yes.

12   Q.  Okay.  Do you recall that the -- that other -- agents

13   from the embassy were involved in the investigation prior to

14   you arriving on July 21st, 2012?

15   A.  Yes.

16   Q.  Okay.  And their involvement included interviewing

17   people, correct?

18   A.  Yes.

19   Q.  Now, as the case agent in this case, you've read other

20   reports related to -- done by other agencies, correct?

21   A.  Correct.

22   Q.  You've reviewed school records related to Mr. Page,

23   correct?

24   A.  Yes.

25   Q.  You've reviewed as much evidence that you can in this

1    case, correct?

2    A.  Correct.

3    Q.  And when you yourself, after you have met with witnesses

4    and with Mr. Page, have taken notes, correct?

5    A.  Yes.

6    Q.  In your two interviews on July 25th and July 27th, did

7    you take notes?

8    A.  No, I did not.  I believe it was SA Keith McKinney did.

9    Q.  Did Mr. McKinney write a report in regards to this case?

10   A.  No, he did not.

11   Q.  Did you rely on his notes, then, to write your reports?

12   A.  Some -- some, yes.

13   Q.  When did you write your reports related to the July 25th

14   interview?

15   A.  I don't recall.  I'd have to -- I don't recall.

16   Q.  How about the July 27th?

17   A.  I don't recall either.  I would have to look and see

18   what the particular dates are.

19   Q.  Okay.  You have that July 27th report in front of you,

20   correct?

21   A.  Mm-hmm.

22   Q.  Why don't you take a look at that and tell me when you

23   wrote that report.

24   A.  When it was -- the report date is in November of 2012.

25   Q.  Okay.  So November 2012 is when you wrote the report

1    from July -- from the interview from July 27th, correct?

2    A.  Not necessarily that I wrote it but when it was

3    submitted for -- to TECS for the report.

4    Q.  Okay.  So did you cut and paste something, or when do

5    you think you wrote the report?

6    A.  No.  Like I said, we -- we type it up into a Word

7    document and then it is submitted into the system and then

8    it's approved.

9    Q.  And the closest you can tell, that was sometime in

10   November of 2012 did you say?

11   A.  Yes.

12   Q.  Okay.  I'm going to show you your report from July 25th,

13   2012.

14            MS. ATWAL:  Your Honor, may I approach?

15            THE COURT:  You may.

16   BY MS. ATWAL:

17   Q.  Tell me when you entered that report.

18   A.  It says November 5th.

19   Q.  Of what year?

20   A.  2012.  Sorry.

21            MS. ATWAL:  May I approach again, Your Honor?

22            THE COURT:  You may.

23   BY MS. ATWAL:

24   Q.  Now, you testified that you did not do any -- you did

25   not record the interrogation of Mr. Page on the 25th or the

1    27th, correct?

2    A.   Correct.

3    Q.   And that is because of policy, correct?

4    A.   Correct.

5    Q.   Is that a written policy?

6    A.   I do not know.

7    Q.   How are you aware of the policy?

8    A.   It's just through our training that we don't record

9    conversations.  We always have two agents present during an

10   interview.

11   Q.   When was the last time you had training in regards to

12   whether or not you should record?

13   A.   I don't recall when I've had training.  I believe that

14   they periodically send out e-mails.

15   Q.   And you are aware on September 19th, 2015, one of your

16   colleagues from Homeland Security did, in fact, record an

17   interrogation, correct?

18   A.   Correct.

19        THE COURT:   I'm sorry, when was that?

20        MS. ATWAL:   September 19th, 2015.

21   BY MS. ATWAL:

22   Q.   And, in fact, you also did record alleged victims in

23   this case, correct?

24   A.   Correct.

25   Q.   Their interviews were recorded, video and audio.  True?

1    A.  Yes.  But the video --

2    Q.  True?

3    A.  True, yes.

4    Q.  Okay.  Now, in this case, aside from reviewing other

5    reports, you've been present for all the court hearings,

6    correct?

7    A.  I'm sorry?

8    Q.  You've been present for all the court hearings here in

9    the United States, true?

10   A.  Yes, correct.

11   Q.  You were here for the first appearance?

12   A.  Yes.

13   Q.  You were here for the detention hearing?

14   A.  No, I was not.

15   Q.  And you were just here for the first appearance?

16   A.  Yes.

17   Q.  Do you recall what agent was present for the detention

18   hearing?

19   A.  Yes.  Special Agent Jared Drayson.

20   Q.  Now, you discussed this case with the government when

21   Mr. Page made his first appearance, correct?

22   A.  Correct.

23   Q.  And did you give a recommendation as to whether or not

24   Mr. Page should be detained or released pending this case?

25   A.  Did I make a recommendation?

1    Q.  Yes.  Did you discuss that with the government and give

2    your recommendation?

3    A.  I -- I don't recall that I did.

4    Q.  Do you recall the government being concerned that

5    Mr. Page would be a flight risk?

6    A.  Yes.

7    Q.  And that was based on his lack of ties to this

8    community, correct?

9    A.  No.  It's because of his consistent travel outside the

10   U.S.

11   Q.  And let's talk about that.  You know he's been living

12   abroad for the last 25 years, correct?

13   A.  Yes.

14   Q.  Since 1990 he has not been living in the U.S., true?

15   You recall he joined the Peace Corps in 1990?

16   A.  Yes.

17   Q.  Okay.  And then he's worked in numerous places in Africa

18   and in South America, correct?

19   A.  Correct.

20   Q.  In fact, he's lived in Bolivia?

21   A.  Yes.

22   Q.  Kongo?

23   A.  Yes.

24   Q.  Burkina Faso?

25   A.  Mm-hmm.

1    Q.   Yes?

2    A.   Yes.

3    Q.   Bali?

4    A.   Yes.

5    Q.   Sudan?

6    A.   Yes.

7    Q.   Cameroon?

8    A.   Yes.

9    Q.   Togo?

10   A.   Yes.

11   Q.   And you have read the reports related to the

12   interrogation, correct?

13   A.   Yes.

14   Q.   Yes?  And you know that he refers to the address in

15   Winona as his parents' address, correct?

16   A.   Correct.

17   Q.   And, in fact, that is where his mom and dad live, true?

18   A.   True.

19   Q.   And when you say he travels to Minnesota, it's sometimes

20   just on vacations, correct?

21   A.   Correct.

22   Q.   And he, in fact, told you in one of the interrogations

23   that there was a time when he couldn't go home for the

24   summer because the school wouldn't pay for his ticket for

25   him to return to his parents' home, correct?

1    A.  Correct.

2    Q.  You have also, through your investigation, seen a copy

3    of Mr. Page's résumé, correct?

4    A.  Correct.

5            MS. ATWAL:  Your Honor, may I approach?

6            THE COURT:  You may.

7    BY MS. ATWAL:

8    Q.  Agent Jones, I'm showing you what has been marked as a

9    defense exhibit, and I apologize, I'll write a one in there

10   in a moment.  And that is a copy of Mr. Page's résumé,

11   correct?

12   A.  Correct.

13   Q.  And you had a chance to review this résumé when you

14   gathered documents, reviewed documents, correct?

15   A.  Correct.

16           MS. ATWAL:  Your Honor, I move to admit Defense

17   Exhibit 1.

18           MS. SERTICH:  No objection.

19           THE COURT:  It will be received.

20        (Defense Exhibit No. 1 is received.)

21           MS. ATWAL:  May I approach, Your Honor?

22           THE COURT:  You may.

23   BY MS. ATWAL:

24   Q.  Now, let's move on to the in -- the first interrogation,

25   the one from July 25th, 2012.  Now, when you came to the

1    police station, you were aware that Mr. Page had already

2    been in custody at least a day?

3    A.  Correct.

4    Q.  He had been arrested the previous night?

5    A.  Yes.

6    Q.  And when you saw him, he was wearing shorts and flip

7    flops, correct?

8    A.  I don't recall about the flip flops but shorts, yes.

9    Q.  You did not ask him when was the last time he had

10   showered, did you?

11   A.  No.

12   Q.  You did not ask him the last time he had food?

13   A.  No.

14   Q.  You did not ask him the last time he drank water or

15   anything?

16   A.  No.

17   Q.  Now, you said you didn't notice anything physically

18   wrong with him, but, again, you didn't ask him how he was

19   doing health wise, did you?

20   A.  No.

21   Q.  When you walk into this police station, you're aware

22   there's a jail attached, correct?

23   A.  Yes.

24   Q.  But you're not allowed to see that?

25   A.  Correct.

1    Q.  And you don't know what the conditions are at that

2    particular jail, do you?

3    A.  No.

4    Q.  Now, when you walked into the jail, you -- or into the

5    police station, there's armed guards, correct?

6    A.  I believe there was.

7    Q.  Mr. Page couldn't just walk out of that police station,

8    could he?

9    A.  No.

10   Q.  When he walked into that classroom like setting,

11   Mr. Page was placed furthest away from the door, true?

12   A.  Yes.

13   Q.  In fact, he had his back up against a wall?

14   A.  No.

15   Q.  He was -- his back was towards a wall, correct?

16   A.  No.  The chair he was sitting in was beside the wall.

17   Q.  Okay.

18   A.  But there was a desk in front of us.  Here's the chair.

19   Here's the wall.  He was sitting right here.  I'm sitting

20   right beside him in a chair.

21   Q.  Are there walls around him?

22   A.  Yeah, all of us, yeah.

23   Q.  Okay.  And the door is not close to him; it's closer to

24   you agents, correct?

25   A.  No.  It was in the -- it's in the back and in the middle

```
 1    of the room.

 2    Q.  You're closer to the door than Mr. Page, right?

 3    A.  Just over by one chair, sure.

 4    Q.  You're closer to the door than Mr. Page, right?

 5    A.  Yes.

 6    Q.  Now, inside this room there are about four desks you

 7    would say?

 8    A.  Yeah, something like that.

 9    Q.  And outside you know that there are local police that

10    are armed, true?

11    A.  True.

12    Q.  Now, when you walked into this room, was he already

13    waiting for you?

14    A.  Yes.

15    Q.  And you came in, and one of the first things you said to

16    him is you asked him if he knew why he was there, correct?

17    A.  Correct.

18    Q.  And he tells you he doesn't know why he's there?

19    A.  Correct.

20    Q.  Now, you, being a good agent, have already done your

21    homework on Mr. Page, right, before you even met with him?

22    A.  Correct.

23    Q.  You know he's never been arrested before?

24    A.  Correct.

25    Q.  You know he's never been inside a jail cell before,
```

1   correct?

2   A.   Well, I don't know that for any other occasions.

3   Q.   You don't know if he's been in jail before, right?

4   A.   Not been arrested on a criminal charges, correct.

5   Q.   Right.  So this is, as far as you know, this is his

6   first time he's been arrested on a criminal charge, correct?

7   A.   Correct.

8   Q.   And as far as you were concerned, this is the first time

9   he's been inside of a jail?

10   A.   I guess I'll say correct, but I don't -- I don't know if

11   that's the first time he's ever been inside of a jail.

12   Q.   Okay.  According to your arrest records, you don't show

13   any prior arrest, right?

14   A.   No.

15   Q.   Now, initially when you start the interview, you show

16   him identification, correct?

17   A.   Correct.

18   Q.   And your partner that's with you, Special Agent

19   McKinney, he's an American?

20   A.   Yes.

21   Q.   And it's obvious from the color of your skin and also

22   from your accent, correct?

23   A.   Correct.

24   Q.   Now, the local police, what color are they?

25   A.   They are --

```
 1                MS. SERTICH:  Objection.  Relevance.

 2                THE COURT:  It will be overruled.  Go ahead.

 3                THE WITNESS:  Black.

 4     BY MS. ATWAL:

 5     Q.  Now, when you meet with him, initially is it just you

 6     and Special Agent McKinney?

 7     A.  Yes.

 8     Q.  And Shorten joins you later on?

 9     A.  Yes.

10     Q.  So the first thing you ask -- he asks -- he tells you he

11     doesn't know why he's there, and you tell him it's for some

12     allegations involving kids, correct?

13     A.  Correct.

14     Q.  And you tell him also, look, we're not here to

15     investigate that, right?

16     A.  No, we're --

17                MS. SERTICH:  Objection.  Misstates testimony.

18                THE COURT:  Restate the question, please.

19     BY MS. ATWAL:

20     Q.  You tell him that the local police are investigating him

21     for a crime against kids, correct?

22     A.  Correct.

23     Q.  Okay.  And you tell him you're not there to investigate

24     what they're investigating, right?

25     A.  No.  I -- we tell him that we don't have anything to do
```

1    with the investigation that is against him with the

2    Togolese.

3    Q.   Okay.  So you're insinuating they've got their own case

4    going on, right?

5    A.   Correct.

6    Q.   After that, then you Mirandize him, correct?

7    A.   Correct.

8    Q.   You have him sign a piece of paper?

9    A.   Correct.

10   Q.   And the reason you do that is you want to make sure he

11   understands his Miranda rights, right?

12   A.   Correct.

13   Q.   You want to make sure that he understands what his

14   rights are?

15   A.   Yes.

16   Q.   And, in fact, you ask him if he understands his rights?

17   A.   Correct.

18   Q.   And to be double, quadruple sure, you actually have him

19   sign a piece of paper so you know for sure that he

20   understands what he's agreeing to do?

21   A.   Correct.

22   Q.   Then you start talking about exactly what the Togo

23   police are investigating him for, allegations against local

24   boys in Togo?

25   A.   Correct.

1    Q.  And these were not his students; they were local boys,

2    correct?

3    A.  Yes.

4    Q.  And as the interview starts, he tells you that he has

5    not had inappropriate behavior with any of these kids,

6    correct?

7    A.  Correct.

8    Q.  And 45 minutes goes by, correct?

9    A.  Approximately.

10   Q.  And then your partner decides to take a break, right?

11   A.  Correct.

12   Q.  And when the break happens, that is when another Agent

13   Shorten starts in, correct?

14   A.  That's when she comes in, yes.

15   Q.  All right.  And she tells him, after he's been denying

16   everything, "Tell us what we want to know and we'll see

17   about getting you back to the U.S."?

18   A.  He did not -- he was not denying about the allegations

19   in Cameroon.

20   Q.  She comes in and tells him, "Tell us what we want to

21   know," right?

22   A.  She says that basically she says, "If you tell us what

23   we want to know, then we will help you get back to the U.S."

24            THE COURT:  Want to know about what?  Cameroon or

25   Togo?

```
 1                THE WITNESS:  I'm sorry?

 2    BY MS. ATWAL:

 3    Q.  Did she say we want -- we want you to tell us about

 4    Cameroon or did she say Togo or neither?

 5    A.  Neither.

 6    Q.  Okay.  Now, at this point he had already met with

 7    somebody from the U.S. consulate, right?

 8    A.  Yes.

 9    Q.  And he was still sitting in a jail in Togo, correct?

10    A.  When he met with the Consular Affairs?

11    Q.  When he first met with the Consular Affairs, that was at

12    the Togo jail, right?

13    A.  Correct.

14    Q.  And then afterwards, that's when you interrogate him,

15    correct?

16    A.  Correct.

17    Q.  And then Special Agent Shorten says, "Tell us what we

18    need to know and we'll see about getting you to the U.S.,"

19    correct?

20    A.  Correct.

21    Q.  Now, this must have made you a little angry to hear

22    that, right?

23    A.  Correct.

24    Q.  So did you correct Special Agent Shorten right away?

25    A.  Yes.
```

1   Q.  And she is sitting right there as you tell Mr. Page that

2   your colleague is wrong?

3   A.  Correct.

4   Q.  And your colleague is sitting right next to you,

5   correct?

6   A.  Correct.

7   Q.  And so you said we can't make you any promises, right?

8   A.  Correct.

9   Q.  And you recall him saying, "Well, is that an absolute"?

10  A.  No.  No, I do not recall him saying that.

11  Q.  Do you recall you or any of the other agents telling him

12  we'll have to see what happens?

13  A.  No.

14  Q.  Special Agent Shorten didn't stop there, did she?

15  A.  No, she did not.

16  Q.  In fact, she got very angry?

17  A.  She didn't get very angry.

18  Q.  She got aggressive, right?

19  A.  She got aggressive.

20  Q.  She started raising her voice?

21  A.  Yes.

22  Q.  She's embarrassed by being called out by her colleague,

23  right?

24  A.  I --

25              MS. SERTICH:  Objection.  Speculation.

```
 1    BY MS. ATWAL:

 2    Q.  You called her out --

 3              THE COURT:  Excuse me.

 4              MS. ATWAL:  I'm sorry, Your Honor.

 5              THE COURT:  That's all right.  It's overruled.

 6    BY MS. ATWAL:

 7    Q.  Go ahead and answer.

 8    A.  That she -- I have -- I don't have any idea if she was

 9    embarrassed.

10    Q.  Did you guys have a conversation after this

11    interrogation?

12    A.  I don't recall.

13    Q.  You don't recall talking to her about saying how

14    inappropriate that was to say to a U.S. citizen that is

15    sitting in a third world jail?

16    A.  I don't recall the conversation with her afterwards.

17    Q.  Okay.  You recall having a conversation?

18    A.  Yes.

19    Q.  Did you report what she had said to your superiors?

20    A.  No.

21    Q.  How about to anybody at the U.S. Embassy?

22    A.  No.

23    Q.  Did you report this to anybody other than what you wrote

24    in your report?

25    A.  No.  SA McKinney was there as well and heard what she
```

```
 1   had said.

 2   Q.  Did -- as far as you know, did Special Agent McKinney

 3   report what Shorten said?

 4   A.  No.

 5   Q.  And it's your testimony today that you didn't say

 6   anything or you didn't overhear anybody say something to the

 7   extent we'll see if something can be worked out?

 8   A.  No.

 9   Q.  You continue this interrogation after the break,

10   correct?

11   A.  Yes.

12   Q.  But it's a lot shorter this time, right?

13   A.  Yes.

14   Q.  And at this point Special Agent Shorten in her

15   aggressive manner starts asking about other kids, correct?

16   A.  No, I believe she only asked about Noel.

17   Q.  Okay.  That's another kid, right?

18   A.  That's -- that's a kid, yes.

19   Q.  And that's a kid in Cameroon, right?

20   A.  No, in Togo.

21   Q.  Okay.  And then do you continue to ask about kids in

22   Cameroon?

23   A.  No.

24   Q.  He tells you at some point he doesn't want to talk

25   anymore, right?
```

```
1    A.  Correct.

2    Q.  And the interview ends?

3    A.  Correct.

4    Q.  Then he is taken away again, correct, after the

5    interview ended?

6    A.  I don't know.  I gave him my business card and we left

7    out of the room.

8    Q.  What does your business card say on it?

9    A.  It says special -- it says Summer M. Jones, special

10   agent.  It has the badge on it, and it says ICE, U.S.

11   Immigration and Customs Enforcement, Department of Homeland

12   Security.  It has my e-mail, cell phone number and address.

13   Q.  Okay.  And is the emblem on there the eagle?

14   A.  No, I believe mine -- mine just has my -- it has the

15   badge.

16   Q.  And what is the badge?

17   A.  Our actual law enforcement badge.

18   Q.  Okay.  And does it say USA on it?

19   A.  I believe it does.

20   Q.  You leave him with that, correct?

21   A.  Yes.

22   Q.  And he's left inside that room with the armed guard

23   outside, right?

24   A.  Well, there are guards outside, yes.

25   Q.  Okay.  And then you don't see him for another two days,
```

```
 1    true?

 2    A.   True.

 3    Q.   You know he's taken over to a prison?

 4    A.   Yes.

 5    Q.   Now, you've never been to this prison.  Is that true?

 6    A.   That's -- I've never been inside the prison, that's

 7    true.

 8    Q.   And, again, you've heard the stories about the different

 9    prisons in Africa, correct?

10    A.   Correct.

11    Q.   They don't have the best conditions there either, do

12    they?

13    A.   Correct.

14    Q.   Overcrowding?

15    A.   Correct.

16    Q.   People have to pay for their food and water, true?

17    A.   I'm not so sure about having to pay for it, but I

18    believe that they -- I'm not sure what they're provided.

19    Q.   You've read through your reports and other people's

20    reports that you know that people were bringing in food for

21    Mr. Page at some point, correct?

22    A.   Correct.

23    Q.   Now, you, on the second interview, interrogation, it

24    happens across the street from the prison, right?

25    A.   Yes, I believe so.  Or it's -- the building -- they're
```

1    yeah, it's the judge's quarters/offices or whatever building

2    where the courthouse -- where the courtrooms are.

3    Q.  Armed guards bring Mr. Page to you, correct?

4    A.  A armed guard did, yes.

5    Q.  He's wearing shorts and flip flops again?

6    A.  Shorts, yes.  I did not pay attention to what shoes he

7    had.

8    Q.  His arms are shackled, his hands are shackled?

9    A.  I don't recall that.

10   Q.  His legs are shackled?

11   A.  No, I don't recall that.

12   Q.  Okay.  Now, they bring him to this classroom like

13   quarter, correct?

14   A.  Correct.

15   Q.  And this time it is how many of you agents with him?

16   A.  It's myself, SA Keith McKinney, Dave McClintock and

17   FSNI, so three agents and a foreign service national

18   investigator.

19   Q.  And the three agents are all Americans, right?

20   A.  Yes.

21   Q.  This time you, again, you don't ask him when was the

22   last time he had food, do you?

23   A.  No.

24   Q.  You don't ask him the last time he had showered?

25   A.  No.

1   Q.  You don't ask him how he's being treated?

2   A.  No.

3   Q.  You just do a physical examination and don't notice

4   anything unusual, correct?

5   A.  Correct.

6   Q.  You don't read to him his Miranda rights; you just ask

7   him if he remembers his Miranda rights, correct?

8   A.  I remind him of his Miranda warnings, yes, that he's

9   still under Miranda.

10  Q.  Okay.  So you say to him what?

11  A.  I don't recall exactly.  Just that -- I would have to

12  refer to my notes.

13  Q.  I believe you still have the July 27th report up there.

14  Why don't you take a look at that.

15       You just remind him that he's still -- that the

16  Miranda warnings still apply to him, correct?

17  A.  Correct.

18  Q.  You do not read to him verbatim the Miranda warning, do

19  you?

20  A.  No.

21  Q.  You don't have him sign a piece of paper to make sure he

22  understands, do you?

23  A.  No.

24  Q.  And he tells you what he had told you the day before, he

25  only said it because of Shorten's promise that he'll get

1   back to the U.S., right?

2           MS. SERTICH:  Objection.  Misstates the testimony.

3           THE COURT:  Overruled.

4   BY MS. ATWAL:

5   Q.  You can answer the question.

6           THE COURT:  The record will reflect what her

7   testimony is.

8           THE WITNESS:  I'm sorry.  What was the question

9   again?

10  BY MS. ATWAL:

11  Q.  On the July 27th interrogation, Mr. Page tells you

12  something to the extent that what he had told the day

13  before --

14  A.  Two days prior?

15  Q.  Yep.  Two days prior.  Was because of Shorten's promise

16  that he'll get back to the U.S., true?

17  A.  True.

18  Q.  You never ask him, hey, what about the kids in

19  Cameroon --

20  A.  No.

21  Q.  -- how about that?  You don't ask him about Noel, do

22  you?

23  A.  No.

24  Q.  He then says he has nothing else to say, correct?

25  A.  Correct.

1    Q.  You do have the opportunity to ask him if he wants to

2    say anything about any other individuals, right?

3    A.  Correct.

4    Q.  And he says he doesn't want to talk about that?

5    A.  Correct.

6    Q.  Now let's talk about your contact when you enter things

7    into TECS.  Is that right?

8    A.  Correct.

9    Q.  And it's T-E-C-S.  Is that right?

10   A.  Correct.

11   Q.  Now, you write a little remark in there saying that the

12   subject is under investigation for Protect Act violations

13   correct?

14   A.  Correct.

15   Q.  Protect Act means abuse against children, correct?

16   A.  Correct.

17   Q.  And anybody in law enforcement would know that?

18   A.  I would hope so but not necessarily the case.

19   Q.  You would hope so, correct?

20   A.  Correct.

21   Q.  And generally most agents would know what that means?

22   A.  Correct.  Well, they should.

23   Q.  And then you have another note that says call me,

24   contact me, correct?

25   A.  Correct.

1    Q.  And that means if anybody comes across him, you want

2    them to be aware that he is being investigated for crimes

3    against children, right?

4    A.  Correct.

5    Q.  And that you want to be contacted afterwards?

6    A.  Correct.  Or before.

7    Q.  Okay.  And, in fact, some of these agents did call you

8    beforehand, correct?

9    A.  Yes.

10   Q.  And you tell them, let's just take the encounter at the

11   state of Washington, you ask the investigator in that case

12   to do an interview of Mr. Page?

13   A.  Correct.

14   Q.  You did the same thing in Atlanta, right, you tell them

15   interview this guy?

16   A.  Well, they were -- they were the ones who assisted in

17   the arrest of him.

18   Q.  Yeah.  So you told --

19   A.  I believe --

20   Q.  -- them to interview him, right?

21   A.  I believe they asked me if I wanted him to be

22   interviewed and I said sure.

23   Q.  You wanted him to be interviewed, right?

24   A.  Yes.

25   Q.  Same thing in Miami, you had wanted the agents to

1   interview Mr. Page, right?

2   A.  Yes.

3   Q.  Same thing in Chicago, you wanted him interviewed?

4   A.  Yes.

5   Q.  And in each of those instances he was interviewed,

6   correct?

7   A.  Correct.

8   Q.  He was interrogated by law enforcement at your request,

9   true?

10  A.  True.

11          MS. ATWAL:  Now, Your Honor, may I have a moment?

12          THE COURT:  You may.

13  BY MS. ATWAL:

14  Q.  Agent, I had asked you earlier that during the July 25th

15  interrogation that the allegations did not involve any of

16  his students.  Remember me asking you that question?

17  A.  Yes.

18  Q.  And the same applies for the July 27th interrogation,

19  correct?

20  A.  That?

21  Q.  None of the kids that he was asked about involved his

22  students?

23  A.  That's correct.

24  Q.  During that break on the July 25th interrogation, how

25  long was that break?

```
 1    A.   I would say approximately 15, 20 minutes or so.

 2    Q.   What was the purpose of that break?

 3    A.   SA McKinney, Keith McKinney wanted the break.

 4    Q.   Okay.  And do you know what he went and did during that

 5    break?

 6    A.   Do you know, I'm sorry?

 7    Q.   Do you know what he went and did during that break?

 8    A.   No.

 9    Q.   And you stayed in the room with Mr. McKinney -- with

10    Mr. Page?

11    A.   No, I stepped out and then I came back in.

12    Q.   And when you stepped out, what did you do?

13    A.   I actually talked to SA McKinney outside.

14    Q.   And who was Mr. Page left with inside that room?

15    A.   I don't recall.

16    Q.   Was Special Agent Shorten already in there with him?

17    A.   She -- she might have been, yes.

18    Q.   So there was a time period where Special Agent Shorten

19    was alone with Mr. Page, correct?

20    A.   I believe so.

21         MS. ATWAL:  Your Honor, may I have one moment?  I

22    apologize.

23      (Ms. Atwal conferred with Mr. Mohring.)

24         MS. ATWAL:  I have nothing further at this time,

25    Your Honor.
```

| | |
|---|---|
| 1 | THE COURT:  Thank you. |
| 2 | **REDIRECT EXAMINATION** |
| 3 | BY MS. SERTICH: |
| 4 | Q.  Special Agent Jones, Ms. Atwal asked you some questions |
| 5 | about the reports that you wrote regarding your July 25th |
| 6 | and July 27th, 2012, interviews.  And you testified that |
| 7 | those reports were entered into the TECS system in November |
| 8 | of 2012.  Is that right? |
| 9 | A.  Correct. |
| 10 | Q.  Do you know when you wrote those reports in the Word |
| 11 | document that you discussed? |
| 12 | A.  No.  I don't recall. |
| 13 | Q.  When you wrote those reports, did you confer with |
| 14 | Special Agent McKinney about them? |
| 15 | A.  I -- I don't recall if I did or not. |
| 16 | Q.  You also provided some testimony about Mr. Page residing |
| 17 | outside of the United States since approximately 1990, |
| 18 | correct? |
| 19 | A.  Correct. |
| 20 | Q.  Would it be accurate to say that he regularly traveled |
| 21 | back to the United States during that time period? |
| 22 | A.  Yes, he did. |
| 23 | Q.  In the course of your investigation, do you know whether |
| 24 | Mr. Page has sought or received citizenship in any other |
| 25 | country? |

1    A.  I do not.

2    Q.  Is there any way that you would be able to come to have

3    that information?

4    A.  I -- I don't know.  I'm sure there probably would be,

5    but --

6    Q.  Have you obtained any information indicating that he has

7    received citizenship or a passport in another country?

8    A.  No.

9    Q.  You also testified, when questioned by Ms. Atwal, that

10   there were times that he referred to the home in Winona as

11   his parents' house, correct?

12   A.  Correct.

13   Q.  Are there other interviews in which Mr. Page has

14   referred to Minnesota as home?

15   A.  Yes.

16   Q.  In addition to living abroad, has Mr. Page lived

17   elsewhere in the United States?

18   A.  Yes, he has.

19   Q.  Would it be fair to say that he's lived temporarily

20   elsewhere?

21   A.  Yes.

22   Q.  Where else do you know that he's lived on that temporary

23   basis?

24   A.  When he was teaching in Orinda, California, at the

25   Orinda Academy, he was residing in California.

1    Q.  And approximately when was that?

2    A.  I believe late 2013 to early 2014.

3    Q.  And do you know approximately how long he was there?

4    A.  I would have to look back and see.  I -- my guess would

5    be six months maybe, possibly longer.

6    Q.  Have you received any information that he sought a

7    California driver's license?

8    A.  No.

9    Q.  Is there anywhere else in the United States that, in the

10   course of your investigation, you've learned that he lived

11   temporarily?

12   A.  In Alaska.

13   Q.  And approximately how long did he live there?

14   A.  I believe only a couple of months.

15   Q.  And when was that about?

16   A.  I'm trying to remember when the interview was.  In

17   September, I believe, I want to say like August, September.

18   He was there, worked for a travel lodge or something like

19   that as a van driver.

20          THE COURT:  As a what?

21          THE WITNESS:  Van driver.  I think he's done that

22   twice, gone to work at the same place twice, different

23   years.

24   BY MS. SERTICH:

25   Q.  Now, you've been testifying about interviewing Mr. Page

 1   while he was in custody in Togo.  Did he eventually, at some

 2   point, get released from custody in Togo?

 3   A.  Yes, he did.

 4   Q.  Do you know about when that happened?

 5   A.  I believe it was approximately January of 2013.

 6   Q.  In the course of your investigation, have you learned

 7   what Mr. Page did or where he went following his release?

 8   A.  Yes.

 9   Q.  Where did he go?

10   A.  He, as far as I knew, he fled to Burkina Faso.

11   Q.  At that time did Mr. Page have a valid passport with

12   him?

13   A.  He did not.

14   Q.  Why not?

15   A.  His -- the U.S. Embassy, the State Department, had his

16   U.S. passport.  I was notified that his U.S. passport had

17   expired in the U.S. Embassy in Lomé, Togo.

18   Q.  So are you saying his U.S. passport expired while he was

19   in custody in Togo?

20   A.  Yes.

21   Q.  Do you have information about why he would go to Burkina

22   Faso?

23   A.  He previously taught in Burkina Faso and he knows

24   individuals in Burkina Faso.

25   Q.  While he was in Burkina Faso, did he attempt to get a

1    passport?

2    A.  Yes, he did.

3    Q.  What kind of passport?

4    A.  A U.S. passport.

5    Q.  Did he eventually obtain a U.S. passport there?

6    A.  Yes, he did, through the U.S. Embassy in Burkina Faso.

7    Q.  And after obtaining that U.S. passport in Burkina Faso,

8    did he travel back to the United States?

9    A.  Yes, he did.

10            THE COURT:  Is that the passport application you

11   referred to earlier, the Burkina Faso?

12            THE WITNESS:  Yes.  Yes.

13            THE COURT:  What was the address he listed in that

14   passport application?

15            THE WITNESS:  The Winona, Minnesota, address.

16   BY MS. SERTICH:

17   Q.  You testified, both in speaking with me and with

18   Ms. Atwal, that you didn't record the interview per your

19   agency policy.  Is that correct?

20   A.  Correct.

21   Q.  And does that policy only apply to interviews of

22   subjects or targets of investigations, or does it apply to

23   any interviews that you conduct in the course of an

24   investigation?

25   A.  Any interviews that we conduct.

1    Q.   Okay.  You also testified --

2    A.   Well, I take that back.  With the exception of victim

3    interviews.

4    Q.   And do you know the reason for that difference?

5    A.   Yes.  For victim interviews, our forensic interview

6    specialists, they both audio and video record victim

7    interviews for purposes of court or anything else that you

8    can --

9    Q.   Do you ever tape the interviews that you conduct of

10   subjects or targets of the investigations you are

11   conducting?

12   A.   No.

13   Q.   Would it also be fair to say that there is some

14   difference with various locations of HSI throughout the

15   country of whether agents are instructed to record subject

16   or target interviews or not?

17   A.   Correct.

18   Q.   And can you explain that for the Court?

19   A.   In the example of the Atlanta interview, that was a task

20   force officer that worked for HSI and another local

21   investigator conducted that interview.  It's my

22   understanding and through my law enforcement career that

23   local, county, and state law enforcement do record all their

24   interviews that they do with subjects of investigation.

25   That's their standard and procedure.

1    Q.  I just want to clarify a few points that you testified

2    about regarding that July 25th, 2012, interview.  When you

3    encountered Mr. Page, did he make any indication to you that

4    there was anything wrong with him physically or otherwise?

5    A.  No.

6    Q.  Did he make any statements to you regarding the

7    conditions in which he was being held?

8    A.  No.

9    Q.  And I also want to clarify the testimony you provided to

10   Ms. Atwal.  You previously testified that the statements

11   Mr. Page made regarding the sexual abuse of children in

12   Cameroon occurred before Special Agent Shorten entered the

13   room.  Is that correct?

14   A.  That's correct.

15   Q.  And the admissions that he made after Special Agent

16   Shorten entered the room were with respect to an individual

17   minor in Togo.  Is that correct?

18   A.  That's correct.

19   Q.  Ms. Atwal asked you if you recall Special Agent Shorten

20   saying we'll see if something can be worked out.  And you

21   testified that you did not hear her say anything like that.

22   Correct?

23   A.  Correct.

24   Q.  And do you mean that you never heard her say anything

25   like that after her initial statement that they would see

1   what they could do about getting him home?

2   A.   Correct.

3   Q.   And you said that the statement Ms. Shorten made about

4   seeing what they could do about getting him home, you didn't

5   recall verbatim what she said, correct?

6   A.   Correct.

7   Q.   Is it possible that in that initial statement to him she

8   could have said something like "We'll see if something can

9   be worked out"?

10  A.   Sure, yes.

11  Q.   You also provided testimony that you did not report this

12  statement made by Ms. Shorten to anyone.  Correct?

13  A.   Correct.

14  Q.   Is that something you would typically report up the

15  chain?

16  A.   No.

17  Q.   And why not?

18  A.   I guess it's something between agents.  I don't know.

19  It was one of those, I mean, it's -- an agent makes that

20  statement, that -- I don't know.  It's just something that

21  we don't typically report.

22  Q.   Did you feel that you had attempted to correct the

23  situation to the best that you could?

24  A.   Yes.

25  Q.   There were several points throughout your testimony

1   where you indicated that Mr. Page said he didn't want to

2   talk about something anymore, you know, he didn't want to

3   talk about allegations against him in Togo and those kinds

4   of things.  When he indicated to you throughout the two

5   interviews that he didn't want to talk anymore about a

6   specific subject, did you press him further on that?

7   A.  No.

8   Q.  Did you push him to respond in any way?

9   A.  No.

10  Q.  You also provided testimony about putting information

11  into the TECS system and further interviews conducted by

12  border crossing agents.  Did you instruct any of those

13  agents as to what you wanted them to learn from Mr. Page in

14  the course of those interviews?

15  A.  The only thing that I would tell them is to ask where

16  Mr. Page was travelling to, what he had been doing or where

17  he was going and what he was going to be doing.

18  Q.  And what was the reason for that?

19  A.  Just so that I would have knowledge as to if Mr. Page

20  was out of the country, what he was doing outside of the

21  country, and then if he was coming back into the country as

22  far as where he was intending to travel to and what he was

23  intending to do.

24  Q.  And would it be standard practice in the course of your

25  investigations to request those types of interviews

1    whenever a subject or target of your investigation is coming

2    or going from the country?

3    A.  Yes, it is.

4    Q.  And did you have any indication from law enforcement in

5    Togo when you were interviewing Mr. Page in Togo that he had

6    been interviewed by anyone else in custody?

7    A.  No.

8    Q.  You were only aware of the two interviews that you

9    conducted of him there?

10   A.  Correct.

11            MS. SERTICH:  No further questions at this time.

12            THE COURT:  Any further cross?

13            MS. ATWAL:  Yes, Your Honor.

14                       **RECROSS-EXAMINATION**

15   BY MS. ATWAL:

16   Q.  Special Agent Jones, your alert on TECS reminds other

17   agents that Mr. Page is being investigated for Protect Act

18   violations, correct?

19   A.  Correct.

20   Q.  Violations against children?

21   A.  Correct.

22   Q.  Now, you are, in your system that you use for Homeland

23   Security, you're aware when someone comes in and out of a

24   country, correct?

25   A.  Correct.  If we have a -- if we have a lookout for them.

1    Q.  Okay.  And so you can receive a notice about when

2    someone comes into the country and when somebody goes

3    outside the country?

4    A.  Correct.

5    Q.  And you can know that information without an agent

6    picking up the phone and telling you that, correct?

7    A.  Correct.  On not all occasions though.

8    Q.  But usually you can tell that, correct?

9    A.  Correct.

10   Q.  In your alert to other agents, you specifically put in

11   there that not only was he being investigated for Protect

12   Act violations but you also wanted to be contacted, correct?

13   A.  Correct.

14   Q.  Now, you used, when Ms. Sertich was just asking you

15   questions about Mr. Page being released from prison in

16   January of 2013, you used the word he fled to Burkina Faso,

17   correct?

18   A.  To Burkina Faso, correct.

19   Q.  And in fact, he had no travel restriction, correct?

20   A.  I don't know that.

21   Q.  Okay.  He went to the U.S. Embassy when he got to the

22   other country, correct?

23   A.  No, I do not know if he went to the U.S. Embassy in

24   Burkina Faso.

25   Q.  He applied for his passport, correct?

1    A.  He did.

2    Q.  At the U.S. Embassy, correct?

3    A.  I -- I mean, I believe he did.

4    Q.  Okay.  To get a U.S. passport in a foreign country, one

5    would have to go through the embassy, true?

6    A.  True.

7    Q.  He was never arrested in that other country, correct?

8    A.  Correct.

9    Q.  And he was allowed to come back into the United States,

10   correct?

11   A.  Correct.

12   Q.  And he was not arrested at that time, correct?

13   A.  Correct.

14   Q.  Let's go to Ms. Shorten's, Special Agent Shorten's,

15   statement.  You said you never reported this to your

16   superiors, correct?

17   A.  Correct.

18   Q.  It was something amongst you agents you could sort out?

19   A.  Correct.

20   Q.  So I'm going to ask you again, do you recall what

21   conversation you had with Special Agent Shorten in regards

22   to her statement?

23   A.  No.  I don't recall.

24   Q.  It didn't concern you enough that one of your colleagues

25   was providing false information to a suspect such that you

1   reported it to your superiors, correct?

2   A.   That I -- I'm sorry, what was the first portion?

3   Q.   It didn't concern you that one of your colleagues was

4   making false promises to a suspect, did it?

5   A.   It did concern me.

6   Q.   Not enough for you to go to your superiors, correct?

7   A.   My supervisor did know about it, yes.

8   Q.   Who is your supervisor?

9   A.   At that time it was Christopher Ochre.

10  Q.   So did you report that to him?

11  A.   He -- yes, he was aware of what happened, yes.

12  Q.   When was he made aware of this?

13  A.   I don't recall.

14  Q.   It was well after that first interrogation, wasn't it?

15  A.   Correct.

16  Q.   It was sometime in 2015, true?

17  A.   No.  He -- I would have told him after returning from

18  Togo.

19  Q.   Okay.  Did you write a report about reporting your --

20  A.   No.

21  Q.   It's just something you recall that you did?

22  A.   Yes.

23  Q.   And, again, you were not aware of what happened when

24  Special Agent Shorten was left alone with Mr. Page, are you?

25  A.   Correct.

1          MS. ATWAL:   Thank you.   I have nothing further,

2     Your Honor.

3          THE COURT:   Thank you.

4                    **REDIRECT EXAMINATION**

5     BY MS. SERTICH:

6     Q.   Special Agent Jones, you previously testified that when

7     Mr. Page left Togo for Burkina Faso, his passport was in

8     custody of the U.S. Embassy in Togo to your knowledge.   Is

9     that correct?

10    A.   That's correct.

11    Q.   So what did you mean when you said that Mr. Page fled

12    Togo?

13    A.   I only learned afterwards that Mr. Page had paid an

14    amount of money to the victim and was released out of

15    custody.   Only in 2015, late 2015, did I actually find out

16    that stated that he did not pay the full I guess restitution

17    amount, I'm not sure what the correct word would be there,

18    to the victim and therefore, underneath the way he was

19    released, he was not supposed to have left Togo, so when I

20    was -- back in 2013, in January, I was notified by Dave

21    McClintock that he had been released out of prison and

22    he -- somebody had reported to the U.S. Embassy in Lomé,

23    Togo, that he had spotted Mr. Page in Burkina Faso.

24    Q.   And then he subsequently went to the embassy in the

25    United States -- in Burkina Faso, correct?

 1    A.  Right.  I believe he -- I believe he had called the U.S.

 2    Embassy in Togo or something like that.  There's something

 3    with the communications about his passport.

 4    Q.  But when he crossed the border from Togo to Burkina

 5    Faso, he didn't have a passport with him, correct?

 6    A.  Correct.

 7    Q.  Do you know how long Special Agent Shorten was alone

 8    with Mr. Page?

 9    A.  No, I do not.

10    Q.  Do you have any estimate?

11    A.  Maybe, maybe ten minutes would be my guess.  10,

12    15 minutes maybe.  I'm not for sure.

13    Q.  Did you have a sense when you were in the interview

14    which of you of the agents was in charge of the interview?

15    A.  As far as?

16    Q.  Asking Mr. Page questions.

17    A.  That was me.

18    Q.  And why do you say that?

19    A.  As far as that I was the one asking more questions?

20    Q.  Mm-hmm.

21    A.  Because I was -- I was sitting beside him and yeah.

22            MS. SERTICH:  No further questions, Your Honor.

23            MS. ATWAL:  Nothing further, Your Honor.

24            THE COURT:  Thank you.  Agent Jones, you may be

25    excused.

1      We're going to take a short 15-minute break, and

2   then my suggestion would be that we proceed -- or is the

3   order that you have here the order you want to call the

4   witnesses in?

5      MS. SERTICH:  I believe it is, Your Honor.  The

6   next witness would be Philip Folkemer.

7      THE COURT:  Okay.  So why don't we take a short

8   break, we'll come back and we'll do Mr. Folkemer to

9   conclusion and then take a lunch break, okay?  Thank you.

10      (Recess taken from 11:04 a.m. until 11:19 a.m.)

11      THE COURT:  Ms. Sertich, your next witness.

12      MS. SERTICH:  Thank you, Your Honor.  The

13   government calls Philip Folkemer.

14      (The witness is sworn.)

15      THE COURT:  Thank you.  Please be seated.  Make

16   yourself comfortable.  State your name and spell your last

17   name, sir.

18      THE WITNESS:  My name is Philip Folkemer.  Philip

19   is spelled with one L.  Folkemer is spelled F-O-L-K-E-M-E-R.

20                    **DIRECT EXAMINATION**

21   BY MS. SERTICH:

22   Q.  Good morning, Mr. Folkemer.  Where are you employed?

23   A.  I'm currently employed with the U.S. State Department.

24   Q.  What's your current position with the U.S. State

25   Department?

1    A.  My current position is a political attaché at the U.S.

2    Embassy in Belize.

3    Q.  How long have you been in that position?

4    A.  Since September of 2014.

5    Q.  How long have you been with the State Department in

6    total?

7    A.  Since September of 2009.

8    Q.  Do you --

9             THE COURT:  Did you say Belize, sir?

10            THE WITNESS:  Yes, I did.

11   BY MS. SERTICH:

12   Q.  You understand that you're here today to provide

13   testimony regarding your interactions with Thomas Page in

14   July of 2012?

15   A.  Yes.

16   Q.  What was your position with the U.S. State Department at

17   that time?

18   A.  In 2012 I was a vice consular at the U.S. Embassy in

19   Lomé, Togo.

20   Q.  Generally speaking, what were your duties in that role?

21   A.  We had two -- consulars have two sort of primary duties.

22   The first one is dealing with the local nationals with visa

23   issues or citizenship issues or anything like that.  The

24   other half is American citizen services which would be the

25   most common thing would be someone visits and they lose a

1    passport or something like that or someone comes and they go

2    off their meds and we have to, you know, get them back to

3    the United States or something like that.  Also, if someone

4    dies, we would notify next of kin, of a American citizen,

5    rather, and also prison visits in the case of someone being

6    an American being arrested overseas.

7             THE COURT:  Okay.  Let's take a break.  I want

8    counsel up here for a minute.

9         (Discussion off the record.)

10            THE COURT:  I apologize, Mr. Folkemer.  I needed

11   to disclose to counsel, and I don't know whether you recall

12   this, but in February of 2015, my sister-in-law died

13   tragically in Belize, and I dealt with your consulate and

14   with your office on a number of occasions as a consequence

15   of that death.  I've disclosed that to counsel, and they --

16   and I'm disclosing it here on the record.  I don't believe

17   that it affects anything here today and your current

18   position with Belize has anything to do with what your

19   testimony is, but in an abundance of caution, I wanted to

20   disclose that on the record.  And I don't know whether you

21   recall the death or not.

22            THE WITNESS:  I --

23            THE COURT:  And if you don't, that's all right.

24            THE WITNESS:  I don't.  And the sections are very

25   separate so.

1          THE COURT:  Yeah.

2          THE WITNESS:  With the job -- the folks you would

3     have interacted with are what my job would have been in Togo

4     but not what my job is in Belize so.

5          THE COURT:  Okay.  Thank you.

6     BY MS. SERTICH:

7     Q.  Mr. Folkemer, so you mentioned that one of your duties

8     on the side of your job involving services for American

9     citizens was to visit Americans in custody in Togo.  Is that

10    correct?

11    A.  Correct.

12    Q.  What were your primary functions in that role

13    specifically?

14    A.  So in that role, there's two main functions.  The first

15    is to just to visit the prisoner and sort of announce and

16    explain why we're there.  We're there to provide support.

17    We're not, you know, we're not attorneys.  We provide a list

18    of attorneys if -- local attorneys if the prisoner wants

19    some.  We bring a medical -- or sorry, a privacy clearance

20    waiver so that if they want, if the prisoner wants, we can

21    tell people back home what's happened, that they've been

22    taken into custody; if they want, of course, that's their

23    option.  And then the other primary purpose is to just make

24    sure they are being treated fairly in accordance to local

25    law; that is to say they're not being discriminated against

1    in prison because they're American.

2    Q.  Can you describe the usual procedure or the training

3    that you use with respect to what you should do when you

4    visit an American in custody in a foreign country?

5    A.  I will try, you know, it depends on every prison system

6    is different in every parts of the -- in all parts of the

7    world.  So but in general, the first thing to do is to make

8    contact with whoever is in charge of the prison and just

9    announce, you know, we've heard there's an American here,

10   we'd like to come visit, and in almost all cases they'll say

11   yes.  And then to go and to announce yourself to basically

12   anyone you can see, just say here I am, I'm an American

13   consular officer, I'm here making sure that the American

14   citizen in custody is treated fairly.

15          And then, of course, when you finally meet the

16   American, just ask the very direct questions, are you -- do

17   you feel like you're being treated fairly, are you being

18   treated like everyone else, you know, are they -- are they

19   starving you, are you thirsty, have you been beaten, those

20   questions like that, is there anyone we can contact on your

21   behalf, do you need a list of lawyers, you know, that kind

22   of stuff.

23   Q.  Okay.  Are you also trained to talk to Americans in

24   custody abroad about the fact that you aren't an attorney?

25   A.  Yes.  And that's the first thing we do.  We -- I guess

1    because perhaps in some cases there's a tendency, you see an

2    American, maybe it's a familiar face, and you want to just

3    start talking, and so we make it clear at the beginning

4    that's not our role, that we're not attorneys.  There's no,

5    you know, consular officer, you know, client privilege, that

6    isn't a thing, so we make it very clear from the outset what

7    our role is and isn't.

8    Q.  And in the course of that conversation, do you make some

9    comment about whether the American citizen should talk to

10   you about the facts of why they're in prison?

11   A.  No.  We don't ask that.  I mean, I've heard in some

12   cases it happens, some people want to say things, but we

13   wouldn't ask that.  We would just, you know, we just, again,

14   make it clear that we're not attorneys so, you know,

15   anything they would tell us could, of course, be used in

16   court so, you know, not to tell us things they don't want to

17   tell us.

18   Q.  Other than visiting -- well, we'll -- we'll get to that

19   in a minute.  Did you first hear of Mr. Page on July 24th,

20   2012?

21   A.  Yes, that's correct.

22   Q.  How?

23   A.  I guess someone from the prison called or someone from

24   the police called our office and then someone from my staff,

25   one of our local staff, said that there's an American in

1    custody and we should go visit.

2    Q.  And did you visit Mr. Page on that same date?

3    A.  Yeah.  In the evening after work on the 24th, yeah.

4    Q.  And did you go alone or with anyone else?

5    A.  I went by myself.

6    Q.  Where was Mr. Page at that time?

7    A.  He was in a -- he was in a police station, I guess,

8    police station is the best way to describe it.  He was in I

9    guess you would call it a holding cell but it's more of

10   assembled like a classroom.  There's a -- I'm trying to get

11   a sense of how big it was, maybe the size of all of those

12   pews put together in the back area there, and he was in the

13   room by himself.

14          THE COURT:  I'm sorry, what date was this?  I

15   apologize.

16          THE WITNESS:  This was the 24th.

17          THE COURT:  Thank you.

18   BY MS. SERTICH:

19   Q.  Other than visiting Mr. Page at this police station, had

20   you ever been to that police station before?

21   A.  Not that I recall, no.

22   Q.  Are you -- were you at any point outside of that area

23   that you described as looking like a classroom?

24   A.  Yeah.  I mean, it looked also, I guess, even outside it

25   looked almost like a small schoolhouse kind of thing and

1    just hallways.  And it's difficult to describe.  You sort of

2    walk in, and the guy took me -- the guy sitting at the desk

3    took me around the corner to the room where Mr. Page was.

4    But it was kind of unremarkable otherwise.

5    Q.  At any point did you understand that you were in the

6    area where people in custody were actually being housed or

7    held?

8    A.  I didn't see anyone else there.  I got the sense that it

9    was very temporary, they just sort of were waiting for

10   something.  I didn't get the exact details of what at that

11   time.  But there were no other prisoners around that I saw.

12   It was really just Mr. Page and I think there were probably

13   two other, maybe two guards or something like that.

14   Q.  Okay.  Did you provide Mr. Page with anything at that

15   first visit?

16   A.  Yeah.  I gave him I guess a couple of things, so first

17   the privacy act waiver for him to sign, just authorizing us

18   to alert any, you know, family members that call or ask or

19   hear about it so we can talk with them, and he signed that.

20   I gave him a list of attorneys, of local attorneys, and I

21   also brought him I think a bottle of water and I want to say

22   some peanuts or pretzels or something like that, some small

23   snack.

24   Q.  When you met with Mr. Page, was there anyone else in the

25   room with you?

1   A.  Yeah, there was one other young officer, I guess he was

2   an officer, not in uniform or anything, but came in and sort

3   of stood to the side while I talked to him.

4   Q.  Do you recall whether he was armed or not?

5   A.  I am -- I don't recall, but if he were armed, I would

6   know, because I very rarely saw anyone armed.  But I

7   can't -- I wouldn't say for certain that he wasn't, but I

8   would say I'm pretty sure he was not.

9   Q.  When you met with Mr. Page, did he report any abuse or

10  ill treatment to you?

11  A.  He did not.

12  Q.  Did he show any outward signs of physical abuse?

13  A.  No.

14  Q.  Did the guards or officials that were there at the

15  police station interfere with your visit with him at all?

16  A.  No.  I think the guy stepped over as I was handing over

17  the papers just to check what they were, but that was it.

18  Q.  So he checked the items that you gave to Mr. Page?

19  A.  Right.

20  Q.  Can you generally describe, if you recall, what

21  Mr. Page's demeanor was during that interview?

22  A.  Not -- I mean, he didn't -- quiet, mostly.  I wouldn't

23  say calm but not overly agitated.  He was basically quiet

24  and -- I would say.

25  Q.  Did the guards or officials who were there at the jail

```
1    display any signs of keeping Mr. Page under duress?

2    A.  No.

3    Q.  After the meeting on June 24th, 2012, were you satisfied

4    that Mr. Page was being treated fairly?

5    A.  Yes.

6    Q.  Did you learn while you were there that Mr. Page was

7    going to be moved to another location on the next day,

8    July 25th, 2012?

9    A.  Yeah, they said they were moving him.  I don't think

10   they knew exactly when.  I think they said they were

11   shooting for the next day but didn't have an in fact time.

12   Q.  And how long did you visit with Mr. Page on July 24th?

13   A.  No more than 10 or 15 minutes.

14   Q.  Did the local guards tell you that they would inform you

15   when Mr. Page was moved?

16   A.  Yes.

17   Q.  Did you also visit Mr. Page the following day,

18   July 25th?

19   A.  Yes.

20   Q.  When did that visit occur?

21   A.  It happened in the evening, earlier evening, after work,

22   so sometime -- yeah, early evening I would say.

23   Q.  Were you with anyone else for that visit?

24   A.  I was with our senior consular assistant Loretta.  She's

25   our senior Belize counselor assistant.  Well, was at the
```

1    time anyway.

2    Q.   And where was Mr. Page located during this second visit?

3    A.   Well, we -- we all -- I guess, I don't understand.  You

4    mean where did we talk to him or?

5    Q.   No, just generally --

6    A.   Oh, sorry.

7    Q.   -- speaking, where had he been moved?

8    A.   He had been moved to the prison by that point.

9    Q.   Is that still in Lomé, Togo?

10   A.   Yeah, that's still in Lomé.

11   Q.   And now can you describe to the Court that setting?

12   A.   Sure.  So we had the -- we drove in, there's a

13   courtyard.  It's hard to say how big, half an acre maybe.

14   There was a building on the left, not so big, but I don't

15   know, again, a classroom size building I would say.  And

16   yeah about a classroom size building, I would say, and then

17   on the right there was another separate gate behind which

18   the prisoners were normally kept.

19   Q.   Okay.  And so at any point did you go into that area

20   where the prisoners are kept?

21   A.   No.

22   Q.   Had you ever visited that prison facility other than

23   your visit to see Mr. Page?

24   A.   No.

25   Q.   Generally speaking, do you know anything about prison

1    conditions in Togo?

2    A.  Very little.

3    Q.  Do you know anything about the sanitation conditions

4    there?

5    A.  No.

6    Q.  Do you know anything about the physical structure in

7    which the prisoners are housed other than the outside that

8    you saw?

9    A.  No.

10   Q.  Can you describe for the Court where you actually met

11   with Mr. Page during that meeting?

12   A.  Yes.  We drove in.  It was sort of after hours, so we

13   just -- we just parked.  They let us in because they

14   normally do that for us.  We just sort of parked under a

15   tree in the courtyard there, and they just brought him out,

16   and we just stood there, talking to him under the tree.

17   Q.  So did you get the sense that you were visiting Mr. Page

18   outside of what the normal visiting hours would be?

19   A.  Yes.  Yep.

20   Q.  Did Mr. Page mention whether he had enough food for that

21   day?

22   A.  He said -- he said he had enough, yeah.  I mean, he said

23   he was not being starved or, you know, anything like that.

24   Q.  Did you provide Mr. Page with anything at that second

25   visit?

1    A.  I don't believe so, no.

2    Q.  Were you able to determine whether Mr. Page was in good

3    health condition?

4    A.  He -- he appeared to be in good health condition, and,

5    of course, we asked and he said he was.

6    Q.  Did he make that same representation the previous day?

7    A.  Yes.

8    Q.  Did Mr. Page report any abuse or ill treatment to you at

9    that time?

10   A.  No.

11   Q.  Did Mr. Page show any outward signs of physical abuse

12   while you met with him?

13   A.  No.

14   Q.  During this visit, did the guards do anything to

15   interview with -- or interfere with your visit?

16   A.  No.

17   Q.  Where were prison officials located with respect to you

18   while you were conducting the interview?

19   A.  Not close.  I mean, well out of earshot, maybe -- I

20   couldn't even say.  Well out of earshot.  So at the end of

21   the room here would sound about right.  So if we're sort of

22   standing here talking, they may be sort of in the back

23   corner there.

24   Q.  Did Mr. Page ask you to contact anyone for him during

25   this visit?

```
1   A.  He did.  He mentioned two or three of his friends, his

2   local Togolese friends who he wanted to contact.  And he

3   said he was in contact with one of his friends or someone

4   else who was going to bring him food or water or buy him

5   food.  So he asked to contact a few other folks.

6   Q.  How long did this visit on July 25th last?

7   A.  Again, no longer than 10 or 15 minutes.

8   Q.  Did you also visit Mr. Page on July 27th, 2012?

9   A.  Yes.

10  Q.  Were you with anyone for that interview?

11  A.  Yes.  I was with our consulate chief Art Bell.

12  Q.  And where was Mr. Page located during that interview?

13  A.  He was also in the prison.

14  Q.  Can you describe the setting for the Court where your

15  meeting with Mr. Page occurred on that day?

16  A.  Sure.  That time we met in the building I mentioned,

17  sort of the one standalone building that I saw in the

18  compound, just a -- just a big room.  There were a lot of

19  other prisoners there talking to people.  So at that time,

20  they were using it as sort of a visitor's room.

21  Q.  Did you provide Mr. Page with anything at that third

22  visit?

23  A.  I don't believe we did, no.

24  Q.  Did Mr. Page mention at that visit whether he had enough

25  food for that day?
```

1   A.  He had said that he had someone who was bringing him

2   things, so he -- so yes, he seemed to have enough.

3   Q.  And did he mention anything to you about someone

4   retrieving items from his house?

5   A.  Yeah.  He -- he said he wanted -- he said he was working

6   -- I guess he was working with -- he was working to try to

7   get items from his house somehow with some of his friends

8   working with I guess the director of the school or somebody

9   that there -- he said he was working on it basically.

10  Q.  Were you able to determinate at that visit whether

11  Mr. Page was in good health condition?

12  A.  Yes.  He seemed to be and said that he was.

13  Q.  Did Mr. Page report any abuse or ill treatment during

14  that visit?

15  A.  No.

16  Q.  Did he show any outward signs of physical abuse?

17  A.  No.

18  Q.  Did prison guards do anything to interfere with your

19  visit on this occasion?

20  A.  No.

21  Q.  And where were prison officials in relation to you

22  during this interview?

23  A.  They were just sort of at the doorway, I mean, just, you

24  know, a normal sized room and they were at the doorway and

25  folks were talking sort of all around.

1    Q.  And did you notice whether they were armed during that

2    conversation?

3    A.  I didn't.  But, again, I doubt it.

4    Q.  During the July 27th interview, did Mr. Page ask you to

5    contact anyone on his behalf?

6    A.  Yeah, he asked us to contact his parents.

7    Q.  And did he give a reason why?

8    A.  I think he said that it was about money, to try to get

9    some money.

10   Q.  Did he mention any other friends who he wanted you to

11   contact?

12   A.  At that time, no, I don't think so.  He mentioned that

13   the previous time.  He may have followed up on it but no.

14   Q.  How long did you visit with Mr. Page on July 27th?

15   A.  No more than 10 or 15 minutes.

16   Q.  At any time during the three visits with Mr. Page did he

17   discuss with you the reason that he was in custody?

18   A.  Not directly.

19   Q.  Okay.  What do you mean by that?

20   A.  He -- he sort of alluded to it.  The third time he said

21   something like, I don't know the quote exactly, but he

22   thanked us for coming, he said thanks for coming to check up

23   on us in light of, you know, particularly in light of what

24   the charges are.

25   Q.  Did you know what the charges were against Mr. Page?

```
1    A.  By the third time I did.  At the first time I don't

2    think I did.

3    Q.  Do you recall when you learned what the charges against

4    him were?

5    A.  Sometime -- sometime in those three days.  I don't know

6    exactly.  I don't -- I don't know.

7    Q.  And do you know how you would have been informed of what

8    those charges were?

9    A.  Yeah, I'm not entirely sure.  I mean, I know it probably

10   seems weird that I can't remember that, but it's -- the ex

11   pat community is very small in Togo, very small, and

12   particularly involving someone who is, you know, affiliated

13   with the British school where a lot of the embassy children

14   went, there's just sort of you hear things, I guess, is the

15   only way I can put it.  It's maybe an inelegant explanation,

16   but I heard it.  If I had to guess, I would say probably I

17   heard it from Art, the consulate chief Art Bell, but I could

18   have heard it from, you know, the director of the school.  I

19   could have heard it from somebody else.  I really don't

20   know.  But by the third time, I'm -- I remember knowing by

21   the third time.

22   Q.  So did you have an understanding by the third time that

23   you met with him that Mr. Page was in jail in Togo because

24   he was being accused of sexual abuse of minors --

25   A.  Yes.
```

1    Q.  -- in Togo?

2    A.  Yes.

3    Q.  What would you have done if Mr. Page had reported any

4    abuse or ill treatment during these visits?

5    A.  Well, that's a good question.  The first thing I would

6    have done is I would have just, as diplomatically as I

7    could, I would have asked the prison warden or whoever was

8    in charge, you know, have you heard anything, have you seen

9    anything about this, according to you, is he being treated

10   okay, you know, just would have asked to talk us through the

11   process a little bit.

12        If I hadn't gotten anywhere with that, I would

13   have -- it would have been unfamiliar situation with me,

14   honestly, so I would have called Washington.  I would call

15   the State Department, someone who knows more about this than

16   me, and I would have asked them what to do.

17   Q.  Did you keep or make notes in activity log relating to

18   your visits with Mr. Page?

19   A.  Yes.

20   Q.  Can you explain for the Court what the activity log is?

21   A.  Well, the activity log is something we do for any kind

22   of case, not just a prison visit, but for any kind of

23   American citizen case, just as sort of, you know, a couple

24   of sentences describing what we're doing so that we can look

25   back, you know, in the future and say, oh, here's what

1    happened, here's when.

2    Q.  If Mr. Page had reported any abuse or ill treatment,

3    would that have been recorded in the activity log?

4    A.  Absolutely.  That would have been the first and only

5    thing I would have written in the activity log probably.

6    Q.  If Mr. Page had reported that he was not in good

7    physical or health condition, would you have recorded that

8    in your activity log?

9    A.  Yes.

10   Q.  And it's your testimony here today that you didn't

11   record anything like that because those statements were

12   never made?

13   A.  Yes.

14   Q.  During your time in Togo while you were in charge of

15   American citizen services, did you ever hear about

16   discrimination of non-Togalese citizens in the jail or

17   prison system in Togo?

18   A.  I didn't hear about it.

19   Q.  Were there any other American citizens that you visited

20   in custody in Togo during the time that you were there?

21   A.  There were not.

22   Q.  So you said that by the time you visited Mr. Page for

23   the third time you knew that he was there based on

24   allegations of sexual abuse of minors, correct?

25   A.  Yes.

1   Q.  And did you know that it was minor boys?

2   A.  Yes.

3   Q.  Generally speaking, based on your experience living in

4   Togo and being the coordinator for American citizen

5   services, do you think it would be fair to say that

6   homosexual acts or homosexual activity can lead to

7   discrimination in Togo?

8   A.  Generally, yes.

9   Q.  At any time did you hear of individuals being held in

10  prison being discriminated on that basis?

11  A.  I did not.

12  Q.  Did Mr. Page ever indicate any discrimination on that

13  basis?

14  A.  He didn't.

15          MS. SERTICH:  Nothing further at this time.

16          THE COURT:  Thank you.

17                    **CROSS-EXAMINATION**

18  BY MS. ATWAL:

19  Q.  Good morning, sir.

20  A.  Hi.

21  Q.  Mr. Folkemer, you had just testified that one of your

22  duties in Togo was to do prison visits, correct?

23  A.  Yes.

24  Q.  But the visits, the prison that Mr. Page was located at

25  and the jail that he was at, you didn't actually go inside

1   those cells, did you?

2   A.   No.

3   Q.   You didn't see the conditions of the jail or the prison

4   itself?

5   A.   That's right.

6   Q.   You did not see the amount of people that are held in

7   each cell, correct?

8   A.   Correct.

9   Q.   You don't know about the food or water quality, correct?

10  A.   Correct.

11  Q.   You don't know that there's a toilet, the toilet is a

12  hole in the ground, correct?

13  A.   Correct.

14  Q.   You don't know if there's one shower or two showers for

15  all individuals, correct?

16  A.   Correct.

17  Q.   You do know that people don't have access to a

18  telephone, correct?

19  A.   I -- yeah, I guess I -- I didn't know one way or the

20  other, but I believe you.

21  Q.   Mr. Page asked you to call his parents, correct?

22  A.   Yes.

23  Q.   And that's probably assuming that he himself could not

24  call his parents, correct?

25  A.   Correct.

1   Q.  And at one point he even told you or one of your

2   colleagues that he needed to get a phone, correct?

3   A.  I -- yeah, I guess I remember him mentioning something

4   about a phone, but I don't remember how it was resolved.

5   Q.  Okay.  Now, you talked about this activity log just a

6   few moments ago, and you said that you don't recall Mr. Page

7   telling you about any harm that had come to him, correct?

8   A.  Correct.

9   Q.  And that's based on your review of the activity log and

10  your memory.  Is that correct?

11  A.  Right.

12  Q.  And did you review that activity log before you

13  testified here today?

14  A.  Yeah, a little bit, yeah.

15  Q.  Okay.  Now, you had entered certain facts into the

16  activity log, correct?

17  A.  Yes.

18  Q.  Now, all three of the visits that you conducted on July

19  24th, July 25th, July 27th of 2012, each of those meetings

20  that lasted about 10 to 15 minutes took place at the jail or

21  on prison grounds, correct?

22  A.  Right.

23  Q.  And each time there was guards around, correct?

24  A.  Well, I guess I don't know what you mean.  You mean --

25  Q.  Did you see guards each time --

1    A.  Oh, yes, yeah.

2    Q.  And so those guards could see you, correct?

3    A.  Yes.

4    Q.  You could see them?

5    A.  Mm-hmm.

6    Q.  Yes?

7    A.  Yes.  Sorry.  Yes.

8    Q.  That's okay.  And you testified earlier that even when

9    you gave paperwork to Mr. Page, the guards had to look at

10   that, correct?

11   A.  Correct.

12   Q.  Now, the first thing you do when you go visit a prison,

13   let's just talk exactly to this jail that -- let's talk

14   about the jail first, you notify the person in charge,

15   correct?

16   A.  Correct.

17   Q.  You tell them I'm a U.S. -- I work for the U.S.

18   consulate and I'm going to visit a U.S. citizen, correct?

19   A.  Correct.

20   Q.  And in this case, you believe you got a call from

21   somebody, right?

22   A.  Correct.

23   Q.  Do you recall who that was?

24   A.  No, I didn't take the call.  It went to our office and

25   so our consular assistant would have picked it up.

1    Q.  Is your office located in the U.S. Embassy?

2    A.  Yes.

3    Q.  How large is that embassy?

4    A.  By?  I'm sorry.

5    Q.  How many employees are there in that U.S. Embassy?

6    A.  Boy, at the time, I don't know, I would say there was

7    about 20 to 25 Americans and maybe about 80 to 100 local

8    Togolese.

9    Q.  Okay.  And do you interact with the other Americans that

10   are there?

11   A.  Yes.

12   Q.  Do you guys socialize?

13   A.  Yes.

14   Q.  You know some of the investigative people that work at

15   that consulate?

16   A.  Yes.

17   Q.  Okay.  Do you recall whether it was one of those guys

18   that told you about the arrest of Mr. Page?

19   A.  I don't recall, no.

20   Q.  Do you know how long he had been in custody at the time

21   you came to see him on July 24th, 2012?

22   A.  It can't have been -- well, I don't -- I don't know.

23   Q.  It was 9 o'clock at night when you saw him, correct?

24   A.  Yes.  Sounds right.

25   Q.  He had told you he was hungry and thirsty, correct?

1    A.  I guess.  I don't remember him saying he was hungry.

2    Q.  Would it help if I showed you your activity log?

3    A.  I guess so.

4          MS. ATWAL:  Okay.  Your Honor, may I approach?

5          THE COURT:  You may.

6          THE WITNESS:  Okay.  Yes, now I see it.

7    BY MS. ATWAL:

8    Q.  Okay.  What do you remember, he told you that he was

9    hungry and thirsty, correct?

10   A.  Yes.

11   Q.  You also gave him what's called a EMDA loan application,

12   correct?

13   A.  Yes.

14   Q.  And is that an application so somebody can retain an

15   attorney or get funds to hire an attorney?

16   A.  I believe so, yeah.

17   Q.  And, in fact, Mr. Page also talked to you about having

18   to pay for his food, correct?

19   A.  I don't remember him talking about having to pay for the

20   food.  I remember him talking about having to get someone to

21   bring food in.  So maybe he was paying for it, I don't know.

22   Q.  Okay.  And you also recall him saying that there's

23   bribes at the prison?

24   A.  I don't recall that, but I believe it.

25   Q.  Okay.  And you believe this because of the two years

1    that you spent in Togo, correct?

2    A.  Yeah.

3    Q.  And from talking to your colleagues?

4    A.  Correct.

5    Q.  And you also are aware that a lot of these jails in

6    these third world countries such as Togo, there's a

7    overcrowding problem, correct?

8    A.  Generally, I guess I would believe that, yes.

9    Q.  And you've also heard that they are unlike U.S. prisons

10   in terms of cleanliness, correct?

11   A.  I would also very much believe that, yes.

12   Q.  Now, one of your jobs as the consulate is to make sure

13   that the U.S. citizen is being taken care of, correct?

14   A.  Correct.

15   Q.  Your concern is that this U.S. citizen is being treated

16   fairly and not abused in any way, true?

17   A.  Correct.

18   Q.  And so when you first went to see Mr. Page, you wanted

19   to make sure those things were -- that he was in good

20   health, correct?

21   A.  Correct.

22   Q.  And so you looked at him physically, correct?

23   A.  Correct.

24   Q.  And asked him questions about for 10 to 15 minutes,

25   true?

1    A.  Yes.

2    Q.  And one of the reasons that we have somebody like you in

3    these third world countries is that there is a concern that

4    somebody may not be treated well, correct?

5    A.  Correct.

6    Q.  And it's why the government just asked you whether it

7    was someone's sexual orientation, correct?

8    A.  Correct.

9    Q.  Or the color of their skin?

10   A.  Correct.

11   Q.  And this, and as far as you know, Mr. Page was the only

12   white person in that prison, correct?

13   A.  As far as I know.

14   Q.  The only U.S. citizen in that prison?

15   A.  Yes.

16   Q.  Same thing for the jail, the only white person in that

17   jail?

18   A.  Probably.

19   Q.  On the July 25th, 2012, check, you recall that he was in

20   the same clothes that he had been in the past few days on

21   July 24th?

22   A.  I believe that.  I don't recall the clothing.

23   Q.  Do you remember him wearing a pair of shorts and flip

24   flops?

25   A.  I don't remember his outfit, I'm sorry.

1    Q.  How about when you went to see him on July 27th, do you

2    recall that he had concerns about wearing the same clothes?

3    A.  He mentioned wanting to get some clothes.  I think that

4    was one of the things he had mentioned trying to get out of

5    his house.  He was working on that.  So in that way, yes, I

6    guess that's true.

7    Q.  Now, you talked about if you did have a concern

8    or -- and if a U.S. citizen told you that they were not

9    being treated fairly, the first thing you would do is talk

10   to whoever was in charge, correct?

11   A.  Right.

12   Q.  If somebody had immediately told you this, there was

13   nothing that you could immediately do, correct, in the sense

14   that you couldn't pick up that person and take them out of

15   the jail, could you?

16   A.  No, of course not, right.

17   Q.  You couldn't pick them up and take them out of that

18   prison, could you?

19   A.  No.

20   Q.  And in fact, you would have to leave that person in

21   those conditions until you could figure out what to do,

22   correct?

23   A.  That's correct.

24           MS. ATWAL:  Thank you.  I have nothing further,

25   Your Honor.  May I approach, Your Honor, and grab my --

1          THE COURT:  You may.

2          MS. ATWAL:  Thank you.

3                    **REDIRECT EXAMINATION**

4    BY MS. SERTICH:

5    Q.  Mr. Folkemer, Ms. Atwal asked you a question about

6    whether or not Mr. Page was being made to pay bribes in the

7    jail or the prison.  Do you recall that?

8    A.  Yes.

9    Q.  At any time during the three meetings that you had with

10   Mr. Page, do you recall him telling you that he was being

11   forced to pay bribes in the jail or prison?

12   A.  No.

13   Q.  You previously testified that when you went to visit

14   Mr. Page in prison that this was the only time you had to do

15   this while you were in Togo.

16   A.  That's correct.

17   Q.  Is it the only time you've had to do it in your career?

18   A.  I have not -- yes, it is, because I have not had that

19   job again.

20   Q.  So fair to say that you don't have general knowledge

21   about whether you would normally have been allowed into a

22   jail cell or anything like that?

23   A.  That's -- yes, very fair to say.

24   Q.  You previously testified that it's your job to make sure

25   that Mr. Page is being treated fairly and that he's not

1    being discriminated against based on his status as a U.S.

2    citizen, correct?

3    A.  Correct.

4    Q.  Is it your job in any way to assess whether he should be

5    receiving better treatment than the treatment of Togolese

6    prisoners?

7    A.  No.  I mean, again, you know, this is why it varies from

8    country to country because we can't, as the U.S. Embassy,

9    even if we would like to in some cases, we can't demand

10   better treatment than the country gives its own host country

11   nationals in prison.  And so it, you know, it's certainly

12   true that prison conditions vary from country to country,

13   but it's not our job or nor do we have the ability as the

14   government to make all prisons in the world the same, so

15   it's, like I said, it's only our job to make sure the

16   prisoner is being treated according to the local laws and

17   they're not being specifically discriminated against because

18   they're American, because they're white or whatever the case

19   may be.

20   Q.  And you make that assessment by asking Mr. Page

21   questions.  Is that accurate?

22   A.  Yes.  Asking him questions, that's right, and

23   occasionally asking, you know, the warden or the other

24   authorities if it came to that.

25   Q.  Okay.  So is it your testimony today that you found

1    Mr. Page was being treated fairly based on his

2    representations to you?

3    A.  As far as we could tell and as far as he told us, yes.

4    Q.  Also accurate that it's your testimony today, you found

5    based on what he said and your observations that he was not

6    being abused at any point?

7    A.  Correct.

8    Q.  Also your testimony that based on --

9              MS. ATWAL:  Objection.  Leading.

10   BY MS. SERTICH:

11   Q.  Did Mr. --

12             THE COURT:  Go ahead.

13   BY MS. SERTICH:

14   Q.  Okay.  Is it also your testimony here today that based

15   on his statements and what you observed that Mr. Page was

16   not being sexually harassed or discriminated against in any

17   way?

18   A.  Correct.

19             MS. SERTICH:  Okay.  No further questions, Your

20   Honor.

21             THE COURT:  Thank you.  Ms. Atwal, anything

22   further?

23             MS. ATWAL:  Yes, Your Honor.  Briefly.

24             ///

25             ///

1                          **RECROSS-EXAMINATION**

2      BY MS. ATWAL:

3      Q.  Did you at any point tell Mr. Page if he was being

4      treated poorly what would happen?

5      A.  I specifically probably not.  Like I said, we would have

6      just -- I would have gone in and explained what our job was,

7      and it never -- I guess it never came to that.

8      Q.  Okay.  Now, let's talk about the bribes.  Do you recall

9      in the activity log that it states, he, meaning Mr. Page,

10     reported that small bribes were necessary inside the prison

11     to move from one area to the other but that didn't -- do you

12     recall him saying that?

13     A.  I don't recall, but that's entirely possible that he

14     did, yes.

15     Q.  And again, that's not uncommon for a prison in a third

16     world country, is it?

17     A.  I don't think so, no.

18     Q.  Okay.  Now, we -- you also talked about if Mr. Page was

19     being treated the same as other prisoners, correct?

20     A.  Right.

21     Q.  As a part of your job, it's not your job to talk to

22     local prisoners, is it, non-U.S. citizens?

23     A.  No.

24     Q.  So you don't know how those local prisoners are treated,

25     do you?

```
 1    A.  That's right.

 2    Q.  And prior to July 24th, 2012, you had never met

 3    Mr. Page, correct?

 4    A.  It's possible that we had met at a party or something.

 5    Again, it's a small community.  But I don't know for

 6    certain.

 7    Q.  You don't recall meeting him?

 8    A.  I don't.  It's -- I can't guarantee that it didn't

 9    happen, but I don't recall.

10              MS. ATWAL:  Thank you.  I have nothing further,

11    Your Honor.

12              THE COURT:  You may be excused.  Or do you have

13    some --

14              MS. SERTICH:  Just one moment, please, Your Honor.

15              THE COURT:  Sure.

16              MS. SERTICH:  May I approach the witness, Your

17    Honor?

18              THE COURT:  You may.

19                        REDIRECT EXAMINATION

20    BY MS. SERTICH:

21    Q.  I've handed Mr. Folkemer a copy of the activity log.

22    Mr. Folkemer, do you see that there on the top of the page

23    there's some mention of bribes being made in order to move

24    from place to place?

25    A.  Yes.  Yes.
```

1    Q.  Okay.  Can you tell from that activity log when Mr. Page

2    made that representation or who he made it to?

3    A.  Consulate chief and vice consular on August 14th.

4    Q.  Okay.  And so can you explain who that would have been?

5    A.  The consulate chief was Art Bell and the vice consular

6    would have been whoever came in right after me.  I actually

7    left Togo on August 1st or 2nd.

8    Q.  So that entry was made from statements made by Mr. Page

9    during a visit to the prison on August 14th.  Is that what

10   you said?

11   A.  It appears to be, yes.

12          MS. SERTICH:  Nothing further, Your Honor.

13          MS. ATWAL:  Nothing further, Your Honor.

14          THE COURT:  Thank you.  You may be excused.

15          THE WITNESS:  Thank you.

16          THE COURT:  We'll take a -- Ms. Sertich, your

17   disclosure to me suggested that the direct of each of the

18   remaining four witnesses would be about 20 minutes.

19          MS. SERTICH:  That's correct, Your Honor.

20          THE COURT:  Okay.  So I think that we can safely

21   take each of those in two chunks after lunch and easily get

22   through everything today.  So we can come back here at about

23   1:15.  Is that right?

24          MS. SERTICH:  Yes.  Thank you, Your Honor.

25          THE COURT:  Thank you.

1          (Lunch recess taken at 12:01 p.m.)

2                              *    *    *    *    *

```
 1        (1:24 p.m.)

 2                      IN OPEN COURT

 3              THE COURT:  Sorry I kept you a little longer.

 4   Judge Nelson cornered me.  Ms. Sertich.

 5              MS. SERTICH:  Thank you, Your Honor.  The

 6   government calls Special Agent Sean Lafaurie.

 7              THE COURT:  Agent Lafaurie, would you please

 8   approach the witness stand.

 9          (The witness is sworn.)

10              THE COURT:  Thank you.  Please be seated.

11              State your name and spell your last name for the

12   record, please, sir.

13              THE WITNESS:  My name is Sean Lafaurie.  That's

14   first name Sean, S-E-A-N.  Last name is L-A-F-A-U-R-I-E.

15                  DIRECT EXAMINATION

16   BY MS. SERTICH:

17   Q.  Good afternoon, Special Agent Lafaurie.  Where are you

18   employed?

19   A.  I'm currently a special agent at HSI Blaine located in

20   Blaine, Washington.

21   Q.  How long have you been with HSI?

22   A.  Nine and a half years.

23   Q.  How long have you been stationed in Blaine, Washington?

24   A.  It would have been since June of 2014.

25   Q.  And what are your primary duties in that role?
```

1    A.  I'm a criminal investigator, currently assigned to the

2    border crimes group which handles guns, trade fraud

3    investigations, commercial smuggling investigations and

4    child exploitation investigations.

5    Q.  And you understand that you're here today to testify

6    about an encounter with Thomas Page during a border crossing

7    on September 21st, 2014?

8    A.  I am.

9    Q.  And at that time, your duties were the same as those you

10   just described?

11   A.  Yes.

12   Q.  Can you explain to the Court how Mr. Page first came to

13   your attention?

14   A.  On September 21st I received, to the best of my

15   recollection, I received a call from the port, I was

16   notified from the port of entry by a CBP officer that they

17   were doing an inspection of an individual crossing through

18   that port and that they had received a hit from -- regarding

19   an investigation from an agent in Minneapolis-St. Paul.

20   Q.  And when you say "a hit," is that the TECS system?

21   A.  Yes, ma'am.

22   Q.  Used by HSI?

23   A.  That's correct.

24   Q.  Do you remember approximately what time it was?

25   A.  A little before 4:00 p.m.

1    Q.  So what did you do after you received that notification?

2    A.  I got in communication with the agent out of St. Paul.

3    Q.  And is that Special Agent Summer Jones?

4    A.  Yes, Special Agent Summer Jones.

5    Q.  And how did you contact her?

6    A.  Telephone.

7    Q.  What information regarding Mr. Page did you have, either

8    from the conversation with her or information from the TECS

9    lookout?

10   A.  To the best of my recollection, I was informed, it was

11   the lookout of Agent Jones that Mr. Page was a current

12   target of investigation for a Protect Act violation.  And I

13   discussed with her that he was at the port, and we discussed

14   how to approach it and what needed to be done.

15   Q.  What was said during that conversation?

16   A.  She just basically said that he was a teacher of some

17   sort in Africa and they're looking into him and that they

18   want him to do a border examination and that they wanted him

19   interviewed.  And she suggested she wanted to know where he

20   was coming from, where he was headed, a good address, a good

21   phone number, and where he's been working.

22   Q.  What did you do after you spoke with Special Agent

23   Jones?

24   A.  To the best of my recollection, it would have been on

25   the weekend, on a Sunday, so I went about calling to see

1   anybody who was available to second me on a interview of

2   Mr. Page.

3   Q.  Did you locate someone to second you on the interview?

4   A.  I did, Special Agent Shawn Smith out of my office.

5   Q.  What did you do after that?

6   A.  Well, I got ready, and then I guess -- to the best of my

7   recollection, I met up with Shawn at the Sumas POE in Sumas,

8   Washington.

9   Q.  And the Sumas POE, is that the port of entry?

10  A.  Yes, ma'am.

11  Q.  And is that where Mr. Page was located?

12  A.  Yes.

13  Q.  So how long did it take you between when you were first

14  notified you said a little before 4:00 p.m. until when you

15  got to the port of entry?

16  A.  To the best estimation, about 5:30 I got there, so about

17  an hour and a half after receiving the initial phone call.

18  Q.  Can you explain for the Court how U.S. citizens crossing

19  the border in vehicles are inspected at that Canada/

20  Washington state border?

21  A.  Well, I don't have any specific knowledge of the Sumas

22  POE, but generally speaking, when a U.S. citizen or anybody

23  trying to transverse the international border between Canada

24  and United States, they will go through examination and

25  inspection and interview by CBP officer through he was

1    driving in a vehicle, vehicle lanes, they would approach and

2    they would scan his license plate, and they would ask him

3    for an identification, generally a passport, and that person

4    would turn over the passport to the CBP officer and they

5    would run that passport.

6    Q.  Are individuals crossing the border ever subjected to

7    further inspection?

8    A.  Absolutely.

9    Q.  And what does that further secondary inspection entail?

10   A.  Generally it entails a vehicle inspection to make sure

11   they're not travelling and bringing in contraband.  And

12   sometimes they corroborate their statements upon entry, the

13   declaration about what they're doing, what they're carrying,

14   so they want corroborate all of that, and they want to

15   determine if there's any contraband in the vehicle.

16   Q.  So while the vehicle is being searched, where does the

17   person go?

18   A.  In a general waiting area, a public waiting area.

19   Q.  And when you first encountered Mr. Page, was he in that

20   public waiting area?

21   A.  To the best of my recollection, I would have walked past

22   him to go past the general waiting area into the back area

23   behind the counter where the CBP officers would be located

24   at.

25   Q.  Can you explain what that room looks like?

1    A.  It's a room of not particularly big size.  I think the

2    waiting area is maybe 30 by 50 feet.  I don't know if you

3    can fit that many people in it.  And there's a back area

4    where CBP officers are there with computer desks and where

5    they go through processing people I guess for entry.

6    Q.  And were you in uniform?

7    A.  No, I was not.

8    Q.  So at the time that you first encountered Mr. Page, was

9    it your understanding that his car was being inspected?

10   A.  Yes, ma'am.

11   Q.  And is it fair to say that, technically speaking, he's

12   not free to go at that point because his car is being

13   inspected?

14   A.  Yes, ma'am.  He wouldn't have transportation, I mean,

15   from that area.

16   Q.  Okay.

17   A.  At that point.

18   Q.  And if someone tried to leave that area without their

19   car, what would happen?

20   A.  It would raise a level of suspicion, and they'd probably

21   be detained and questioned further to determine why he's

22   trying to leave the border examination area and process as

23   well.

24   Q.  So did you ultimately first meet Mr. Page in a back

25   room?

1    A.  To the best of my recollection, I didn't verbally have

2    any interaction with Mr. Page until he was brought back into

3    like a conference room area, a small conference room area.

4    Q.  Who was he brought back by?

5    A.  CBP officers were escorting him back.

6    Q.  Okay.

7    A.  Or in inclusion with us.

8    Q.  And how far is that conference room from the general

9    waiting area?

10   A.  I wouldn't say more than 50 to a hundred feet.

11   Q.  Okay.  Can you describe what that room, conference room,

12   looks like?

13   A.  It was an open area with windows, to the best of my

14   recollection, on the opposite side.  We're talking maybe an

15   area of 15 feet by 10 feet, a conference room, I don't

16   recollect how big it is.  It couldn't fit probably more than

17   eight, ten people.  With one entrance on the side.

18   Q.  Did you ask Mr. Page if he would be willing to be

19   interviewed?

20   A.  We told him he -- we were going to want to talk to him

21   and we'd sit down and talk about what was going on.  He

22   seemed to have questions.

23   Q.  How many people were in the interview room?

24   A.  During the interview, for the majority of the interview,

25   it was myself, Special Agent Shawn Smith and a couple of CBP

1    officers that were wandering in and out of the interview

2    through the open door.

3    Q.   Okay.  So the door was open throughout the interview?

4    A.   Yeah, to the best of my recollection, it was open on

5    access.  I don't know if they swung it shut a couple of

6    times.  My main focus wasn't on that.  But it definitely

7    wasn't locked or nothing to impede the door.

8    Q.   So you, Special Agent Smith and Mr. Page were the only

9    permanent people in the room?

10   A.   To the best of my recollection, yes.  There were people

11   to the majority of the portion, but permanently from the

12   beginning of the interview to its termination was just me

13   and Shawn Smith.  I didn't have accountability of the people

14   coming in and out, it being the area CBP's are in control.

15   Q.   How were you seated in the room?

16   A.   I believe Mr. Page was sitting opposite and I was

17   sitting on the side across from him with Special Agent

18   Smith.

19   Q.   He -- sorry, he was sitting opposite of you?

20   A.   He was sitting not in parallel with us but it was either

21   across from us or kiddy corner where we could face him, we

22   were facing him.

23   Q.   Okay.  And where were both of you in relation to the

24   door?

25   A.   He, to the best of my recollection, the door was at a

1    45-degree angle and Mr. Page was in between us and the door.

2    Q.  What time did the interview begin?

3    A.  Interview began at approximately 5:52 p.m.

4    Q.  Was that interview recorded?

5    A.  No, ma'am.

6    Q.  Why not?

7    A.  Agent policy says we don't record interviews.

8    Q.  And do you ever record interviews of subjects or targets

9    of investigations?

10   A.  Not in HSI Blaine and only when in coordination with the

11   state level where they are required to record.

12   Q.  Did you provide Mr. Page with a Miranda warning?

13   A.  Yes, ma'am.

14   Q.  And was that at the beginning of the interview?

15   A.  That was approximately two minutes into the interview

16   after receiving biographical information regarding his

17   current location to corroborate whatever border examination

18   questions CBP officers had about where he had been, where he

19   was going.

20   Q.  And did you do that from memory or was there something

21   that you used in order to give him his Miranda warnings?

22   A.  It would have been read by a rights waiver card.  Excuse

23   me, a statement of rights card.

24   Q.  Okay.  And do you carry one of those with you all the

25   time?

1    A.  I do.  In my wallet.

2    Q.  Okay.  And as a part of that warning, did you tell him

3    that he had the right to remain silent?

4    A.  Yes, ma'am.

5    Q.  Did you tell him that anything he said could be used

6    against him in court?

7    A.  Yes.

8    Q.  Did you tell him that he had the right to an attorney?

9    A.  Yes.

10   Q.  Did you ask him whether he understood those rights?

11   A.  We did.

12   Q.  Did you ask him if he was willing to waive those rights

13   and be interviewed?

14   A.  We asked him if he was willing to talk to us, yes.

15   Q.  Okay.  And how did he respond?

16   A.  Yes.

17   Q.  Did he also say he understood his rights?

18   A.  He did.

19   Q.  Did Mr. Page sign any kind of Miranda waiver form?

20   A.  No, he did not.

21   Q.  And why did you Mirandize Mr. Page that day?

22   A.  Well, we knew going into it that he was going to be

23   sitting there for a little while, while his car was being

24   done.  We also know that he's a active target and during the

25   interview he might elicit some statements of wrongdoing and

1    we wanted to make sure we were covered in case there was any

2    admissibility issues about where he was at and how he was

3    talked to or with the type because it was during a inner

4    border examination that he was in CBP being stopped there

5    while his car was being looked at so.

6    Q.  How did you start the interview with Mr. Page?

7    A.  To the best of my recollection, myself and Agent Smith

8    introduced ourselves.  We said we were here, that we're

9    going to -- he was being -- they were looking at his car;

10   that we were going to do a border inspection interview.  And

11   we went into it by ourselves.  I believe he knew why we were

12   there.  We kind of talked about it, get to it.  I told him

13   we would do some biographical stuff just to get it knocked

14   out, where he was going and complete that, and then we'd get

15   into a little bit more of the interview of we just want to

16   know where he's been, where he was going, where he's

17   working.

18   Q.  So based on what you said, fair to say the beginning of

19   the interview was questions about where he had been, where

20   he was going, that sort of thing?

21   A.  Yeah, absolutely.  We wanted to corroborate his border

22   examination to make sure there wasn't any material

23   difference in what he told us and what he told them, so we

24   wanted to get that knocked out of the way.

25   Q.  Okay.  So what did he say about what he was going to be

1    doing or where he'd be going after he came into the U.S.?

2    A.  He said he had been working at a lodge, it was a Alaskan

3    lodge in Alaska, and he was driving down some equipment to

4    Seattle, and from that point he was going to drop off the

5    company equipment and take a train to Winona, Minnesota.

6    Q.  At some point during the interview did Mr. Page talk at

7    all about the allegations of sexual abuse of minors in Togo?

8    A.  He brought it up when we discussed with him about the

9    school in Orinda, I believe it was, that working at that was

10   terminated because they had found some information about his

11   pedophilia problems.

12   Q.  Okay.  When you're talking about a school in Orinda, was

13   that a school in the United States?

14   A.  Yes, ma'am.  I think, I believe it's east of Oakland.

15   Q.  Okay.  And so how did you get to that point in the

16   conversation about talking about where he was working?

17   A.  Well, basically started, we got his biographical

18   information.  He was read his Miranda warnings and then

19   jumped around.  We basically went chronologically, like

20   where he's been working.  We discussed his job at the lodge,

21   and then we moved on from there and if he had any issues

22   there.  We were pretty upfront, and he knew why we were

23   talking with him.  He seemed like he had had interaction

24   with us before.  And then we went on to the Orinda and asked

25   him what happened there, and it was this point that he said

1    he was abruptly terminated, that they found some information

2    that what he would refer to as pedolalia.  We asked him to

3    go further into it, and he said he didn't want to discuss

4    it.  The only thing he said was he was accused, arrested and

5    released.

6    Q.  Did you inspect any items that Mr. Page had with him?

7    A.  We did.

8    Q.  Okay.  What items?

9    A.  He had a Toshiba laptop computer and a phone.  It was an

10   iPhone.

11   Q.  Did you ask him if you could search those items or tell

12   him that that was part of --

13   A.  Sure, we asked him for consent to look at it.  To the

14   best of my knowledge, Agent Smith knew how to access it with

15   whatever pass code was going on so.

16   Q.  And how was the review of those items conducted?

17   A.  Visually by Agent Smith.

18   Q.  Okay.

19   A.  So he basically went through it as a layperson would,

20   opened it up and just visually browsed it.

21   Q.  Did you or Special Agent Smith use any forensic software

22   or anything like that to search the iPhone or laptop?

23   A.  No, we did not.

24   Q.  What time did the interview end?

25   A.  At approximately 7:27 p.m.

1    Q.  How did it end?

2    A.  We thanked him for his time.  We told him that we had

3    everything, we were completing the interview and that I'm

4    sure he had questions about whether or not he was going to

5    go.  Unfortunately we told him it's up to CBP and that he

6    would be released upon the termination of his vehicle

7    inspection; that we had nothing further for him and there's

8    no reason for to us to hold him any longer, for him to be

9    there any longer for our purposes.  And we thanked him for

10   being up-front and honest and let him go, because I think it

11   was Sunday night, everybody wanted to go home.

12   Q.  Do you know where Mr. Page went after the interview?

13   A.  I do not.

14   Q.  Were you carrying a weapon at the time of the interview?

15   A.  I was.

16   Q.  Was it visible?

17   A.  No, it was not.

18   Q.  Was Special Agent Smith carrying a weapon?

19   A.  He was.

20   Q.  Was it visible?

21   A.  No, it was not.

22   Q.  How would you describe the tone of the interview?

23   A.  Friendly, pretty friendly, low-key.

24   Q.  Did you or Special Agent Smith ever raise your voices at

25   Mr. Page?

1   A.  Absolutely not, no.

2   Q.  Did either of you ever use any profanity with him?

3   A.  No.

4   Q.  Did either of you make any promises to him?

5   A.  No.

6   Q.  Did either of you threaten him at all?

7   A.  Nope.

8   Q.  At any point during the interview did you or any law

9   enforcement agent place hands on Mr. Page?

10  A.  No.  Besides we might have shook hands at the end of the

11  interview.

12  Q.  Okay.

13  A.  Or at the beginning as well.

14  Q.  Was Mr. Page handcuffed at any time while you saw him?

15  A.  No, he was not.

16  Q.  Okay.  And at any time during the interview did Mr. Page

17  ask to speak to an attorney?

18  A.  No, he did not.

19          MS. SERTICH:  No further questions at this time.

20          MR. MOHRING:  Thank you, Your Honor.

21                    **CROSS-EXAMINATION**

22  BY MR. MOHRING:

23  Q.  Good afternoon, Agent.

24  A.  Afternoon.

25  Q.  You used an acronym a number of times.  CBP?  CPP?

1    A.  Yes, sir.  My apologies.  Customs and border protection.

2    Q.  Okay.  So CBP.  And those are the folks that, at least

3    as far as what you've been testifying about, who had primary

4    responsibility for searching Mr. Page's car?

5    A.  That is correct, sir, yes.

6    Q.  Okay.  Is it fair to say that your involvement in this

7    case and in this investigation was limited to what you

8    testified about questioning Mr. Page on September 21st of

9    2014 and then coming --

10   A.  In the course of my testimony, yes, sir, it was just

11   simply to interview him about a location questions,

12   biographical stuff, finding out where he was and going.

13   Q.  You hadn't -- you weren't involved in any investigation

14   or any --

15   A.  Prior to that, no, sir.

16   Q.  Nor since then, except for having to come here?

17   A.  Besides being called to testimony, yes.

18   Q.  Okay.  And you said that, at least my understanding of

19   it, is that this began with Mr. Page appearing at the border

20   to cross into the United States from Canada?

21   A.  Yes, sir, that would be my understanding.

22   Q.  And a database or a system produced a hit when he tried

23   to do that?

24   A.  That's correct.

25   Q.  So when a hit happens, what -- what do the border agents

1    do?

2    A.  To the best of my knowledge, not being a CBP officer,

3    they'll see that and they'll notify the supervision.  My

4    best guess of what has been done or my knowledge and

5    experience is they'll tell him to go park his car and go

6    inside and they'll do a secondary inspection.  Their

7    management will be notified.  It will somehow go to I

8    believe in Blaine they have a call center that will make the

9    notifications.  Under their policy, I believe they'll notify

10   the duty agent, which was me that night, and agents Summer

11   Jones as well to let her know that they had a TECS hit.

12   Q.  So notify Summer Jones because she was the person who

13   had the --

14   A.  They should --

15   Q.  Who the computer told them to notify; she was flagged it

16   in somehow?

17   A.  I would assume they would.  I can't -- I can't testify

18   to what happened at that night.  I know I got a phone call

19   and that somehow me and Summer had talked telephonically,

20   because again, I would have to defer to her about what, if

21   anything, needed to be done regarding this hit.

22   Q.  Okay.  So with the hit, the person is kind of put on ice

23   while steps are taken, depending on what the hit says

24   and --

25   A.  Absolutely.

1    Q.   -- what people decide to do?

2    A.   At the discretion of CBP.

3    Q.   Okay.  So the first you heard about it was you got a

4    call from somebody who --

5    A.   Who would be the CBP officer.

6    Q.   Okay.

7    A.   I don't recollect who.

8    Q.   And that's because you were on duty that night you said?

9    A.   Yes, sir.  Yes, sir.

10   Q.   So they called you up and they said, "We've got a hit on

11   a guy"?

12   A.   Yes.

13   Q.   Did they describe what information they received from

14   the system that came with the hit?

15   A.   Unfortunately I don't recollect, but they would read it

16   to me, yes.

17   Q.   That would be --

18   A.   That would be standard policy.  I would be like okay,

19   what is it, read it to me, see if it's pertinent to anything

20   that needs to be followed up on.

21   Q.   Okay.  And you said that in the course of that, I

22   believe you learned that the hit was about suspected

23   violations by Mr. Page of the Protect Act?

24   A.   I don't know what exactly because I don't recollect

25   exactly what it was.  But the information there, I asked

1    about who the agent was who held it and I would get more

2    information from her.  So I don't recollect what they said

3    the hit was about.

4    Q.  Okay.

5    A.  I don't know if that information about the Protect Act

6    violation came from the hit or if it came from Agent Jones.

7    I can't testify to that because I don't recollect.

8    Q.  Clear to you, though, that you got that information

9    before you had any direct contact with Mr. Page?

10   A.  Oh, absolutely, yeah.

11   Q.  So whether you spoke to Special Agent Jones or from the

12   hit, you were told, you learned that his case was about him

13   being suspected of violations of the Protect Act?

14   A.  Yes, sir.

15   Q.  And Protect Act, it means a lot under the Protect Act,

16   but does that translate to you as this is a case involving

17   sex offenses against minors?

18   A.  Absolutely, I do understand that.

19   Q.  Okay.  So you hear Protect Act, but that translates and

20   what it means --

21   A.  I'm familiar with it, yeah.

22   Q.  -- is child sex offenses?

23   A.  Yes, sir.

24   Q.  Okay.  And because the border contacts and the way that

25   the hit came up, international child sex offenses?

 1   A.  I'm not familiar with Protect Act not being anything but

 2   international.  U.S. on U.S. citizen international contact

 3   of minors as far as I know of the Act.  I'm not intimately

 4   involved in it.

 5   Q.  So you got a call from the CBP?

 6   A.  Correct.

 7   Q.  You then were contacted by or got in contact with

 8   Special Agent Jones, Summer Jones?

 9   A.  Yes.

10   Q.  How long do you think the conversation that you had with

11   her was?

12   A.  I don't recollect the conversation at all, but if you

13   want me to make assumptions.

14   Q.  Do you think it was long?

15   A.  I don't think it was that long.

16   Q.  Five minutes, ten minutes?

17   A.  I don't think it was that long.  Basically my

18   recollection what needed to be done, and my conversation

19   with Summer Jones was basically it was a ongoing criminal

20   investigation and she wanted to find out where he had been,

21   where he was going and address and a phone number and where

22   he was working.

23   Q.  So those were the instructions, his kind of travel

24   itinerary, where he's been and where he was headed to?

25   A.  Yes.

1    Q.  And information about his employment?

2    A.  Yes.

3    Q.  That's what she wanted you to ask about?

4    A.  Yes.  We had also discussed about if there was any

5    questions regarding his issues with his criminal history.

6    Q.  Issues with criminal history?

7    A.  With specifically we went over the five things, and I

8    asked her specifically if she wanted him to be interviewed

9    regarding anything to do with that.  She said to the point

10   where anything that comes up, we talked about it, but it

11   wasn't the point of the interview, it was to more mainly get

12   more biographical information.

13   Q.  Biographical information?

14   A.  What I mean by that, previous, where he's going, where

15   he's been, the job he's working, his phone number and his

16   address.

17   Q.  Okay.  And anything else you can get is gravy?

18   A.  Sure.

19   Q.  Is that kind of the --

20   A.  Sure.  Because, yeah, I wouldn't have asked that

21   specifically.

22   Q.  Okay.  And you said that you made -- that he was

23   Mirandized from a card, right?

24   A.  Yes, sir.  To the best of my recollection, yes.

25   Q.  By you?

1    A.  By standard policy.  It would have been one of us.  To

2    my recollection, it was mine.

3    Q.  Okay.

4    A.  It was my case.  Per policy, I would investigate, do the

5    Miranda.  And I do not read the Miranda warnings without a

6    card.

7    Q.  Say that again.

8    A.  I don't in normal policy or ever read the Miranda

9    warnings without the card.

10   Q.  Okay.  Got it.  And I think you testified on direct

11   examination that you made -- you made a decision to advise

12   him of his Miranda rights because you wanted to elicit

13   incriminating statements and you wanted to make sure that

14   you were covered as far as admissibility went.

15   A.  In consideration, and Mr. Page was under criminal

16   investigation and during our interview he might say

17   something inculpatory, I wanted to make sure that he was

18   covered by Miranda.

19   Q.  Okay.  I mean, you were kind of hoping he would, right?

20   At least part of you?

21   A.  Honestly --

22   Q.  Part of the reason you ask questions not about the five

23   things that, you know, where are you coming from, where are

24   you going to, where are you working, phone number, address,

25   part of the reason you go beyond that was to elicit

1   incriminating statements, right?

2   A.  Well, like I alluded to earlier, I spoke with

3   Mr. -- with Agent Jones and she said it wasn't necessary but

4   if it went down that path, make sure that I documented and

5   memorialized it.  You're asking me personally if I wanted

6   him to elicit, absolutely not, probably not.  It was

7   7 o'clock on a Sunday afternoon, Summer said she had her

8   case, I was there to get biographical information

9   specifically, and I just wanted -- and we spoke only to that

10  with Mr. Page what we were there for and that we weren't too

11  happy we were out there at 7:30 on a Sunday but we had a job

12  to do and he seemed to be respectful of that, and we moved

13  on from there.

14  Q.  All right.  Let me ask you this.  There's a report that

15  was generated.  I can give you a copy of it --

16  A.  Okay.

17  Q.  -- if it would help you answer questions.

18  A.  Sure.

19  Q.  But a report was generated about the whole process that

20  happened there on the border?

21  A.  Okay.

22  Q.  On September 21st, 2014, all right?

23  A.  All right.

24  Q.  And did you participate in, I mean, some of the

25  information in this report came from you?  Have you seen

1     this report?

2     A.  I haven't.

3     Q.  You have not seen it?

4     A.  No, I have not.

5     Q.  Let me just ask if you've seen reports like this.

6     A.  Sure.

7              MR. MOHRING:  May I approach, Your Honor?

8              THE COURT:  You may.

9              THE WITNESS:  This would be a report investigation

10    or a ROI.

11    BY MR. MOHRING:

12    Q.  Right.  Have you seen reports like this?

13    A.  Yes, sir, I have.

14    Q.  Okay.  But you have not seen this one?

15    A.  In particular, no.  It has a portion of the report that

16    I submitted to Agent Jones.

17    Q.  Okay.  So --

18    A.  I'm -- sir, I haven't had a opportunity to review it.

19    Q.  All right.

20    A.  If you're going to ask me questions.  One second.

21    Q.  Let me show you another document that I just received.

22    I believe that there's some overlap.  There's a different

23    font.  Is that -- is the second document I just showed you a

24    document that you prepared?

25    A.  Yes, sir.  This is -- this Word document that you gave

1    to me is a report I prepared.

2    Q.   Okay.

3    A.   And I electronically e-mailed to the agent.  And this is

4    her report regarding our interview in original format for

5    HSI purposes, for our agency, Homeland Security

6    Investigations.

7    Q.   Okay.

8    A.   So I'm reading to see if there's any -- there doesn't

9    appear to be any additional information.

10   Q.   All right.  Let's go through your report, and let me ask

11   you this question.

12   A.   Okay.  I've seen this report, yes, sir.  I prepared this

13   report.

14   Q.   To the two-page report that is in Word format, that's a

15   document that you prepared and that you had an opportunity

16   to review before testifying here today?

17   A.   Yes, sir, absolutely.

18   Q.   Okay.  And in preparing to testify, you looked at that.

19   Did you actually take any handwritten notes during the

20   course of your questioning of Mr. Page?

21   A.   Yes, sir, I did.

22   Q.   And do those still exist?

23   A.   They do.

24   Q.   Did you review those before testifying?

25   A.   I did.

```
1            MR. MOHRING:  Your Honor, I'll make a formal

2    request at the end of this process, but I would ask that the

3    handwritten notes which are basis of the agent's testimony

4    -- or input into this agent's testimony be disclosed.

5    BY MR. MOHRING:

6    Q.  Is the printed Word document report that you're looking

7    at, is that an accurate account of what happened that

8    afternoon/evening?

9    A.  To the best of my recollection, yes, and it would be

10   more closer to the fact as closer to my recollection than it

11   would be a year and a half later would be as accurate as it

12   would, minus a couple of typographical.

13   Q.  Okay.  I don't have that in front of me, but the report

14   reflects that the interview began at 5:52 in the afternoon.

15   Does that sound right?

16   A.  Yes, sir.

17   Q.  And it ended on -- at 7:27?

18   A.  Yes, sir.  That would be correct.

19   Q.  So an hour and a half, give or take?

20   A.  Yes, sir.  An hour and 35 minutes.

21            THE COURT:  When -- when we're done with all the

22   testimony, you can identify what you're asking for based on

23   what the testimony elicits.  So at the end of the day, you

24   know, I anticipate that you will request the agent's rough

25   notes and Ms. Sertich will have a response to that, but
```

1    we'll cover that at the end of the day.

2              MR. MOHRING:  That's on my list.  Thank you,

3    Judge.

4              THE COURT:  Thank you.

5    BY MR. MOHRING:

6    Q.  Did Mr. Page make any statements about any of the areas

7    that you questioned him about, the five basics, or the

8    questioning that went beyond those five basics that are not

9    reflected in your report?

10   A.  I don't recollect.

11   Q.  Not that you recall?

12   A.  I'm sure we went into -- the interview was an hour and

13   35 minutes, and this was everything substantial in it and

14   everything substantial from my notes.

15   Q.  So at least as far as any questioning about Protect Act

16   violations, any statements that he made in response to that

17   would have been -- would be reflected and summarized in your

18   report?  Is that true?

19   A.  I would think so, to the best of my recollection about

20   any statements he would have made that are pertinent to

21   Protect Act violations would be incorporated in this report.

22   Q.  At least as you sit here and testify here this

23   afternoon, do you recall him saying anything else related to

24   Protect Act violations that isn't in your report?

25   A.  I couldn't tell you, but the most pertinent thing is in

1    the report that we discussed about -- about the stuff in

2    Togo.  I don't, off the top of my head, recall him saying

3    anything about any international stuff.  As described in my

4    report, he did not want to talk about it, and we did not

5    push him on it.  As to previous speaking, we let it lie

6    where it was.  We didn't ask him to elaborate because he

7    said he didn't want to so.

8    Q.  Okay.  So you're based at in Blaine, Washington.  Is

9    that correct?

10   A.  Yes, sir, that's correct.

11   Q.  Was this the first time that you went to the --

12   A.  Sumas port of entry.

13   Q.  -- Sumas port of entry?

14   A.  I don't recollect, but I can tell you I'd been only at

15   the port of entry three times.  Again, I transferred there

16   out of Los Angeles in June of that year.

17   Q.  This is September of that year that we're talking about,

18   right?

19   A.  Yes.

20   Q.  Do you know whether the capacity to audio and/or

21   videotape questioning exists at the Sumas, Washington point

22   of entry?

23   A.  I don't understand your question.  You're going to have

24   to qualify.  Are you saying do we --

25   Q.  Do they have tape recorders there?

```
1   A.  Yeah, that's why I'm asking -- I'm asking you to
2   elaborate on that a little bit.  I know some inspection
3   areas have video and audio recording in rooms or an agent
4   may have a video recorder or somebody might have a tape
5   recorder or if they have their computer they might sit in
6   front of and record.  Specifically you're asking whether any
7   devices potentially record, absolutely, I'm sure there are.
8   Q.  Okay.  But a decision was made, consistent with policy,
9   to not tape the questioning, hour and a half, roughly, of
10  questioning of Mr. Page?
11  A.  That is what I was told; that according to Blaine
12  policy, that we don't tape record.
13  Q.  According to Blaine policy?
14  A.  SAC Seattle.  Our office doesn't tape-record interviews.
15  Q.  Is that a written policy to your knowledge or is that
16  just something everybody --
17  A.  That's just what we've been told by the SAC office.
18  Trust me, I've asked so.
19  Q.  It sounds, but correct me if I'm wrong, that the
20  questioning of Mr. Page began with kind of the five basic
21  areas that Special Agent Jones asked you to cover and then
22  went beyond that.  Is that kind of the sequence of things?
23  A.  Well, to the best of my recollection, he was asked what
24  address he was going to and just some basic questions and
25  just basically how you're doing, this is what we're here
```

1    for, give him as much information as possible so we can talk

2    to him.

3    Q.  And did any of that information, introductory

4    information, include discussions of the Protect Act

5    violations or suspicions of international criminal sexual

6    activity involving minors?

7    A.  That I don't know.  We didn't -- we didn't ask any

8    questions, but whether or not we told him the purpose for

9    our interview, he might have been told.

10   Q.  Okay.  And at some point in that preliminary process you

11   advised him of his Miranda rights from a card?

12   A.  That's correct.  He was advised of his Miranda rights,

13   yes, sir.

14   Q.  And you did not use a form?

15   A.  No, we did not.

16   Q.  Is that a policy also of the Seattle SAC?

17   A.  As far as I know, it's at the discretion of the agent.

18   Q.  Okay.  So that was your call?

19   A.  It would be mine and Agent Smith's call, correct.

20   Q.  You recall discussing it?

21   A.  I do not recall discussing it.  I think it was more a

22   point of access to the paperwork versus an intention of

23   using it.  Again, we -- he was Mirandized for excessive

24   caution purposes, so we would expect in case of border

25   examination, they went further into things of criminality.

```
1    Q.  Okay.  In -- during the interview, you said you took

2    notes.  Did the other -- is it Agent Smith?

3    A.  Yes, sir.  Unfortunately it's confusing, Shawn, we have

4    another Shawn, yes, he -- he also -- I'm sorry, I forgot

5    your question.

6    Q.  He also took notes?

7    A.  He apparently wrote notes, yeah, as well on my notes.

8    Q.  Okay.  While you were -- simultaneously, you're working

9    on the same notepad or?

10   A.  Yeah.  Yeah, that would be it.  I would be writing and I

11   see a -- he might have wrote something at the bottom of it.

12   I think that's all.  I was mainly tasked with taking notes

13   because it was my case.  And, generally speaking, when we do

14   interviewing, only one person takes notes because then

15   you're going to have two sets of notes, right, so I was in

16   charge of notating the interview, but I know there were some

17   comments he must have probably had something to say I'm just

18   off the top of my head.

19   Q.  And am I right in surmising that you know that because

20   you've looked at those notes and some of the handwriting

21   isn't yours?

22   A.  Exactly.

23   Q.  And you remember having his views --

24   A.  Not views, there was some information that Mr. Page,

25   I'll tell you in particular, you'll see the notes, that
```

1    regarding the contact information for Mr. Page is not in my

2    handwriting, so I can more than likely say it was Agent

3    Smith who wrote down Mr. Page's phone number and his name.

4    Other than that, there weren't anything that was in his

5    handwriting, and that was at that final page of the notes

6    so.

7    Q.   Okay.  For the biographical part of the information, you

8    testified on direct examination that one of the things that

9    you look for is to try to corroborate or not corroborate

10   between what the person is telling you their -- when you're

11   questioning them and the information that they've written on

12   a declaration form that they turned over?  You said you look

13   to corroborate?

14   A.   Well, any reference he made.  I did not see the

15   declaration.  I'm sure we asked CBP some information before

16   we talked to him, hey, what's going on here, what happened,

17   where did he say he was going, just to find out if he said

18   anything different.  I don't recollect what CBP told me.  I

19   just jotted down what he told me so --

20   Q.   Okay.  But you testified that corroboration is one of

21   the things that you look for.  At least as you sit here, as

22   you're here this afternoon, do you recall anything that did

23   not corroborate?

24   A.   No, sir, I do not.

25   Q.   So you --

```
1    A.  To my knowledge, Mr. Page was honest about where he was

2    going, where he was headed, where he worked, what his phone

3    number was, his address.

4    Q.  Okay.  You testified that he had a computer that was

5    searched and a phone that was searched?

6    A.  I don't know if "search" would be an appropriate term.

7    We glanced through it.  Like I said, we didn't do any

8    searches.  I unfortunately wasn't the agent who did it.

9    Shawn, while I was talking to Mr. Page, was looking at it.

10   And so to the extent at how far he looked into it, I

11   couldn't testify to that.

12   Q.  At least fair to say that pictures of children or child

13   pornography or anything like that, those would be things

14   that would catch --

15   A.  Absolutely.

16   Q.  -- his attention in a case like this?

17   A.  Absolutely.

18   Q.  Was anything found in the searches of -- searches,

19   reviews, whatever word you like, of the phone and the

20   computer?

21   A.  Unfortunately I can't testify to what Agent Smith saw

22   but --

23   Q.  Did you learn of anything of any evidentiary

24   significance being found on a computer or the phone?

25   A.  Besides what was afforded to Agent Jones, nothing that I
```

1    was aware of or that Agent Smith made me aware of.

2    Q.   And what was forwarded to Agent Jones was some texts

3    from the telephone?

4    A.   That's correct.   That's correct.

5    Q.   Okay.   At a point, then, in the hour and a half of

6    questioning, Mr. Page was asked questions about

7    inappropriate or illegal sexual contact with children?

8    A.   Sure.

9    Q.   Right?

10   A.   Sure.

11   Q.   And that came about, as you testified, that came out of

12   questioning about prior employment and reasons that he was

13   terminated from prior employment in Orinda?

14   A.   Unfortunately my recollection isn't extremely crisp, but

15   I'm sure throughout all his employment Mr. Page was asked do

16   you have any problems during these times at these locations.

17   I think in my notes we identify that a -- the Alaska lodge

18   if he had any contact with minors.   We asked him on his trip

19   if he had any contact with minors.

20   Q.   Okay.

21   A.   I think that's why we elicited these statements in

22   Orinda which is just basically that yeah, there were

23   problems but not there but there were some issues with him

24   and his employment because of something.

25   Q.   And the report indicates beyond employment or problems

 1   of employment that he would not describe the specific crime

 2   he was accused of or whether he was guilty.  That's what the

 3   report says?

 4   A.  That's exactly correct.  That's according to my report

 5   and that's my recollection, yes.

 6   Q.  What did he say?  How did he communicate he didn't want

 7   to answer?

 8   A.  I don't -- I don't exactly remember how he said it.  I

 9   remember that he used the word he was in Orinda Academy and

10   that they had found out about some pedophile problems, and

11   it's in quotes in my notes so that's how I know he said it.

12   I asked him to elaborate, and he basically said there was

13   some issues in Africa; that he was accused, arrested and

14   ultimately released.  I believe I asked him to talk more

15   about it.  He had said he had met somebody from the United

16   States law enforcement.  I asked him to talk more about it,

17   these issues with these people.  He had said that I think

18   the only other part he went into is that his chef had

19   accused him of doing it.

20   Q.  At what point in this process did he say he would not

21   describe the specific crime he was accused of or he was

22   guilty?

23   A.  I'm assuming, to the best of my recollection, I asked

24   him, well, what were you accused of, and he

25   wouldn't -- according to my notes and the response, it was

1    he did not want to talk about what he was accused of and

2    didn't want to --

3    Q.  And -- go ahead, sorry.

4    A.  And according to so we let it lie there.

5    Q.  And do you recall what words he said that indicated he

6    didn't want to talk about it?

7    A.  I don't.  I don't -- I don't know if he said he didn't

8    want to talk about it any further or if he didn't feel

9    comfortable, I don't remember.  I know his only statements

10   regarding that were what's in the report so.

11   Q.  And how long after he said I don't want to describe the

12   specific crime I'm accused of or whether I'm guilty or

13   whatever words he said, how long did the interview continue

14   after that?

15   A.  I don't know.  Like I said, it was -- we would go from

16   employment to employment, so I know when the subject matter,

17   when we described it, we moved on to a different subject

18   matter.  So that was the theme of the interview, if you

19   don't feel comfortable saying something, you don't have to

20   talk to us about it and we moved on to something else.

21   Unfortunately I don't know what timeframe it took place.

22   Q.  So you don't recall whether he said -- whether he

23   expressed his reluctance or whatever words he said to

24   communicate his unwillingness, whether that happened early,

25   middle, late in the interview process in the hour and a

1    half?

2    A.  I don't know if it was more towards the beginning or the

3    middle.  It was somewhere along the lines and,

4    unfortunately, as the report goes, chronologically speaking,

5    the report was written on a chrono, chronology of his work,

6    so there was a bunch of bouncing around.

7    Q.  So let me clarify.  I apologize for interrupting.  So

8    the report is chronological to his employment, not

9    chronological to the sequence of questions and answers?

10   A.  To the best of my recollection during question, I was

11   with a partner, with Agent Smith, was probably throwing back

12   questions that he wanted to during the pauses.  Normally

13   during a interview rapport, when the agent is speaking to a

14   subject, the subject is responding to him, when we're done

15   with that lining of questioning, the agent will pick up

16   mentally the questions they want answered.  So I would have

17   finished asking him questions about the certain employment

18   and without interrupting me, Shawn generally would know in

19   our training would not interrupt somebody when there's

20   question and answering and would have interjected other

21   questions.  So I put it together the best I could.

22   Q.  So this report that you wrote is more linear than the

23   actual interview.  Is that fair?

24           Or let me ask the question differently.  This

25   report describes a series of information.  Did the

1    information that's in the report come in this sequence or is

2    the report a summary of what was said, not in the -- not

3    necessarily in the sequence that it was said?

4    A.  You know, for the majority part of it, I would say it's

5    a pretty good linear.

6    Q.  Okay.

7    A.  What was said from the way it was written down.  And

8    I'll explain to you how the process is done.  I mean, I

9    would be, as we spoke of earlier, writing this report based

10   on having notes, so I would go from the beginning of the

11   first page and then go down to the final page.  I can tell

12   you by memory and by my recollection of reviewing the notes

13   that this was pretty close to the way the order it was

14   written down in the notes.

15   Q.  Okay.

16   A.  It started with his -- his current employment, moved

17   down to the Orinda Academy, and then it came through about

18   the problems in Togo, and then we'd asked him what countries

19   he visited, and then we'd ask for current contact

20   information, and then it went into the fact of looking over

21   his -- his computer and his iPhone.

22        You asked at what point he described the issues of

23   the criminality in Togo, what portion of the interview, that

24   depends, because the portion of the interview at the end was

25   dedicated to the inspection of his phone and his computer

1    where there was an interview going on where Shawn was like

2    okay, okay, what is this, and, you know, that's where

3    it -- that' where the final that to make sure there was no

4    issues with his phone prior to him being released or being

5    let go or being turned back over to finish up his

6    examination with customs and border protection.

7    Q.  Okay.  So was the questioning towards the tail end based

8    on what was being found on the phone or on the computer?

9    A.  I'm sure there was.  Maybe we asked him about -- I know

10   that, in review of my notes, there was a -- there was

11   something about another school, and I'm sure you might have

12   asked me about it, that he had indicated that he was looking

13   for employment, an employment request related to an

14   international school.

15   Q.  Okay.  At any point in the process was he told that he

16   was free to go?  The interview process?

17   A.  I don't recollect.

18   Q.  Not that you recall then?

19   A.  Well, unfortunately it wasn't under our power.  It was

20   during a border examination, right, and it's happening

21   concurrently, so I think he had -- we discussed him wanting

22   to go.  We said as soon as we can we're going to get you out

23   of here; they're looking at your car.  I mean, it happened

24   concurrently with that, so like I said, it was, you know, he

25   seemed to be buying his time with us while he was waiting

1    for CBP to finish up.

2    Q.  And I understand as long as they had his car, he wasn't

3    going anywhere.  What I'm asking is just specifically was he

4    told you're free to go at any point during that hour and a

5    half questioning?  It sounds like he was not.  Is that fair?

6    A.  Well, again, you're going to have to qualify what you

7    mean as free to go.  Do you mean can I leave this room, can

8    I leave the port, can I leave the city?

9    Q.  Was he told any of those things?

10   A.  To the best of my recollection, no.

11   Q.  Okay.

12   A.  I mean, I'm sure he asked.

13   Q.  And I think obvious from your testimony, but just to

14   make it very clear, he was not arrested at the end of all of

15   this; he was ultimately allowed to leave?

16   A.  Absolutely, yes.

17   Q.  If the interview started at -- I think you said he first

18   approached the border around 4 in the afternoon?

19   A.  Sir, I don't know.  That's when I received the phone

20   call.  That's when I was notified.

21   Q.  So he was at least at the border certainly no later than

22   4 o'clock?

23   A.  Yes, sir.  We assume, I unfortunately can't testify to

24   the length of time that he was at the POE.

25   Q.  The interview ends at 7:27 so three and a half hours

1   give or take after that.  Do you know when he was actually

2   allowed to physically leave and enter the United States?

3   A.  I do not.

4   Q.  You were not present?

5   A.  I was not present at his entry, and I don't believe I

6   was present when he was free to -- when the examination was

7   complete, no, sir.

8   Q.  Now, as far as the search of the computer and the phone

9   go, it wasn't entirely clear from your testimony, did you

10  ask for his permission, for his consent to search those

11  items?

12  A.  Like I said, Agent Smith handled the digital devices, so

13  I don't know exactly what the interaction was between

14  Mr. Page, but odds are, understanding from Shawn that he can

15  do and generally there's some kind of locking device that

16  Mr. Page said it was somehow okay for him to go in there,

17  but he asked and received the password for it.  But I don't

18  recollect.  Agent Smith was basically handling that kind of

19  stuff.

20  Q.  Okay.  Was a consent to search form prepared?  Have you

21  ever seen such thing?

22  A.  I know it exists.

23  Q.  You know it exists.  Was one done?

24  A.  No, no, there was not.

25  Q.  And any interaction about potential lack of consent,

1     that was between Agent Smith and Mr. Page --

2     A.  I'm sure I participated it in and --

3              THE COURT:  You two keep talking over each other,

4     and you're going to have to stop, because it's hard for me,

5     and it's even harder for the court reporter.

6              MR. MOHRING:  I apologize, Your Honor.

7              THE WITNESS:  I apologize, Your Honor.

8              THE COURT:  Thank you.

9     BY MR. MOHRING:

10    Q.  Do you recall Mr. Page being asked by either of you for

11    his consent to search his computer and his phone?

12    A.  I remember there's a conversation on it, and I don't

13    remember the exact content of the conversation.  I can tell

14    you normally under border examination, electronic devices

15    are subject to border examination.

16    Q.  And I'm not -- what I'm trying to get at is what

17    specifically he asked, what was he told, and it sounds like

18    you don't remember?

19    A.  Yes, sir.  I wish I did remember.

20    Q.  Okay.  But in any event, you're clear that a consent to

21    search form was not prepared; that he did not a sign consent

22    to search?

23    A.  Well, I can tell you, to the best of my recollection,

24    no, and I also don't know where they were kept there, so I'm

25    going to say pretty emphatically that we did not sign one.

1    Or sign one for us.

2              MR. MOHRING:  Your Honor, I have no further

3    questions at this point.  Thank you.

4              THE COURT:  Ms. Sertich.

5                    **REDIRECT EXAMINATION**

6    BY MS. SERTICH:

7    Q.  Just a couple of clarifying points, Your Honor.  Agent,

8    you mentioned that you forwarded to Special Agent Summer

9    Jones some text messages off the cell phone.  Is that

10   correct?

11   A.  Some photographs of some text messages that were located

12   on Mr. Page's phone, yes, correct.

13   Q.  Were there also some employment documents from a laptop

14   that were forwarded to Special Agent Summer Jones,

15   photographs of those documents?

16   A.  Yes, ma'am.

17   Q.  Okay.  And you had a conversation with Mr. Mohring about

18   consent to search those electronic items.  Generally

19   speaking, at the border, do you need someone's consent to

20   search their items or belongings?

21   A.  We do not.

22              MS. SERTICH:  No further questions, Your Honor.

23              MR. MOHRING:  Could I have a moment, Your Honor?

24              THE COURT:  You may.  Take your time.

25              MR. MOHRING:  Nothing further.  Thank you, judge.

1           THE COURT:  You may be excused, sir.  Thank you.

2   You may be excused, sir.  Thank you.

3           THE WITNESS:  Thank you, Your Honor.

4           MS. SERTICH:  The government is calling CBP

5   Officer George Fuentes.

6           THE COURT:  Good afternoon, Officer Fuentes.

7   Would you please approach the witness stand.  Would you

8   please raise your right hand.

9       (The witness is sworn.)

10          THE COURT:  Thank you.  Please be seated.  Make

11  yourself comfortable.

12          State your name and spell your last name for the

13  record, please.

14          THE WITNESS:  My name is George Fuentes.

15  F-U-E-N-T-E-S.

16                    **DIRECT EXAMINATION**

17  BY MS. SERTICH:

18  Q.  Good afternoon, Officer Fuentes.  Where are you

19  employed?

20  A.  I am employed at Chicago O'Hare International airport.

21  Q.  Who are you employed with?

22  A.  U.S. Customs and Border Protection.

23  Q.  What's your position with can I call it CBP from now on?

24  A.  That's fine.

25  Q.  Okay.  What's your position with them?

1   A.   Customs and border protection officer.

2   Q.   How long have you been in that position?

3   A.   Almost nine years now.

4   Q.   And what are your duties in that role?

5   A.   My duties are conducting inspections at border crossings

6   in the United States.   In the case of O'Hare airport,

7   because it's an international airport, we have flights both

8   arriving and departing internationally.

9   Q.   And do you understand that you're here today to testify

10  about an encounter with Thomas Page during a border crossing

11  on October 24th, 2014?

12  A.   Yes, I do.

13  Q.   And were your duties at that time the same as the duties

14  you just described?

15  A.   Yes.

16  Q.   Can you explain to the Court how Mr. Page first came to

17  your attention?

18  A.   So at the time, I was a member of the counterterrorism

19  response passenger enforcement rover team, and that

20  particular unit is designated with doing examinations on

21  subjects of interest.   And we also work with a unit called

22  the passenger analysis unit.   So that unit will identify

23  subjects of interest and create like a daily lookout.   So we

24  have, in our office, we have a whiteboard which is we call

25  our lookout board, and so the analysis unit will give a list

1    of subjects of interest both arriving and departing the

2    United States on that particular day.

3    Q.  Okay.  So the first time you've heard of Mr. Page, is

4    that because he was listed on the whiteboard?

5    A.  He was listed on the whiteboard, on the lookout board.

6    Q.  Did you speak with Special Agent Summer Jones before

7    interviewing Mr. Page?

8    A.  I did not.

9    Q.  What information did you have about Mr. Page prior to

10   the interview?

11   A.  I would have had just biographical information,

12   identifiers, which would consist of a photo, his full name,

13   date of birth, information regarding the particular lookout

14   of the subject, and information regarding his --

15           THE COURT:  I want to make sure I understood you.

16   You said you did not speak to Agent Summer Jones before you

17   spoke to Mr. Page.  Is that correct?

18           THE WITNESS:  That is correct.

19           THE COURT:  Okay.  Thank you.

20           MS. ATWAL:  Your Honor, could we have the witness

21   maybe speak more into the microphone?

22           THE COURT:  Yeah.

23           MS. ATWAL:  Thank you.

24           THE COURT:  Thank you.

25           ///

1    BY MS. SERTICH:

2    Q.  So you said that there was information that you had

3    about the lookout.  So did you have information about why

4    Mr. Page was someone who there was a lookout for?

5    A.  The only information I would have had was, to my

6    recollection, was that he was under investigation by HSI.

7    And information within the lookout stated that he had been

8    previously arrested in Lomé, Togo.

9    Q.  And is what you've just testified about the extent of

10   your knowledge of Mr. Page when you went to interview him?

11   A.  Yes.

12   Q.  Can you explain how you first encountered Mr. Page?

13   A.  So it would have been on the jet bridge --

14   Q.  Can I stop you?  So when you say "the jet bridge," do

15   you mean the tunnel that you walk through to get onto the

16   plane?

17   A.  Yes.  So in the airport, every airport has a gate where

18   each flight will either arrive or depart from, and so in

19   this case, I -- the particular gate that he was scheduled to

20   board the flight and depart from, yes, at the jet bridge of

21   that flight.  After the ticketing area where the airline

22   will scan the boarding passes, just after that, at the

23   threshold of the jet bridge is where I would have been and

24   encountered the subject.

25   Q.  Okay.  And what did you first say to him in order to

1    initiate conversation with him?

2    A.  I would have presented myself as a customs and border

3    protection officer and just stated that we were going to ask

4    questions on his travels aboard.

5    Q.  Okay.  Were you in uniform at the time?

6    A.  I was.

7    Q.  And how often do you conduct these outgoing interviews

8    on persons that have been noted for on the lookout, as you

9    said?

10   A.  Probably daily.

11   Q.  Do you also stop random people in the same manner on the

12   jet bridge for questioning?

13   A.  Yes.

14   Q.  Do you remember approximately what time of day it was?

15   A.  It would have been in the evening, probably 7:00 p.m.,

16   8:00 p.m., I don't recall exactly.

17   Q.  At any point after you, as you said, you know, asked

18   Mr. Page to talk to you or you're going to ask him some

19   questions, did you provide him with a Miranda warning?

20   A.  I did not.

21   Q.  Why not?

22   A.  He wasn't in custody.  He was detained for a border

23   search, but he was never under arrest or in custody.

24   Q.  What types of questions did you ask Mr. Page?

25   A.  It would have been just routine questioning, where he is

1    going, the purpose of his travel, how long would he be going

2    for, how did he finance his travel.

3    Q.  Was there anything suspicious from your perspective

4    about Mr. Page's travel plans?

5    A.  He was travelling on a one-way ticket which is

6    not -- not typical.  Typically when you're travelling

7    internationally you'll have a round trip ticket.  Also the

8    tickets were purchased by a third party.

9    Q.  Is that indicated on the ticket itself?

10   A.  That was indicated by Mr. Page.

11   Q.  Okay.  And do you know where Mr. Page was going to on

12   that day?

13   A.  I'm sorry?

14   Q.  Did you know where Mr. Page was departing to that

15   evening?

16   A.  Well, the flight was destined, that he was scheduled to

17   depart on, was destined for Doha, Qatar, and then through

18   questioning, he said he was going to Bahrain.

19   Q.  So based on your testimony, then, is it accurate to say

20   that you interviewed Mr. Page about his travel plans in

21   Bahrain and then did you also question him about his past

22   travel and employment?

23   A.  I did.

24   Q.  At any point during the interview did any of Mr. Page's,

25   of the allegations against him relating to anything that

1    happened in Togo or anything relating to the Protect Act,

2    was anything like that raised during the interview?

3    A.   No.

4    Q.   Were you carrying a weapon at the time of the interview?

5    A.   I was.

6    Q.   Was it concealed or was it visible?

7    A.   Visible.

8    Q.   And how would you describe the tone of the interview?

9    A.   The -- to the best of my recollection, it would have

10   been just casual, I mean, normal conversation.

11   Q.   Did you or anyone else ever raise your voice at

12   Mr. Page?

13   A.   No.

14   Q.   Did you use any profanity with Mr. Page?

15   A.   No.

16   Q.   Did you make any promises to him?

17   A.   No.

18   Q.   Did you make any threats to him?

19   A.   No.

20   Q.   At any point during the interview did you or any other

21   law enforcement officer place your hands on Mr. Page?

22   A.   No.

23   Q.   Was he handcuffed at any time?

24   A.   No.

25   Q.   And how long did the interview last?

1    A.  I don't recall exactly, but it would have been probably

2    five to ten minutes.

3    Q.  At any time during the interview did Mr. Page ask to

4    speak to an attorney?

5    A.  No.

6    Q.  Was Mr. Page's bag searched?

7    A.  Yes.

8    Q.  Did you find anything of interest in his luggage?

9    A.  No.

10            MS. SERTICH:  No further questions, Your Honor.

11            THE COURT:  Okay.

12                         **CROSS-EXAMINATION**

13   BY MR. MOHRING:

14   Q.  Did you ask him if he wanted to talk to a lawyer,

15   Officer?

16   A.  No.

17   Q.  As I understand it from your testimony, you -- were you

18   stationed in the jet way as people are coming by going onto

19   the plane?

20   A.  Yes.

21   Q.  And based on the information that you got from the

22   lookout board, you were looking for Mr. Page?

23   A.  Yes.

24   Q.  You had information from the board that he was expected

25   to be getting onto that flight?

1    A.  Yes.

2    Q.  So he was on his way onto the flight, not on his way off

3    of the flight?

4    A.  Correct.

5    Q.  When you detained him to question him?

6    A.  Yes.

7    Q.  And the information -- there was some questions about

8    the information that you had that led for you to station

9    yourself there to try to question him.  You knew that he was

10   on the board as someone who should be questioned?

11   A.  Yes.

12   Q.  And you knew just from your training that that was

13   because the analysis unit had identified him and put his

14   name on the board as someone who should be questioned if you

15   see him?

16   A.  Right.

17   Q.  And are you one of a number of officers who are -- who

18   work out of O'Hare, look at the board and question people?

19   A.  On that particular unit, yes.

20   Q.  Okay.  So from the board or in connection with the

21   board, you had a photograph, a name, a date of birth?

22   A.  Correct.

23   Q.  And the flight information?

24   A.  Yes.

25   Q.  And you knew from that that he was under HSI

1    investigation?

2    A.  Yes.

3    Q.  And so -- and did you testify that you -- that that

4    information said something about a previous arrest in Togo?

5    A.  Yeah.

6    Q.  And that was information that you knew about as you were

7    standing there looking for Mr. Page?

8    A.  Yes.

9    Q.  What did -- what did you know about the arrest in Togo?

10   What had you --

11   A.  I didn't know anything.

12   Q.  Just the fact that there had been one?

13   A.  Yes.

14   Q.  Anything about the charges?

15   A.  No.

16   Q.  Anything about the Protect Act being involved or him

17   being under suspicion of Protect Act violation?

18   A.  Not that I recall.

19   Q.  So under those circumstances, if all you have is a

20   flight that the person is expected to be going on and

21   identification information that would allow you to be able

22   to at least have a good chance of recognizing him and that

23   they are a target of some investigation but you don't know

24   what or what the focus is or the suspicions are; am I right

25   so far?

1    A.   Yes.

2    Q.   What -- what are your marching orders, for lack of a

3    better word, what's your mission there in questioning him?

4    A.   Just gathering information as to his current travel,

5    what would have been the current travel at the time.

6    Q.   Okay.  And that's -- so that's what you do with the

7    names that are on the board when you don't have anything

8    more to go on?

9    A.   Yeah.

10   Q.   Fair?

11   A.   Yes.

12   Q.   Okay.  Now, I'm looking at a report of an investigation

13   that describes your approaching Mr. Page and statements that

14   he made in response to questions that you asked him.  Have

15   you seen such a report before testifying today?

16   A.   Which report is that?

17   Q.   Let me show you a copy.

18        Showing you a document that has the caption

19   Department of Homeland Security Report of Investigation, has

20   a report date of September 15th, 2015, an assignment date of

21   August 3rd of 2012, begins in July 2012.  This is kind of a

22   cover sheet.  But then there's a substantive report, next

23   page, that begins details of investigation on October 24th,

24   2014.  Have you seen this document, sir?

25   A.   That particular document, no.

 1    Q.  Does this document quote information that you typed

 2    up --

 3    A.  Yes.

 4    Q.  Okay.  So you did prepare a report?

 5    A.  Yes, there was a report, yes.

 6    Q.  That you drafted based --

 7    A.  Yes.

 8    Q.  -- on your questioning, contact with Mr. Page and your

 9    questioning and his answers?

10    A.  Yes.

11    Q.  Does this appear to include the text of your report?

12    A.  Yes.  On the second page.

13    Q.  In any event, you prepared a report that described your

14    investigation activities and the statements that he made?

15    And this is not it, but this contains information --

16    A.  This is from the I believe it's the third paragraph that

17    begins with "PACS was approached."

18    Q.  When we jump to all capitals?

19    A.  Yes.

20    Q.  Okay.

21    A.  Until, let's see, until ending with "PACS was released

22    and allowed to board."

23    Q.  And are you talking about, I don't want to put words in

24    your mouth, but are you confident that the section of this

25    that you just identified is the entirety of your report?

1    A.  Yes.

2    Q.  So there's nothing that's been left out?

3    A.  I don't believe so, but I can --

4    Q.  Okay.

5    A.  -- read it over.

6    Q.  And your report, the document that this appears to

7    duplicate, that -- you did look at that before coming here

8    to testify this afternoon?

9    A.  Yes.

10   Q.  Did Mr. Page say anything regarding either his travel

11   plans or any Protect Act violation in his discussion with

12   you that afternoon/evening did you say?

13   A.  I'm sorry?

14   Q.  Did he say anything to you that you didn't put in your

15   report?

16   A.  That I recall, no.

17   Q.  Okay.  Where did the questioning happen?

18   A.  It would have been on the jet bridge before the plane,

19   the jet bridge connected to the actual airplane.

20   Q.  So as people are filing by, you stopped and questioned

21   him right there.  Did you take him aside anywhere?

22   A.  We -- to the best of my -- of our abilities will take

23   any subject that we question, we'll try and move off to the

24   side as best as possible, but, you know, we're limited to

25   the actual space that -- the actual size of a jet bridge

1    so --

2    Q.  And as the questioning is happening, are you between him

3    and the airplane?

4    A.  I don't recall.

5    Q.  If he had said to you -- I take it you didn't tell him

6    "You don't have to talk to me, you're free to go"?

7    A.  I didn't tell him that, no.

8    Q.  If he had said to you "I'm not talking to you, I'm

9    getting on this plane," would you have stopped him?  Was he

10   free to get on the plane until he was done talking to you?

11   A.  In that case, if he didn't want to talk to me, we

12   probably would have just conducted a bag exam and let him

13   go, yeah.

14   Q.  But you didn't tell him that?

15   A.  No.

16   Q.  And he would have at least have been detained while you

17   searched his bag?

18   A.  Yes.

19   Q.  And the search happens right there on the jet bridge,

20   too, you're going through his stuff?

21   A.  Typically.

22   Q.  Wow.  And it was just you and him?  There were no other

23   agents there?

24   A.  There would have been another officer there.

25   Q.  Okay.  Did that officer actually participate?

1    A.  I -- I don't believe so.  I don't recall.

2         MR. MOHRING:  Could I have just a moment?  I

3    apologize, Your Honor.

4         THE COURT:  Take your time.

5    BY MR. MOHRING:

6    Q.  Were you wearing a uniform the same or similar to the

7    one that you're wearing here in court today?

8    A.  Similar, yes.

9    Q.  So the uniform kind of identifies you and who you work

10   for as far as customs and border patrol, right?

11   A.  Yes.

12   Q.  Did you identify yourself as an officer who was there to

13   question him?

14   A.  Yes.

15   Q.  And did you tell him what it was that led to you being

16   there to question him and how -- did you tell him why he

17   drew your attention?

18   A.  No.

19   Q.  Did he ask?

20   A.  No.

21   Q.  Did he at any point break off the questioning or did you

22   just kind of run out of questions and you were done?

23   A.  Just we finished our -- I finished my question and yeah,

24   that was pretty much it.  It wasn't really broken off.

25   Q.  And you searched his bag, the bags that he was carrying.

1    Did he have any checked bags?

2    A.  I don't recall.

3    Q.  And the search of the bags that he was at least had with

4    him, you did not ask for his permission; that's something

5    you just do?

6    A.  Yes.

7    Q.  And you didn't find anything that jumped out at you as

8    being of interest when you searched his stuff?

9    A.  Correct.

10   Q.  And was that the sum total of your contact with Mr. Page

11   there that day?

12   A.  Yes.

13   Q.  Haven't had anything to do with him before or after?

14   A.  Correct.

15           MR. MOHRING:  Thank you, officer.  I have no

16   further questions.

17           MS. SERTICH:  No further questions, Your Honor.

18           THE COURT:  You may be excused.  Thank you, sir.

19           THE WITNESS:  Thank you.  Should I just leave it

20   here?

21           THE COURT:  Yeah.  Thank you.

22           THE WITNESS:  Thank you.

23           MS. SERTICH:  Government calls Special Agent

24   Michael Nagle.

25           THE COURT:  Good afternoon, Special Agent Nagle.

 1   Would you please approach the witness stand.

 2              THE WITNESS:  Sir, good afternoon.

 3              THE COURT:  Would you raise your right hand, sir.

 4        (The witness is sworn.)

 5              THE COURT:  Thank you.  Please be seated.  Make

 6   yourself comfortable.

 7              State your name and spell your last name, please,

 8   sir.

 9              THE WITNESS:  My name is Michael Nagle.  My last

10   name is spelled N-A-G-L-E.

11              THE COURT:  Thank you.  You may proceed.

12              MS. SERTICH:  Thank you, Your Honor.

13                       **DIRECT EXAMINATION**

14   BY MS. SERTICH:

15   Q.  Good afternoon, Special Agent Nagle.

16   A.  Good afternoon.

17   Q.  Where are you employed?

18   A.  I'm employed by the Homeland Security Investigations.

19   Q.  Okay.  And what's your position with HSI?

20   A.  Special agent.

21   Q.  Where are you currently stationed?

22   A.  I'm currently stationed in Newark, New Jersey.

23   Q.  And you understand that you're here today to testify

24   about an encounter with Thomas Page during a border crossing

25   on May 29th, 2015?

1    A.   Yes, ma'am.

2    Q.   And where were you stationed at that time?

3    A.   Miami, Florida.

4    Q.   Okay.  At the airport there?

5    A.   Yes.

6              THE COURT:  I'm sorry, where?

7              THE WITNESS:  Miami, Florida.

8    BY MS. SERTICH:

9    Q.   How long have you been with HSI?

10   A.   Approximately four years.

11   Q.   And what are your primary duties as a special agent?

12   A.   In our agency, we investigate any violations of federal

13   law, specifically related to immigration and customs issues.

14   Q.   And --

15   A.   And statutes.

16   Q.   And was that your duty, your role, at the time of

17   the -- that you encountered Mr. Page in May of 2015?

18   A.   Yes, it was.

19   Q.   Can you explain to the Court how Mr. Page first came to

20   your attention?

21   A.   On the day that we encountered Mr. Page, I was what's

22   called the duty agent at the airport.  I helped at Miami

23   International airport as a primary backup duty agent,

24   responding calls for assistance that customs and border

25   protection or any outside agency may need, so that day I was

1    the primary, so I received a call from Agent Summer Jones,

2    and she was requesting some assistance from us.

3    Q.  And what information did you get from Special Agent

4    Jones during that phone call?

5    A.  She said that a target of one of her investigations was

6    going to be arriving at Miami International Airport that

7    day; he was going to be travelling from Bolivia.  She said

8    that he was the target of a child exploitation case that she

9    was working and she was looking for some information

10   regarding his travel history, and she asked that if we could

11   assist.

12   Q.  Okay.  So when you say "travel history," what did you

13   think?  What did you think you were trying to accomplish in

14   the course of this interview?

15   A.  What she had said to us is that she was aware that he

16   had traveled foreign to foreign, from one foreign country to

17   another, prior to coming to my international airport that

18   day, but she was interested in specifically what countries

19   he had traveled to prior and what his activities were there.

20   Q.  And did you know in that foreign to foreign travel what

21   country it was before Bolivia that she was talking about?

22   A.  I believe she said that he was probably in Bahrain prior

23   to that.

24   Q.  Can you explain how you first encountered Mr. Page?

25   A.  Because we do these encounters so often, I don't

1    remember the specific, very first moment I saw Mr. Page.  I

2    can say that typically we meet a target or a person that

3    we're trying to speak to plane side when they arrive, but

4    it's possible that I could have met him at a primary booth

5    where you come and turn your passport over to customs and

6    border protection.

7    Q.  So does plane side mean the area by the gate when you

8    first come off the plane?

9    A.  Yes, I'm sorry, as passengers are disembarking the plane

10   just outside the jet bridge which is the bridge that

11   connects the main gate to the plane.

12   Q.  And when you're talking about the primary checkpoint,

13   are those the officials that sit in booths and check

14   everyone who comes through?

15   A.  Yes, ma'am.

16   Q.  So you could have met him in either of those locations?

17   A.  I could have.  I'm sorry, I don't remember which one.

18   Q.  Were you in uniform at the time?

19   A.  No, ma'am.

20   Q.  So what happened after you encountered Mr. Page?

21   A.  Well, it was myself and another agent, and then we had

22   two customs and border protection officers who were in

23   uniform.  They are the primary agency that deals with

24   actually inspecting and checking people as they come or go

25   from the United States.  So we were sort of an assist role

1    with them as they were putting him through the process which

2    is goes through primary, shows his passport to them, you

3    know, they run his passport across their machines.  He was

4    then referred to what's known as secondary which is there's

5    immigrations secondary which is the first step.  They go in,

6    they have him sit down in a waiting room with hundreds of

7    other people on some days, and they input his information

8    into the system.

9              After that, we walk down to the customs

10   enforcement area which was just an escalator ride down the

11   stairs there, and we go into what's called a large secondary

12   enforcement area and conduct that interview from there.

13   Q.  So when you say that it's a large secondary enforcement

14   area, what kind of space are we talking about?

15   A.  Approximately the size of this courtroom prior to the

16   benches and just short of the jury benches there.  It's a

17   big wide open tiled room.  It has two metal benches, two

18   high, about waist level or a little higher, metal tables.

19   There's maybe four or five detention cells that are off of

20   that main building -- or main room.  And there's also two

21   CBP offices with computers and that sort of thing.

22   Q.  So do individuals also get randomly selected for

23   secondary inspection in that room?

24   A.  Yes, ma'am.

25   Q.  And about how many people come through that room in any

1    given day?

2    A.  Not being an officer, I don't know, you know, the exact

3    number, I would say, but it's pretty regular.  Maybe a

4    handful per hour every hour.

5    Q.  So you mention there was another special agent there.

6    Who was that?

7    A.  Agent Robert Hernandez.

8    Q.  And then there were two CBP officers?

9    A.  At least two.  I believe there was only two that day,

10   yeah.

11   Q.  And while you were conducting the interview, were those

12   CBP officers engaged in the interview or what were they

13   doing?

14   A.  So when we came in, we put all of his baggage up on one

15   of those large metal tables I referred to.  Customs and

16   border protection officers started going through it.  I

17   stood there with them while they did it, went through his

18   clothing, that sort of thing, and checked for any

19   contraband, anything like that.

20        Once they finished up that portion of that, they

21   sort of stood off to the side, I think they might have even

22   gone into one of the offices that were off that room, but

23   they weren't primarily engaged in the conversation we were

24   having with Mr. Page.

25   Q.  Did you provide Mr. Page with a Miranda warning?

```
1    A.  No, ma'am.

2    Q.  Why not?

3    A.  Because our questions were limited to the border

4    inspection that we were conducting, it was mostly regarding

5    travel history and that sort of thing, we didn't do that.

6    Q.  Okay.  What did you ask Mr. Page about?

7    A.  We asked him where he was coming from that day and then

8    we worked back chronologically as to the countries that he

9    had visited prior to entering the United States that day and

10   what his activities were there.  We also asked him where he

11   was travelling to after Miami.

12   Q.  And when you were doing that reverse chronological

13   examination of where he had been in the past, did you

14   eventually ask him, get to the point of him being in Togo?

15   A.  Yes, ma'am.

16   Q.  And what did he say, if anything, about Togo?

17   A.  He stated that the reason that he left Togo and went to

18   Bahrain -- excuse me, he said prior to Bahrain he was in

19   Togo.  At some point he said that he had some problems with

20   some local children there.  We asked him what the problems

21   were, and he wouldn't tell us what they were.  And then we

22   asked, "Well, did you leave Togo because of those issues?"

23   He said no, he went to -- he left Togo and went to Bahrain

24   just because he was taking a temporary teaching job that he

25   had been offered.  So he said it was something separate from
```

1   Togo, the issues he was having.

2   Q.  When Mr. Page indicated to you that he didn't want to

3   talk about the issues in Togo, did you press him any further

4   on that?

5   A.  We probably asked him once or twice what the problems

6   were.  He became very embarrassed, very visibly embarrassed.

7   He sort of hung his head and he became blushed, but after

8   that, we didn't ask him any more questions regarding it.

9   Q.  Were you carrying a weapon at the time of the interview?

10  A.  Yes, ma'am.

11  Q.  Was it visible?

12  A.  No.

13  Q.  How about the other special agent who was with you?

14  A.  No, ma'am.

15  Q.  Was he carrying a weapon?

16  A.  He was but it wasn't visible.

17  Q.  Okay.  How about the CBP officers?

18  A.  Yes, they were carrying weapons and they were visible.

19  Q.  Okay.  How would you describe the tone of the interview?

20  A.  It was a rather routine, relaxed conversation, just

21  asking about his travel history.  Nothing out of the

22  ordinary.

23  Q.  Okay.  Did you or anyone else ever raise your voice at

24  Mr. Page?

25  A.  No, ma'am.

1   Q.  Did you use any profanity with him?

2   A.  No, ma'am.

3   Q.  Did you or anyone else make any promises to Mr. Page?

4   A.  No.

5   Q.  Did you or anyone else threaten him at all?

6   A.  No.

7   Q.  During the course of this interview process, did you or

8   anyone else lay hands on Mr. Page?

9   A.  No, ma'am.

10  Q.  Was he handcuffed at any time?

11  A.  No.

12  Q.  Do you recall approximately how long the interview was?

13  A.  Anywhere between 20, 30 minutes at most.

14  Q.  At any point during the interview did Mr. Page ask to

15  speak to an attorney?

16  A.  No, ma'am.

17  Q.  You mentioned that Mr. Page's belongings were searched

18  as a part of this interview.  Was anything of interest found

19  with respect to this investigation?

20  A.  I noted that Agent Summer Jones' business card was

21  crumpled up in his luggage, that was sort of interest to me,

22  and then when we did a physical inspection of his phone, I

23  had noted that there was Facebook conversations with -- that

24  he was having with profiles that appeared to be younger

25  children -- or children I guess you could say.  I don't know

1    the age of them.

2    Q.  And generally speaking, what were those conversations

3    relating to?

4    A.  They were related to -- they were asking him for money.

5    We asked him what the conversations were about, and he said

6    that they were asking him for money to pay for school exams

7    because I guess they cost money wherever they were and that

8    he, in the past, had helped them financially in that

9    situation.

10   Q.  Okay.  And when you say that you found these messages on

11   his phone, how did you go about searching his phone?

12   A.  Just physically.  We didn't use any forensic apparatus.

13   We just opened up the phone, pressed on the buttons and

14   looked at some of the Facebook conversations that we could

15   see, looked at his messages, his phone logs, that sort of

16   thing.

17   Q.  Okay.  And so you said you didn't use any forensic

18   software or anything like that?

19   A.  Correct.

20   Q.  Did you ask Mr. Page whether you could search the phone

21   or did you just search it?

22   A.  I don't remember.

23   Q.  Okay.  Do you believe that you need someone's consent to

24   search their phone during border crossing?

25   A.  No, we don't.

1    Q.  How did the interview or inspection end?

2    A.  After we asked him about the travel history, went

3    through his phone, we packed everything back up for him, his

4    luggage.  I think he actually packed it back up, closed up

5    his suitcase, and we escorted him out and wished him luck.

6              MS. SERTICH:  Okay.  I have no further questions,

7    Your Honor.

8              THE COURT:  Thank you.

9                        **CROSS-EXAMINATION**

10   BY MR. MOHRING:

11   Q.  Good afternoon, agent.

12   A.  Good afternoon, sir.  How are you?

13   Q.  Okay.  How are you?

14   A.  Okay.  Thank you.

15   Q.  You've been testifying about interaction that you had

16   with Mr. Page on May 29th, 2015?

17   A.  Yes, sir.

18   Q.  And is it fair to say that other than preparing and then

19   coming here to testify today, your involvement in this

20   investigation kind of began and ended on that day?

21   A.  Correct.

22   Q.  And did it begin, do I understand you right, it began

23   with a phone call from Special Agent Summer Jones?

24   A.  Yes.

25   Q.  To you directly?

```
 1    A.  Yes.

 2    Q.  And you got the call because you were the primary duty

 3    agent?

 4    A.  Yes, sir.

 5    Q.  When the call came in?

 6    A.  Yeah.

 7    Q.  And she told you to detain and question Mr. Page?

 8    A.  She said that --

 9    Q.  I --

10    A.  I'm sorry.

11    Q.  Go ahead.

12    A.  She said to ask travel related questions when he came in

13    for his inspection, yes, sir.

14    Q.  Okay.  Did -- but that would require actually detaining

15    him while you questioned him, right?

16    A.  As a part of the exam, people are taken to different

17    secondary rooms.  I guess you could call it a detention,

18    yeah.

19    Q.  And the room that you described with the metal tables

20    and the tile floor and the detention cells around it, it

21    wasn't clear to me, is that the immigration secondary or is

22    that customs?

23    A.  That was customs secondary.

24    Q.  And it was in that customs secondary where you

25    questioned Mr. Page for 20 to 25 minutes?
```

1     A.  Yes, sir.

2     Q.  Okay.  And to get there, he had already been through a

3     primary screening which referred him to an immigration

4     secondary from which you then took him to the customs

5     secondary?

6     A.  Yes, sir.

7     Q.  Do I got it right?  And then there at physically present

8     when you were questioning him was another special HSI

9     special agent, right?

10    A.  Yes, sir.

11    Q.  Although you were -- you didn't -- you were kind of the

12    point person?

13    A.  Yes.

14    Q.  And, at least for awhile, two or more uniformed

15    officers?

16    A.  Yes, sir.

17    Q.  Okay.  Fair to say that when you were questioning him

18    there in the customs secondary that he was not free to

19    leave?

20    A.  At that point, no, he was a part of an ongoing

21    inspection so no.

22    Q.  Okay.

23    A.  We had every right to search his belongings at that

24    point.

25    Q.  Did you prepare a report reflecting your activities and

1      the questioning of Mr. Page?

2      A.  No, Agent Summer Jones did.

3      Q.  She prepared a report based on -- do you know based on

4      what?

5      A.  Based on notes I sent her.

6      Q.  Okay.  And have you seen the report that she prepared?

7      A.  Yes, sir.

8      Q.  Let me show you a document.

9              MR. MOHRING:  May I approach, Your Honor?

10             THE COURT:  You may.

11     BY MR. MOHRING:

12     Q.  I'm looking at a report, and, frankly, it looks like

13     maybe the significant identifier, it says report No. 27.

14     A.  Yes, sir.

15     Q.  It begins at the top, the synopsis begins in July 2012.

16     It looks like kind of we've got a cover page and then the

17     substance of the report.  Details of investigation begins on

18     the next page?

19     A.  Yes, sir.

20     Q.  Two pages?

21     A.  Correct.

22     Q.  Is this the report that Special Agent Jones prepared

23     based on your notes?

24     A.  Yes.

25     Q.  And have you had an opportunity to see this report, her

1    report?

2    A.  Yes, sir.

3    Q.  And you reviewed it before testifying?

4    A.  Yes, sir.

5    Q.  Did you also have a chance to look at your notes before

6    testifying from which this was prepared?

7    A.  I sent an e-mail to Agent Jones, and I had seen that

8    e-mail, yes, sir.

9    Q.  So the notes that you're talking about, it was an

10   e-mail?

11   A.  Just an e-mail, right.

12   Q.  And she processed it and came up with this report which

13   we now have today?

14   A.  Correct.

15   Q.  But you've also seen the e-mail itself that you sent

16   before testifying?

17   A.  Yes.

18   Q.  Did -- focussing on Special Agent Jones' report.

19   A.  Yes, sir.

20   Q.  Because I don't have the e-mail, did Mr. Page say

21   anything about his travel activities or his problems with

22   local kids in Togo that is not -- to you that day that is

23   not reflected in this report?

24   A.  No, sir.

25   Q.  And was your questioning of Mr. Page, did you tape it?

```
 1    A.  No, sir.

 2    Q.  I think you were asked, but let me confirm, you did not

 3    advise him of his Miranda rights?

 4    A.  No, sir.

 5    Q.  You're familiar with those and --

 6    A.  Of course, yes, sir.

 7    Q.  And Homeland Security has forms, HSI forms or maybe

 8    they're ICE forms?

 9    A.  Yes.

10    Q.  That are Miranda forms that you have available to you

11    that you could use if you want?

12    A.  Yes, sir.

13    Q.  So your questioning of Mr. Page at least included

14    questions about his travel activities, starting most

15    recently and then going back into the past?

16    A.  Correct.

17    Q.  Is that kind of the format?

18    A.  Mm-hmm.

19    Q.  So he -- you asked him questions about his travel and

20    his activities in Bolivia.  That's where he was coming from,

21    right?

22    A.  Correct.

23    Q.  As you asked him those questions, and as he answered

24    those questions, did he say anything you knew to be false?

25    A.  That I knew to be false, no, sir.
```

1   Q.  As best as you can make it, was he truthful in his

2   answers to the questions that you were putting to him that

3   day?

4   A.  As far as I know, yes, sir.

5   Q.  Now, in that kind of I think -- in that reverse

6   chronological questioning form, okay, what happened before

7   that and what happened before that, you got to Togo, and he

8   told you that he had spent time there?

9   A.  Yes.

10  Q.  And the report says, "We played dumb and asked him about

11  the problems."  Do you recall that?

12  A.  Yes, sir.

13  Q.  When you say "We played dumb," what does that -- well,

14  what does that look like?

15  A.  Well, Agent Jones had said that the allegations were

16  made against him regarding the child exploitation that may

17  have occurred in Togo, so we didn't ask him any specific

18  questions regarding those allegations, we just asked him

19  about his activities in Togo, and that's what I meant by

20  playing dumb where I wasn't asking specific probing

21  questions.

22  Q.  But you -- you played dumb, hoping that he would talk

23  about it?

24  A.  I was just asking about his travel history.  I didn't

25  have any hope for anything in particular, sir.

1    Q.  Well, playing dumb sounds like an intentional decision.

2    Those are your words, right, "we played dumb"?

3    A.  Yes.

4    Q.  And that was a -- it was a decision that you made as the

5    point person in that interview to play dumb, in your words,

6    in questioning him about --

7    A.  Yes, sir.

8    Q.  -- his activities in Togo?

9    A.  Yes, sir.

10   Q.  Okay.  You said he got really -- or I think the report

11   says he got really embarrassed and wouldn't fully spit it

12   out.  Do you recall those words?

13   A.  Yes, sir.

14   Q.  And those are -- those are your words; that's your

15   description of how it happened?

16   A.  Yes.

17   Q.  How did he communicate his unwillingness to talk about

18   it?  What did he say?

19   A.  When we asked him what problems are you referring to, it

20   was just silence, sort of an awkward silence.  That's when

21   he began to hung his head -- or hang his head, excuse me,

22   and was blushing.  I think we waited for him to say

23   something, and he didn't, and then we asked him maybe one

24   more time what problems are you referring to, and he didn't

25   say anything, just a awkward silence, so that's what I was

1   referring to didn't spit it out, didn't actually say

2   anything.

3   Q.  So he just stopped talking?

4   A.  Yes, sir.

5   Q.  And you said you took a -- I think when the prosecution

6   was asking you questions, you tried a couple of times to get

7   him to answer the question?  You took --

8   A.  I might have asked twice.

9   Q.  -- another couple of runs at it?

10  A.  Probably twice we asked him.

11  Q.  Okay.  But he did not -- and in none of those attempts,

12  he didn't answer your questions?

13  A.  Correct.

14  Q.  At any time, at any point, right?

15  A.  Yes, sir.

16  Q.  You said that his phone was searched.  Was that by you

17  or by --

18  A.  By me.

19  Q.  Okay.  And as you were searching his phone, you found

20  some Facebook conversations about money?

21  A.  Yes, sir.

22  Q.  Did you find any conversations that had anything sexual

23  in it?

24  A.  No, sir.

25  Q.  In a case like this, based on the information that you

1    had about the nature of the allegations against Mr. Page, is

2    child pornography something you would have been on the

3    lookout for?

4    A.  I would have noted it for sure if I saw it, yes.

5    Q.  And you didn't see any?

6    A.  No, sir.

7    Q.  And up until coming into court to testify this

8    afternoon, that was the last -- the interview ended.  You

9    were done with the questioning?

10   A.  Yes.

11   Q.  He was allowed to enter the United States?

12   A.  Yes, sir.

13   Q.  And have you had any contact with Mr. Page since then?

14   A.  No.

15            MR. MOHRING:  I have nothing further, Your Honor.

16   Thank you.

17            MS. SERTICH:  Nothing further, Your Honor.

18            THE COURT:  Thank you, Agent Nagle.  You can be

19   excused.

20            THE WITNESS:  Thank you, Your Honor.

21            THE COURT:  We'll take a short break.  You have

22   one more witness.  Is that correct?

23            MS. SERTICH:  That's correct, Your Honor.

24            THE COURT:  Very good.  Thank you.  Take

25   15 minutes.

1     (Recess taken from 2:58 p.m. until 3:18 p.m.)

2          MS. SERTICH:  The government calls Task Force

3     Officer Cameron Smith.

4          THE COURT:  Good afternoon, Officer Smith.

5          (The witness is sworn.)

6          THE COURT:  Thank you.  Please be seated.

7          THE WITNESS:  Thank you.

8          THE COURT:  Make yourself comfortable.  Spell

9     your -- or state your name, spell your last name for the

10    record.

11         THE WITNESS:  Cameron Smith.  Last name is

12    S-M-I-T-H.

13         THE COURT:  Thank you.

14                    **DIRECT EXAMINATION**

15    BY MS. SERTICH:

16    Q.  Good afternoon, Task Force Officer Smith.  Where are you

17    employed?

18    A.  Clayton County Police Department in Clayton, Georgia.

19    Q.  And are you on a federal task force?

20    A.  I am.

21    Q.  What task force is that?

22    A.  Homeland Security Investigations.

23    Q.  And do you know that your -- you understand that you're

24    here today to testify about an encounter with Thomas Page

25    during a border crossing on September 29th, 2015?

1    A.  Yes, ma'am, I do.

2    Q.  And were you involved with that task force at that time

3    of the interview?

4    A.  Yes, ma'am, I was.

5    Q.  What were your primary duties as a member of that task

6    force?

7    A.  In the task force, general duties is a criminal

8    investigator, we mainly do narcotics trafficking and money

9    laundering cases.  We also do interviews and interrogations.

10   Q.  So how long have you been with the police department?

11   A.  A little -- the police department, a little over five

12   years.

13   Q.  And how about the task force?

14   A.  A little over one year.

15   Q.  Can you explain to the Court how Mr. Page first came to

16   your attention?

17   A.  I was contacted by Ms. Summer, Ms. Jones, in reference

18   to Mr. Page using Atlanta as a connection point to travel

19   out of the country.

20   Q.  And did you speak with her on the phone?

21   A.  I did.

22   Q.  What did she tell you about Mr. Page before you

23   interviewed him?

24   A.  She advised me that she was going to be taking out a

25   warrant for him on the day that he was going to be in

```
 1    Atlanta, and she asked that we make contact with him and

 2    detain him and conduct a interview with him when he -- when

 3    he got into Atlanta.

 4    Q.  Did she ask you to arrest him?

 5    A.  Yes.

 6    Q.  Based on what?

 7    A.  Based on her probable cause for charges.

 8    Q.  So is it your understanding that at some point that day

 9    she would be obtaining a complaint and accompanying arrest

10    warrant?

11    A.  Yes.

12    Q.  For Mr. Page?

13    A.  Yes, ma'am.

14    Q.  So what information did Special Agent Jones provide you

15    about Mr. Page?

16    A.  That he was going to be flying in and going to be flying

17    out of the country.  She was going to be obtaining arrest

18    warrants for him for I believe it was three counts of some

19    type of child exploitation act.

20    Q.  And did you know any of the underlying facts supporting

21    those what she said were three counts of child exploitation

22    charges?

23    A.  No, I didn't.

24    Q.  Can you explain how you first encountered Mr. Page?

25    A.  Mr. Page was sitting at his gate, waiting for I would
```

1   assume his plane either to arrive or for them to start

2   boarding his flight.

3   Q.  Had he come in from another location?

4   A.  He did.

5   Q.  On that same day?

6   A.  Yes, ma'am.

7   Q.  So you encountered him at the gate for his next outgoing

8   flight?

9   A.  That's correct.

10  Q.  And do you know where he was travelling to that day?

11  A.  I would have to look at the report again.  I don't

12  recall exactly which country he was flying to.  I think it

13  was --

14  Q.  You don't have to guess.  Was he going abroad from

15  Atlanta?

16  A.  He was leaving the country.

17  Q.  Okay.  And were you in uniform that day?

18  A.  No, I was not.

19  Q.  Okay.  When you first encountered him, did you arrest

20  him?

21  A.  No, we did not.

22  Q.  Okay.  Explain what happened when you first went up to

23  him.

24  A.  Myself and two other agents went to the gate where he

25  was supposed to be located, Task Force Officer Beverage and

1    then Agent Morison.  Task Force Officer Beverage stood off

2    to the side, just as an observer, and myself and Agent

3    Morison made contact with Mr. Page.

4    Q.  What did you say to him?

5    A.  We advised him that we would like to take him back to

6    the office and speak with him; we have some information

7    about an agent in Iowa that was needing -- needing him or

8    needing to speak with him.

9    Q.  Okay.  So did you change locations at that point?

10   A.  We did.

11   Q.  Where did you go?

12   A.  We went to our office at the airport.

13   Q.  How far was that from the gate?

14   A.  200 yards, less than 200 yards.

15   Q.  And where did you go once you got into your office?

16   A.  We have a small conference room inside our office.

17   Q.  Okay.  And did you all go in and sit down?

18   A.  We did.  Mr. Page sat on one side of the table.  Myself

19   and Task Force Officer Beverage sat on the other side of the

20   table.

21   Q.  So accurate to say Special Agent Morison was no longer

22   with you when you went into that room?

23   A.  That's correct.

24   Q.  Okay.  Between meeting Mr. Page at the gate and going

25   into this room in your office, did you ever place hands on

1    Mr. Page?

2    A.  No, we didn't.

3    Q.  And is the conference room in a secure area in the

4    airport?

5    A.  There is a access point, yes, ma'am.

6    Q.  Okay.  So do you have to swipe to get in there, swipe to

7    get out?

8    A.  Yes, ma'am.

9    Q.  Both?

10   A.  Yes, ma'am.

11   Q.  Okay.  Did you have any conversation with Mr. Page

12   between the gate and going into the conference room?

13   A.  I believe it would have been general conversation.

14   Myself, personally, I did not have any -- any conversations

15   with him from the point where we made contact and we began

16   walking to the office.

17   Q.  Okay.  Was your interview of Mr. Page recorded?

18   A.  It was.

19          MS. SERTICH:  May I approach, Your Honor?

20          THE COURT:  You may.

21   BY MS. SERTICH:

22   Q.  I've handed Officer Smith a CD labeled Government's

23   Exhibit 3.  Officer Smith, do you recognize that CD?

24   A.  I do.

25   Q.  What is it?

1    A.  It's a CD.  It's got the recorded interview with myself

2    and Mr. Page.

3    Q.  Okay.  And how do you know that that's what's on that

4    disc?

5    A.  It's got my initials and the date, and I listened to it

6    last night.

7              MS. SERTICH:  Okay.  The government offers

8    Exhibit 3.

9              MR. MOHRING:  Could I just ask, is the tape, is it

10    the entire tape or a selection of statements?

11             THE WITNESS:  It would be the entire --

12             MR. MOHRING:  The entire?

13             THE WITNESS:  It would be the entire interview,

14    yes.

15             MR. MOHRING:  Unedited?

16             THE WITNESS:  Yes.

17             MR. MOHRING:  No objection.

18             THE COURT:  Received.

19        (Government Exhibit No. 3 is received.)

20    BY MS. SERTICH:

21    Q.  So you said that it was just you and Task Force Officer

22    Beverage conducting the interview?

23    A.  Yes, ma'am.

24    Q.  Did you provide Mr. Page with a Miranda warning?

25    A.  We did.

1   Q.  I've also handed you a document labeled Government

2   Exhibit 4.  Do you recognize that document?

3   A.  Yes, ma'am, I do.

4   Q.  What is it?

5   A.  It's a Miranda statement form.

6   Q.  And is that the form that you used to Mirandize Mr. Page

7   on September 29th, 2015?

8   A.  It's a copy of it, yes, ma'am.

9   Q.  Is your signature on that document?

10  A.  Yes, ma'am, it is.

11  Q.  Where?

12  A.  It's the third line down under "witness."

13  Q.  Okay.  And is there another witness line underneath

14  that?

15  A.  That's correct.

16  Q.  Whose signature appears there?

17  A.  Agent Beverage.

18  Q.  Okay.  And did Mr. Page also sign that form?

19  A.  He did.

20        MS. SERTICH:  The government offers Exhibit 4.

21        MR. MOHRING:  No objection for present purposes,

22  Your Honor.

23        THE COURT:  It will be received.

24     (Government Exhibit No. 4 is received.)

25        ///

1    BY MS. SERTICH:

2    Q.   Is the reviewing and signing of that document that's

3    Government Exhibit 4 captured in the audio recording on the

4    CD labeled Government Exhibit 3?

5    A.   It is.

6    Q.   During your interview with Mr. Page, were you carrying a

7    weapon?

8    A.   Yes, ma'am.

9    Q.   Was it visible?

10   A.   No, ma'am.

11   Q.   Was Officer Beverage carrying a weapon?

12   A.   Yes, ma'am.

13   Q.   Was it visible?

14   A.   No, ma'am.

15   Q.   How would you describe the tone of the interview that

16   day?

17   A.   Calm, friendly, and inviting.

18   Q.   Okay.  At what point did you advise Mr. Page that he was

19   going to be under arrest that day?

20   A.   It was somewhere at -- I would say during the middle of

21   the interview.

22   Q.   Okay.  Is it reflected on the recording?

23   A.   It is.

24   Q.   Did you or Task Force Officer Beverage ever raise your

25   voices with Mr. Page before or after that recording?

1    A.  No, ma'am.

2    Q.  Did you or any of the other law enforcement agents use

3    profanity with Mr. Page, either before or after that

4    recording?

5    A.  No, ma'am.

6    Q.  Did you or anyone else make any promises to Mr. Page

7    before or after that recording?

8    A.  No, ma'am.

9    Q.  Did you or any other law enforcement officer threaten

10   Mr. Page before or after that recording?

11   A.  No, ma'am.

12   Q.  During the course of the interview, did you or anyone

13   else place hands on Mr. Page?

14   A.  No, ma'am.

15   Q.  Were there any kinds of physical interactions between

16   law enforcement and Mr. Page during the course of the

17   interview that you wouldn't know happened just by listening

18   to the audio recording?

19   A.  No, ma'am.

20   Q.  Was Mr. Page handcuffed at any time during the

21   interview?

22   A.  Not during the interview.

23   Q.  Approximately how long was the interview?

24   A.  Approximately 40 minutes.

25   Q.  And at any time during the interview did Mr. Page ask to

1    speak to an attorney?

2    A.  He had mentioned that he wasn't comfortable answering a

3    question without an attorney.

4    Q.  Okay.  And did you press him to answer that question?

5    A.  No, ma'am.

6    Q.  That answer?

7    A.  No, ma'am.

8    Q.  And is that interaction reflected on the recording?

9    A.  Yes, ma'am, it is.

10   Q.  Did he ever ask for an attorney before or after the

11   recording?

12   A.  No.  No, ma'am.

13   Q.  How did the interview end?

14   A.  We advised him that we were going to place him in the

15   holding cell while we were waiting on another call back from

16   Ms. Jones or Agent Jones and we would let him know what was

17   going to happen from there.

18   Q.  At that point was Mr. Page handcuffed?

19   A.  No.  No, ma'am.

20   Q.  Okay.

21   A.  He was walked back to the holding cell.  Actually went

22   to -- we walked into the restroom first, he asked to use the

23   restroom, and then we walked him into the holding cell.

24   Q.  And at that point was it clear to Mr. Page that he was

25   under arrest?

1    A.  Yes, ma'am.

2    Q.  You testified that this contains the full recording of

3    the interview, not various clips of the interview, correct?

4    A.  That's correct.

5    Q.  Was there a time at which the recording was momentarily

6    turned off?

7    A.  There was a time where the phone had -- the light had

8    turned off on the phone and I turned it back on and it was

9    paused.  We stopped talking and I pressed play.

10   Q.  Okay.  So was the recording restarted immediately?

11   A.  That's correct.

12   Q.  And nothing was -- of substance was said during that

13   short pause?

14   A.  Nothing was said during that -- nothing other than let

15   me fix this or we didn't question Mr. Page.

16   Q.  Okay.  And can you tell by listening to the recording

17   when that happens?

18   A.  No, ma'am, you can't.

19   Q.  Do you have a recollection about what point during the

20   interview when that happened?

21   A.  It would have been somewhere in the middle of the

22   interview.  I had checked my phone had just I would say it

23   timed out and it went black.

24   Q.  So you were recording the interview on your phone?

25   A.  Yes, ma'am.

1   Q.   Okay.  And is -- why did you record the interview?

2   A.   I wanted to have it for in case something like this

3   happened.

4   Q.   Okay.  Does any -- as part of the task force or as part

5   of the local police department, are there any rules

6   regarding recordings?

7   A.   For Atlanta, it's just investigator preference.

8   Q.   And why did you Mirandize Mr. Page?

9   A.   Because he was -- at the time he was detained, he was

10  going to be arrested, and we were going to question him.

11  Q.   Did Mr. Page have belongings with him when you met him

12  at the airplane?

13  A.   He did.

14  Q.   What ultimately happened to those?

15  A.   Those belongings were detained and sent to Ms. Jones.

16  Q.   Okay.  Were they searched at all by you or any of the

17  law enforcement officers in Atlanta?

18  A.   Prior to putting them -- after -- when we put him in the

19  holding cell and we separated him from his belongings, they

20  were searched and then put into a box to be sent to

21  Ms. Jones.

22  Q.   Okay.  Did you discover anything of relevance to the

23  investigation in the course of searching his belongings?

24  A.   He had a -- I believe he had a computer or a -- he had

25  some electronic devices that were separated and sent to

1    Ms. Jones as well.

2    Q.  Did you search those at all?

3    A.  No, we didn't.

4         MS. SERTICH:  No further questions, Your Honor.

5                      **CROSS-EXAMINATION**

6    BY MR. MOHRING:

7    Q.  Good afternoon, officer.

8    A.  Good afternoon, sir.

9    Q.  You've been testifying about an interaction with

10   Mr. Page that happened on September is it 29th of last year?

11   A.  Yes, sir.

12   Q.  And I received a series of Homeland Security reports

13   that describe his arrest and questioning.  Are those

14   documents that you've seen that you're familiar with?

15   A.  I've seen the report that I've typed.

16   Q.  Okay.  Let me show you the reports that I've received,

17   and let -- and if you would, just take a look at them and

18   tell me if the report you typed is in here.

19   A.  Yes, sir.  Yes, sir, it is.

20   Q.  Is it -- is it contained in here or is your actual

21   report one of these?

22   A.  My actual report is one of these, sir.

23   Q.  Okay.  Is it the one that begins with it says report No.

24   3, begins -- synopsis begins on September 28th, 2015: "This

25   report documents the interview that was conducted with

1    Thomas Robert Page"?

2    A.  Yes, sir.

3    Q.  So that is -- this is the report that you prepared?

4    A.  Yes, sir.

5    Q.  And that you -- have you reviewed this before

6    testifying?

7    A.  Yes, sir.

8    Q.  It looks like it's a five-page report?

9    A.  That's correct.

10   Q.  Not much on the fifth page but --

11   A.  What now, sir?

12   Q.  Not much on the fifth page, but five pages all total,

13   correct?

14   A.  Yes, sir.

15   Q.  Okay.  So is it fair to say that you're -- other than

16   preparing to testify today and reviewing that report, that

17   your involvement in this investigation began the day before

18   Mr. Page was arrested when you were contacted by HSI Special

19   Agent Jones?

20   A.  That's correct.

21   Q.  And that it ended on the day of his arrest after you

22   were done questioning him, or -- or have you been involved

23   in the investigation since then?

24   A.  I was contacted in reference to coming up here.

25   Q.  To testify?

1   A.   That's correct.

2   Q.   For purposes of this?

3   A.   Yes, sir.

4   Q.   Other than that, no other involvement in the

5   investigation?

6   A.   No, sir.

7   Q.   You weren't involved in any of the investigation that

8   led to the charges?

9   A.   No, sir.

10   Q.   And haven't done anything since the day of his arrest,

11   other than coming --

12   A.   Reviewing my report.

13   Q.   And coming up to Minnesota?

14   A.   Yes, sir.

15   Q.   To join us today?

16   A.   Yes, sir.

17   Q.   Okay.  So it began -- did it begin with a phone call

18   from Special Agent Jones the day before the arrest?

19   A.   From the best of my recollection, it did, on the 28th I

20   received a phone call from her.

21   Q.   Okay.  And she told you to be on the lookout for

22   Mr. Page; that he would be coming through the Atlanta

23   airport?

24   A.   She said that he was going to be flying into Atlanta the

25   next day.

1    Q.  Okay.  And as a task force officer for Homeland

2    Security, you were stationed at the airport that day?

3    A.  Yes, sir, I was.

4    Q.  Okay.  And is that -- is this a type of call that, as a

5    task force officer for Homeland Security, you get?

6    A.  Yes, sir.  As a duty agent, we receive all the calls

7    that come into the airport, regardless of what type of

8    investigation or case it is.

9    Q.  Okay.  So it can be a local investigation; it can be an

10   HSI investigation?

11   A.  It would have some type of HSI correlation.

12   Q.  Okay.  How long was your conversation with Special Agent

13   Jones the night before you arrested Mr. Page?

14   A.  I don't recall.

15   Q.  What information did she communicate to you about him?

16   A.  That she was going to be taking an arrest warrant out

17   for him the next day.

18   Q.  A complaint and a warrant?

19   A.  That's correct.

20   Q.  And so you were told to find him and detain him?

21   A.  That's correct.

22   Q.  And question him?

23   A.  That's correct.

24   Q.  What kind of outline did she give you of -- I think -- I

25   think your testimony was detain him, conduct an interview

1   and arrest him based on her probable cause.

2   A.  That's correct.

3   Q.  Did she describe her probable cause to you?

4   A.  She had mentioned that it was the child exploitation

5   cases.

6   Q.  So I think you said, at least based on your memory, that

7   there would be three charges, three counts of child -- some

8   type of child exploitation?

9   A.  That's correct.

10  Q.  Did she give you any details of that, who or where or

11  when?

12  A.  Not that I recall.  She may have.  But not that I

13  recall.

14  Q.  Okay.  At least as you testified today, she said she had

15  probable cause for three -- she believed she had probable

16  cause for three charges of child exploitation?

17  A.  Yes, sir.

18  Q.  And that based on that, she was telling you or asking

19  you to detain and arrest Mr. Page?

20  A.  Yes.

21  Q.  And based on not just her belief that she had probable

22  cause but her plan to submit a complaint and get a complaint

23  and --

24  A.  On the 29th, yes, sir.

25  Q.  Now, the complaint didn't -- the complaint and the

1    warrant were not signed at the point that you approached

2    Mr. Page and initially detained him, right?

3    A.  No, sir.

4    Q.  You got word that that had happened later?

5    A.  Yes, sir.

6    Q.  During or after the interview?

7    A.  After the interview.

8    Q.  Okay.  Now, having reviewed your report before

9    testifying, is it an accurate account of your activities the

10   day that you detained and questioned and arrested Mr. Page?

11   A.  Yes, sir.

12   Q.  Is it an accurate summary of the statements that he made

13   to you?

14   A.  It's fairly similar to the disc, the recording.

15   Q.  Did he say anything to you relating to the investigation

16   and these charges that Special Agent Jones discussed with

17   you that is not reflected in your report?

18   A.  Can you say that -- can you ask that one more time?

19   Q.  Any statements about this case that don't appear in your

20   report?

21   A.  No, sir.

22   Q.  Did the -- did all of your interaction with him about

23   the investigation and the charges happen while the tape

24   recorder was on?

25   A.  No.  The tape recorder didn't start until we placed him

1    into the room, into the conference room.

2    Q.  Okay.  Was there any questioning of him that happened

3    before you hit the record button on your phone?

4    A.  There -- it was general questions.  It was demographic

5    questions.  It wasn't anything -- I believe he was asking us

6    questions.  It was general talk.  I wouldn't say it was all

7    questions.

8    Q.  Did any of the general talk relate to the investigation

9    or the charges?

10   A.  To the effect that we were taking him back because the

11   HSI in Iowa and HSI in Minnesota had information about him

12   and we were going to be -- I don't think -- I don't recall

13   us telling him during that time that she was taking out a

14   warrant for him that day.

15   Q.  Okay.  So he was told that HSI had an investigation

16   based out of Iowa.  Was he told before you got into the

17   room, before you hit the record button, the nature of the

18   investigation or the nature of the charges?

19   A.  No.

20   Q.  Did he say anything about the investigation or the

21   charges before you got into the room before you hit the

22   record button?

23   A.  No, sir.

24   Q.  Did he say anything about the investigation and the

25   charges after you shut the recorder off?

1    A.  No, sir.

2    Q.  From the point that you -- you approached him, I think

3    you said was there another task force officer with you when

4    you first had contact with Mr. Page?

5    A.  He was with us.  He was acting as an observer.  He

6    wasn't actually physically with myself and Agent Morison.

7    Q.  How far away from you was he?

8    A.  Me to the door.  On the other side, at a different gate

9    he was watching us.

10   Q.  Okay.  But he knew what was going on?  He was clued in?

11   A.  He went up there with us, yes.

12   Q.  So there's an agent, a task force officer who is

13   observing but from a distance?

14   A.  That's correct.

15   Q.  There's you and another agent and Mr. Page.  Is that

16   when you first contact --

17   A.  The initial encounter was myself, Agent Morison and

18   Mr. Page.

19   Q.  Okay.  And you told him to come with you?

20   A.  I wouldn't -- I don't think those were my exact words.

21   Q.  Okay.  What did you tell him?  How did you get him to go

22   with you?

23   A.  We asked him if he would come back and speak with us.

24   Q.  In asking him if he would come back and speak with you,

25   was he free to say no?

1   A.   We would have told him he needed to come back and speak

2   with us.

3   Q.   So effectively his freedom is -- he was detained --

4   A.   He was being detained at that time, yes.

5   Q.   -- from the point of first contact, no ifs, ands or

6   buts?

7   A.   That's right.

8   Q.   How did you recognize him?

9   A.   We pulled his picture up on a passport database, I

10  believe.

11  Q.   Okay.

12  A.   From the best of my recollection.

13  Q.   That day, the 29th, the day of his arrest?

14  A.   I believe it would have been the 28th.

15  Q.   Okay.  So you brought him to a room in an office there

16  at the Hartsfield airport?

17  A.   That's correct.

18  Q.   You said it was, you know, less than 200 yards away?

19  A.   Approximately.  I didn't measure it.

20  Q.   And the office that you were at, it's a HSI office?

21  A.   Yes, sir.

22  Q.   And it was -- you said it was a small conference room

23  where the questioning happened?

24  A.   That's correct.  A table about that size, eight or nine

25  chairs around it.

1   Q.  Okay.  And he was -- so he was taken from the gate where

2   he was waiting for his flight to that -- directly to that

3   conference room?

4   A.  That's correct, yes, sir.

5   Q.  And as I understand from what you were saying about the

6   swiping, that, I mean, you need a card to get into the

7   conference room, you need a card to get out of the

8   conference room?

9   A.  Not the conference room, no, sir.

10  Q.  To the office itself?

11  A.  From the point when we made contact with him to the room

12  there's three access points.

13  Q.  Okay.  And each of those three access points you need to

14  use a card to get in?

15  A.  Two are card; one is a button.

16  Q.  Okay.  And he didn't have a card?

17  A.  He did not.

18  Q.  And the button is a -- one of the code things you need

19  to know the pass code to get through?

20  A.  That's correct.

21  Q.  And he didn't -- he -- to your knowledge, he didn't know

22  the password?

23  A.  He wouldn't be able to get through any of those doors.

24  Q.  All right.  Were the charges discussed before you

25  reviewed the Miranda form?

1    A.  No, sir.

2    Q.  The Miranda form, the discussion of Miranda rights, that

3    happens fairly early in the interrogation?

4    A.  I believe there was a moment where we started to do the

5    Miranda, he said he needed his glasses, and there was a

6    brief pause while I went to get his glasses.

7    Q.  All right.

8    A.  And then that's the first thing, the first bit of

9    conversation you hear.

10   Q.  Now, the prosecution asked you did he ever ask to speak

11   to an attorney, and you said no, he never did ask to speak

12   to an attorney?

13   A.  He never directly asked to speak to an attorney.

14   Q.  Did you ever ask him if he wanted to?

15   A.  We read him his Miranda.

16   Q.  Nothing -- just what's on paper?

17   A.  That's correct.

18   Q.  Nothing else as far as the right to counsel goes?

19   A.  He --

20   Q.  Actually that wasn't --

21   A.  Can you --

22   Q.  Let me re-ask the question.  Did you ask him anything

23   about his desire for a lawyer or the right to counsel other

24   than just reviewing the statements on the Miranda?

25   A.  We didn't ask him anything.

1     Q.  And the Miranda form that you use is a Homeland

2     Security?

3     A.  It's a standardized form.

4     Q.  ICE Miranda form, right?

5     A.  Yes, sir.

6     Q.  So not just a standardized form, it's --

7     A.  Standardized to HSI.

8     Q.  Thank you.  In preparing to testify, I think you said

9     you looked at your report.  Did you also say you've had a

10    chance to listen to the tape --

11    A.  I have.

12    Q.  -- in the last couple of days?

13    A.  Yes, sir.

14    Q.  So as -- he was asked to read the Miranda rights out

15    loud and if he understood to initial and a place for

16    initials --

17    A.  Yes.

18    Q.  -- on the form?

19    A.  Yes, sir.

20    Q.  And then I think he was asked, "Knowing and

21    understanding your rights, if you're willing to speak to us,

22    please print and sign your name" or words to that effect?

23    A.  Yes.

24    Q.  Does that sound right?  And he then said, "As long as I

25    can have an attorney, if I don't like the question, I can

1    ask for an attorney"?

2    A.   Something to the effect of if I was uncomfortable, then

3    I would like to have my attorney with me.

4    Q.   Okay.  And the answer was yes.

5    A.   The answer to what is this?

6    Q.   How did you respond when he said that?

7    A.   Yes, we told him if he didn't -- didn't like the

8    question, he didn't have to answer it.

9    Q.   The tape early on, after the Miranda rights -- well,

10   actually, let me ask you this.  So there in the room is you,

11   Mr. Page and there's another agent?

12   A.   Mr. Beverage.

13   Q.   Mr. Beverage.  Was it you who was doing most of the

14   questioning or was it kind of both -- did both of you

15   participate?

16   A.   Both of us participated.

17   Q.   After the Miranda rights are given, somebody says, "Like

18   I explained earlier, we know they wanted you and our job was

19   to pick you up."  Do you recall, was that you who said that?

20   A.   That's me speaking to him.

21   Q.   "Like I explained earlier."  What did you explain

22   earlier?

23   A.   That would be the general conversation we were talking

24   about when we first made contact with him.

25   Q.   That you had been asked to detain him by somebody in

1    Iowa?

2    A.   That we had been -- yes.  Yes, sir.

3    Q.   Okay.  During the questioning -- I think -- so after

4    Miranda and after talking about "like I explained earlier,"

5    there -- this question about his travel, his itinerary,

6    where he was going, what his plans were, right?

7    A.   Yes, sir.

8    Q.   He's asked and talks about his aunts and that he's going

9    to be meeting where he's going?

10   A.   Yes, sir.

11   Q.   There's a discussion about diving equipment.  You talked

12   about his plan to do some diving, so there's a conversation

13   about diving equipment and where you can get it and where is

14   it?  Do you recall --

15   A.   Are you asking me that, yes, I recall that.

16   Q.   And then the topic shifts to questioning about his

17   activities and troubles in Togo.  Do you recall that?

18   A.   Yes, sir.

19   Q.   And he told you that he was represented by a lawyer

20   then, right?

21   A.   Something to that effect.  I don't remember the exact

22   wording.

23   Q.   Okay.  And as far as representation, did you pursue

24   that?  Did you ask him questions about his lawyer and who

25   that person was?

1     A.  I think it was to the extent that he had mentioned that

2     he had hired a local lawyer at I believe it was Cameroon.

3     Q.  I want to ask you some questions.  There was several

4     points, were there not, in the questioning where he told you

5     he didn't want to answer questions?

6          MS. SERTICH:  Your Honor, I'm just going to object

7     as a matter of course that all of this is reflected in the

8     Government's Exhibit 3.

9          THE COURT:  It is.  But Mr. Mohring can -- is

10    entitled to inquire and explore the witness's memory.  You

11    may proceed.

12    BY MR. MOHRING:

13    Q.  By my notes, roughly 26 minutes and 16 seconds in, he

14    says, "I'm not too wild about answering those questions."

15    Do you recall that?

16    A.  I recall the time where he had mentioned something like

17    that, yes, sir.

18    Q.  And the questions that he was talking about were

19    questions that had to do with illegal sexual activity with

20    minors in Togo, correct?

21    A.  It may -- that was what the question revolved around,

22    yes.

23    Q.  And he told you, "I'm not too wild about answering those

24    questions."  And was it you or Agent Beverage, do I have the

25    name right?

1    A.   That's correct.

2    Q.   Who said, "Why do you not want to answer those

3    questions?  We're just trying to clear up.  I don't want you

4    to be accused of something that is as serious as this if

5    you're not doing anything wrong."  Was that you?

6    A.   No, that was not.

7    Q.   That was Agent Beverage?

8    A.   That's correct.

9    Q.   "All I care about is that if you need help, you get

10   help."  Did you say that or was that Agent Beverage?

11   A.   That was Mr. Beverage.

12   Q.   And those were things that were said to Mr. Page after

13   he said, "I'm not too wild about answering those questions,"

14   right?

15   A.   That is.  It's on the recording.

16   Q.   28 minutes, 30 seconds, by my note, he says, "I'm just

17   not comfortable asking those particular questions.  I don't

18   want to dig myself into a hole I can't get back out of."  Do

19   you recall him saying words to that effect?

20   A.   I do.

21             THE COURT:  Did you mean answering the questions?

22             MR. MOHRING:  I'm sorry?

23             THE COURT:  Did you mean answering the questions?

24             MR. MOHRING:  Yep.

25             THE COURT:  I think you said asking the questions.

1        MR. MOHRING:  I'm sorry, just answering those

2    questions, thank you, Your Honor.

3    BY MR. MOHRING:

4    Q.  "I don't want to dig myself into a hole I can't get back

5    out of."  Somebody, is it you or Agent Beverage, says, "I

6    understand.  Honestly, I don't think you would be digging

7    yourself into a hole if you told us that you have a

8    problem."  Was that you?

9    A.  No, sir, it wasn't.

10   Q.  Do you recall those words or words to those effect being

11   said?

12   A.  Something similar to that effect, yes, sir.

13   Q.  By Agent Beverage.  Yes?

14   A.  Yes, sir.

15   Q.  Towards the end, then, well, 31 minutes by my note, "I

16   don't want to answer those questions, like I said before."

17   Do you remember him saying that?

18   A.  That's correct.  But during that time, I should note

19   that there weren't any -- I don't recall there being any

20   direct questioning about that particular incidence.

21   Q.  He's asked, "Why do you not want to answer the

22   questions?"  That's a question, right?

23   A.  I'm --

24   Q.  He's then -- he then -- "I don't want to answer those

25   questions, like I said before.  It's going to lead to

1    something else farther down the line."

2            He was then asked a question, "What do you think

3    it's going to lead to," a question, right?  Was that you who

4    asked that question?

5    A.  I believe that would have been Mr. Beverage.

6    Q.  All right.  And that, by my notes, that happened at

7    31 minutes.

8            The questioning continued until you said about

9    40 minutes, 38 and a half, something like that?

10   A.  Somewhere close to that, yes, sir.

11   Q.  He was asked in those last minutes if people were -- if

12   people interviewed people at the schools that he had been

13   at, would -- did he think anyone else would make an

14   accusation?  He was -- you recall questioning --

15   A.  Yes.  Yes.

16   Q.  -- along that line?  In terms of custody, I mean, you're

17   clear, he was in custody from the point that you --

18   A.  He was going to be arrested.  He was detained at that

19   point while we were waiting on her to get the complaint.

20   Q.  Last question I have, and I meant to ask this, and I

21   apologize.  In the instructions that you got or in the

22   conversation that you had with Special Agent Jones the day

23   before all of this, what did she ask you to -- what kind of

24   guidance did you get for the interview and the areas that

25   she wanted you to try to cover?

1    A.  I don't believe there was a specific outline.  I don't

2    recall there being a specific outline of questioning.

3    Q.  Were you -- did she ask that you question him about his

4    travel and his itinerary?

5    A.  Like I said, I don't believe there was a specific

6    outline.

7    Q.  Did she ask you to question him --

8    A.  I don't recall what she asked me to ask him.

9    Q.  Okay.  Let me ask you this question.  Did she ask you or

10   suggest to you that she would like you to ask him questions

11   about the charges or illegal sexual activity with minors in

12   Africa?

13   A.  I don't recall her asking that, and I don't believe she

14   did.

15   Q.  You went there on your own?

16   A.  Went where on my own?

17   Q.  To question him about those topics?

18   A.  That -- yes, it's on the interview, yes, sir, the -- the

19   questioning led to that.

20           MR. MOHRING:  Okay.  Nothing further, Your Honor.

21           THE WITNESS:  Do you want this back, sir?

22           MS. SERTICH:  Nothing further, Your Honor.

23           THE COURT:  Thank you.  You may be excused.  Thank

24   you, sir.

25           THE WITNESS:  Thank you, sir.

1        MS. SERTICH:  Your Honor, should I tender Exhibits

2    3 and 4 to the Court?

3        THE COURT:  Please.

4        Are there any further witnesses from the

5    government?

6        MS. SERTICH:  No, Your Honor.

7        THE COURT:  Does the defense intend to call any

8    witnesses?

9        MR. MOHRING:  Not at this point, Your Honor.  As

10    the Court knows, there are some reports that have been

11    discussed.

12        THE COURT:  Yes.

13        MR. MOHRING:  That I think we're entitled to.

14    Subject to review of those, the defense rests.

15        THE COURT:  Right.  Okay.  So let's do a little

16    clean-up.  The defendants did make a motion for rough draft

17    notes in front of Judge Keyes, I believe, when Mr. Page was

18    initially arraigned or made his initial appearance, and

19    Judge Keyes ordered those notes to be produced.

20        MR. MOHRING:  No, Your Honor.  That was just a

21    motion directing for an order that they be preserved.

22        THE COURT:  They be preserved.  I'm sorry.

23    Correct.  Okay.

24        So let's do this.  What do you want to tell me

25    about the non-dispositive motions, if anything?

1          MS. SERTICH:  You can go first on your motions.

2          MR. MOHRING:  Okay.  Your Honor, we did file Brady

3    motions.  I have nothing to say on the record for that.

4          We filed a motion seeking access to any

5    16(a)(1)(G) expert disclosures.

6          THE COURT:  Yep.

7          MR. MOHRING:  And a request that the Court set a

8    deadline in the very near future for the disclosure of

9    those.  I would think that a yes or no decision we

10   contemplate expert testimony or not would be possible even

11   before identifying who those folks are.

12         The government in their response suggests 14 days.

13   I would ask that the Court set a deadline 28 days before

14   trial.

15         I can tell you that we would be seeking an

16   extension of the existing trial date because of the briefing

17   that we anticipate but also because it's a challenging

18   matter to investigate a case in West Africa but --

19         THE COURT:  The Court may well order a continuance

20   sua sponte so I would --

21         MR. MOHRING:  But for the -- the prosecution has

22   suggested that 14 days is enough, that's enough to prepare

23   cross.  It's not just about preparing cross, but we need to

24   contemplate a battle of experts if there's going to be one.

25   I would ask that the Court set a deadline of 28 days before

1    trial for any 16(a)(1)(G) expert disclosures.

2          MS. SERTICH:  I have no objection to that

3    suggestion.

4          THE COURT:  Okay.

5          MS. SERTICH:  And I have no problem saying right

6    now that the government does anticipate expert testimony.

7          MR. MOHRING:  There's a motion for electronic

8    surveillance and disclosure, the results of any electronic

9    surveillance.  The prosecution has said that there is none.

10   I have no basis to dispute that.  I take them on their word.

11         The same is true for access to any informant

12   information.  We've sought disclosure of any informant

13   information.  The prosecution has said that there is none.

14         We filed a motion seeking access to any 404

15   evidence and a notice of any 404 evidence that they intend

16   to produce.  There too I would ask that the Court set a

17   deadline in the very near future for that notice.

18         MS. SERTICH:  Are you moving on, or should I

19   address that one?

20         MR. MOHRING:  I was about to, yes.

21         MS. SERTICH:  Okay.  So with respect to the 404

22   evidence, the government will continue to request a

23   disclosure deadline of 14 days before trial.  As Mr. Mohring

24   indicated, there are challenges to getting materials on a

25   case out of West Africa, and there are some materials that

1     are not available to the government until there's an

2     indictment in hand.  As I say in my response, we would

3     disclose materials that we receive as soon as practicable,

4     give defense counsel notice as soon as possible of our

5     intent to use any such disclosures.

6              THE COURT:  Okay.

7              MR. MOHRING:  On that, Your Honor, I would ask

8     that, again, that the Court consider a deadline in the very

9     near future.  If they find stuff after the deadline that

10    they reasonably weren't able to find before the deadline,

11    then there's a good cause, but setting a deadline in the

12    near future allows us to know what the universe is and

13    properly litigate motions in limine.  The indictment that

14    they say they needed they've had since October so.

15             THE COURT:  The difficulty in litigating a case

16    that involves travel to Africa goes both ways, Mr. Mohring.

17    What's good for the goose is good for the gander, and the

18    Court will take that into account when it issues its order.

19             MR. MOHRING:  Your Honor, as the additional

20    discovery motions that I want to make are motions that are

21    based on the testimony that we've heard.

22             THE COURT:  Yep.

23             MR. MOHRING:  So in terms of what's been filed on

24    paper, that's all I have.

25             THE COURT:  Okay.  Great.  Ms. Sertich, do you

1    have anything you want to add?

2            MS. SERTICH:  I do not.

3            MR. MOHRING:  I can tell -- I probably should have

4    said too, the government filed a discovery motion.  We don't

5    object.  We understand our obligations.  It's -- what

6    they're asking for is all in the rules.

7            THE COURT:  Okay.  So let's talk a little bit

8    about, first, when the transcript can be available and

9    that's not in my control.  Madam court reporter.

10       (The Court conferred with the court reporter.)

11           THE COURT:  All right.  So the transcript will be

12   available in two weeks.  What do you propose by way of

13   briefing after the transcript is available?  Because you

14   both know that I usually sort of let you do your own thing

15   in that regard, so tell me what you want, and I'll try to

16   accommodate you.

17           MR. MOHRING:  If we can have two weeks with the

18   transcript, that would be great, Your Honor.

19           MS. SERTICH:  Same with the government.

20           THE COURT:  Mr. Mohring, so you're going to open

21   and they will respond in two weeks.  Does anyone want any

22   reply at all or do you think --

23           MR. MOHRING:  If there is a reply, we won't need

24   more than a couple of days to generate that.

25           THE COURT:  Right.  So why don't we just leave

1    that for a moment, and if you do make a request for a reply,

2    then you know that I'm inclined to almost always say "give

3    me more," and I'll take it.

4         So we're six weeks out then.  And let me remind

5    you that you -- anything that you don't raise in your

6    post-hearing briefing I'm not going to address.  So

7    you've -- you have to address the issues that you identify

8    in your supplemental briefing, okay?

9         MR. MOHRING:  Understood.

10        THE COURT:  In addition, and as we've already

11   alluded to, it is highly likely, based on the briefing

12   schedule and everything else, that the trial schedule for

13   April 4th in front of Judge Frank is going to get continued.

14        MS. SERTICH:  I can also represent to the Court

15   that I have a trial date certain on another case in front of

16   Judge Frank that day so.

17        THE COURT:  It's kind of a conflict going on

18   there, isn't there?

19        Okay.  I will -- I think I'm going to shop my

20   affidavit around to a colleague and ask them if

21   they'll -- you just want a four corners on it, so do

22   you -- you don't need any briefing on this, do you?

23        MR. MOHRING:  No, Your Honor.  Thank you.

24        THE COURT:  Okay.  So you can -- you'll find out

25   who is going to do it, I guess, or I'll let you know.

1          (The Court conferred with the clerk.)

2               THE COURT:  Do you still want to make any more

3     oral motions, Mr. Mohring?

4               MR. MOHRING:  Yes, Your Honor, I do, and I'll

5     follow these up with written motions, but just to make sure

6     we're on the same page since we're all together yet.

7               THE COURT:  Okay.

8               MR. MOHRING:  Your Honor, we've heard about two

9     different -- testimony about two different type of witness

10    statements, handwritten notes from Officer -- or Agents

11    Lafaurie and McKinney.  Lafaurie was the gentlemen who

12    testified from Washington.  McKinney was the individual

13    whose notes formed, played a quintessential role in Special

14    Jones' report and her preparation for her testimony.  And

15    then we've heard about testimony about more formal reports,

16    statements from testifying witnesses.  Officer Fuentes had a

17    report, Agent Nagle, and I guess we can't -- TFO, field

18    officer, Task Force Officer Smith testified that we have his

19    report, so two more formal reports, an e-mail report from

20    Agent Nagle and a report from Officer Fuentes.

21               I'll be filing a motion for access to all of

22    those, the handwritten notes, because of the essential roles

23    they played in testimony and because they're statements of

24    witnesses and the more formal written reports which are all

25    statements of the testifying witnesses.

1          THE COURT:  You want to decorate your conference

2     room wall with those statements?

3          MR. MOHRING:  I want to see what they say.

4          THE COURT:  I know you do.

5          MR. MOHRING:  And I think we're entitled to them.

6     The notes of Special Agent McKinney, while they are not the

7     notes or a statement of the testifying witness, it's clear

8     they played an essential role in her report and her

9     testimony.  And her memory of things -- the things that

10    happened wasn't -- she didn't remember a lot of stuff, so

11    that ought to factor into the analysis.  Anyway, I'll submit

12    those in writing, but that's the additional discovery, based

13    on the testimony, that I'll be asking for.

14         THE COURT:  And I'm sure the government is going

15    to object to all of that?

16         MR. MOHRING:  I don't doubt it.

17         MS. SERTICH:  I will respond in writing, Your

18    Honor.

19         MR. MOHRING:  I think the reports, the written

20    reports of the agents, the guys' e-mail and the report that

21    the other -- that Officer Fuentes wrote, those are reports

22    that are statements.  I can't imagine an objection to that.

23         MS. SERTICH:  All I would say about those, Your

24    Honor, is that, as is indicated in the reports in

25    Mr. Mohring's possession, those are just recounted in the

1   reports that he has.

2           THE COURT:  And you know what, you might be right.

3   I think that the defendants are entitled to double check

4   that.

5           MS. SERTICH:  Okay.

6           THE COURT:  Given what the issues are at stake

7   here.

8           MS. SERTICH:  Okay.

9           THE COURT:  That makes the most sense to me.

10  Okay.  Anything else?

11          MR. MOHRING:  In terms of motions yet to come,

12  that's all I have, Your Honor.

13          THE COURT:  Okay.

14          MS. SERTICH:  I just wanted to make a couple of

15  points.  There were some additional nonstandard motions.

16  With respect to the motion to suppress statements, the

17  government didn't put any evidence on today about statements

18  made to foreign law enforcement officers.

19          THE COURT:  Mm-hmm.

20          MS. SERTICH:  What I represented to Mr. Mohring is

21  that at this point we don't plan on using those statements.

22  If that changed, I would notify him immediately.

23          THE COURT:  So why don't we -- let's handle that

24  motion this way.  Let's just dismiss that motion without

25  prejudice, so at a certain point if you notify the

```
 1    defendants that you're going to use statements from foreign

 2    law enforcement officers, then they'll be entitled to make,

 3    renew their motion, and preserve those rights.  Does that

 4    make sense?

 5              MR. MOHRING:  It does.

 6              MS. SERTICH:  Yes, Your Honor.

 7              THE COURT:  Okay.

 8              MS. SERTICH:  And then with respect to the motion

 9    to dismiss the indictment, as noted in my response, given

10    that the filing of the memorandum was at the same time that

11    my response was due, I would just request time for

12    additional briefing on that point as well.

13              THE COURT:  Okay.  So and that's fine, because I

14    suspect that the defendants are going to be briefing that

15    particular issue in their brief.

16              So the only other thing that I think we need to

17    address is, Ms. Sertich, you said in your response to the

18    motion to suppress the evidence as a result of the search

19    and seizure of the search warrant that you anticipated

20    requesting additional time for post-hearing briefing

21    following the hearing with respect to that.  Is that --

22              MS. SERTICH:  That was only if --

23              THE COURT:  If they were --

24              MS. SERTICH:  If they were going to make further

25    argument --
```

1              THE COURT:  And they're not, so it's just a

2       straight up four corners?

3              MS. SERTICH:  Correct, Your Honor.

4              THE COURT:  And I'll walk the hallways with a

5       sandwich sign asking someone to take it from me, okay.

6       Anything else?

7              MS. SERTICH:  I don't think so, Your Honor.

8              MR. MOHRING:  I don't think so.  I -- just for the

9       record, as indicated in the discovery declaration that I

10      filed on the pre-trial motions, the prosecution has

11      indicated that they don't intend to use the results of the

12      searches of his residences in Africa, the searches of his

13      property at the borders, and so based on that, no motion to

14      suppress --

15             MS. SERTICH:  I have to make a correction there.

16      There -- we do not intend on using any of the evidence

17      gathered during the execution of the search warrant at his

18      house.  We may use evidence gathered during the border

19      crossings.

20             MR. MOHRING:  Okay.

21             THE COURT:  Okay.

22             MR. MOHRING:  Understood.

23             THE COURT:  All right.  And I think that that's

24      going to be the subject of some briefing anyway, or at least

25      I anticipated it based on the questioning here.

1   (The Court conferred with the clerk.)

2    THE COURT:  You are going to do supplemental

3 briefing on the oral motions, correct?

4    MR. MOHRING:  Yes.  Yeah, I'll put it all in

5 writing.  The discovery motions, they'll all be in writing.

6    THE COURT:  Okay.  Anything else?

7    MS. SERTICH:  No, Your Honor.

8    MR. MOHRING:  Not for this afternoon.

9    THE COURT:  All right.  Thank you all.  Thanks for

10 getting through it so quickly.

11    MR. MOHRING:  Thank you.

12    THE COURT:  Appreciate it.

13    MS. SERTICH:  Thank you.

14    THE COURT:  I anticipate, then, that it will be

15 under advisement six weeks from today.

16   (Proceedings concluded at 4:09 p.m.)

17        *   *   *

18

19

20

21

22

23

24

25

1                          **I N D E X**

2       GOVERNMENT WITNESSES:                                    PAGE

3           Special Agent Summer Jones
                Direct Examination by Ms. Sertich          5
4               Cross-Examination by Ms. Atwal             40
                Redirect Examination by Ms. Sertich        70
5               Recross Examination by Ms. Atwal           79
                Redirect Examination by Ms. Sertich        83
6
            Philip Folkemer
7               Direct Examination by Ms. Sertich          85
                Cross-Examination by Ms. Atwal             104
8               Redirect Examination by Ms. Sertich        113
                Recross-Examination by Ms. Atwal           116
9               Redirect Examination by Ms. Sertich        117

10          Special Agent Sean Lafaurie
                Direct Examination by Ms. Sertich          120
11              Cross-Examination by Mr. Morhing           134
                Redirect Examination by Ms. Sertich        162
12
            CBP Officer George Fuentes
13              Direct Examination by Ms. Sertich          163
                Cross-Examination by Mr. Mohring           170
14
            Special Agent Michael Nagle
15              Direct Examination by Ms. Sertich          179
                Cross-Examination by Mr. Mohring           189
16
            Task Force Officer Cameron Smith
17              Direct Examination by Ms. Sertich          199
                Cross-Examination by Mr. Mohring           212
18

19      GOVERNMENT EXHIBITS:                                    REC'D

20      1                                                        4
        2                                                        15
21      3                                                        205
        4                                                        206
22
        DEFENSE EXHIBITS:
23
        1                                                        49
24

25

1                    **C E R T I F I C A T E**

2          I, Staci A. Heichert, certify that the foregoing is

3     a correct transcript from the record of proceedings in the

4     above-entitled matter.

5

6                    Certified by:   *s/ Staci A. Heichert*

7                                    Staci A. Heichert,
                                     RDR, CRR, CBC, CCP
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25